**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | <u>**COMPLAINT**</u> |
| Plaintiff, | **24 Civ. 4987** |
| -against- | **ECF Case** |
| **SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, KATHLEEN FRAHER, and ANTONIO MARTINO,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff U.S. Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Silvergate Capital Corporation ("SCC"), its former Chief Executive Officer ("CEO") Alan J. Lane ("Lane"), former Chief Operating Officer ("COO") Kathleen Fraher ("Fraher"), and former Chief Financial Officer ("CFO") Antonio Martino ("Martino") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. From November 2022 through January 2023, Defendants made false or misleading statements and material omissions to, and engaged in other conduct that misled, the public and SCC investors regarding the effectiveness of Silvergate Bank's ("Silvergate" or "the Bank") Bank Secrecy Act ("BSA")/Anti-Money Laundering ("AML") compliance program and its financial soundness.

2. SCC, Lane, and Fraher misrepresented the operational and legal risks facing the Bank by falsely stating in SEC filings and other public statements that the Bank had an effective BSA/AML compliance program tailored to the heightened risks posed by its crypto asset customers; and that it had conducted extensive due diligence and transaction monitoring related to those customers, including one of its now most notorious customers, FTX (the crypto asset trading platform that

imploded in November 2022), and FTX's related entities.

3. In fact, contrary to these statements, the Bank's BSA/AML compliance program was inadequate. For most of 2021 and 2022, the Bank had not conducted appropriate automated monitoring of its preeminent product, the "Silvergate Exchange Network" (the "SEN"). The SEN was a key mechanism for the Bank's crypto asset customers to transfer funds amongst themselves and was tailormade to attract crypto asset customers. But the Bank failed to adequately or automatically monitor for suspicious activity approximately $1 trillion in banking transactions that occurred on the SEN. The Bank also failed to detect nearly $9 billion in suspicious transfers by FTX and its related entities.

4. With evidence of these failures available to them, SCC and Lane nevertheless issued misleading statements to the investing public that the Bank's BSA/AML compliance program was adequate. SCC and Lane also included similar misstatements about the Bank's compliance in response to a letter from sitting U.S. Senators seeking explanations for the Bank's failure to detect the FTX transfers.

5. After FTX's failure caused panic in the crypto asset industry—and a bank run and severe liquidity crisis for the Bank—Defendant Martino engaged in a fraudulent scheme to mislead investors about the Bank's dire financial condition. As CFO, Martino knew that the Bank had borrowed billions of dollars in 2022, which was scheduled to mature in January and February 2023, and he knew that the Bank's only viable source of funding to repay that debt would be to sell billions in securities in the First Quarter of 2023. But Martino fraudulently approved a January 17, 2023 SCC earnings release that falsely stated the Bank expected to sell only $1.7 billion in securities during the First Quarter of 2023, of which it had already sold $1.5 billion. As Martino knew or recklessly disregarded, these statements falsely implied that the Bank expected to sell only $200 million more in securities over the rest of the First Quarter, when he knew or recklessly disregarded that the Bank was

more likely than not to be required to sell far more than that. In the ensuing weeks, the Bank in fact was required to sell an additional $1 billion in securities. The earnings release Martino approved also falsely reported the Bank's method of calculating the false $1.7 billion sales number; understated the Bank's losses from its expected securities sales; and overstated a key leverage metric for SCC and the Bank. As part of his fraudulent scheme to deceive investors, Martino also made false or misleading statements on SCC's January 17, 2023 earnings call. He further falsified the Bank's financial statements and failed to devise and maintain important accounting controls.

6.      Ultimately—facing a potential enforcement action by bank regulators for the Bank's ineffective BSA/AML compliance program, high costs to remediate that program, and its auditor's demand that the Bank correct its financial statements concerning losses from expected securities sales—SCC announced on March 8, 2023 that it would liquidate and cease operations of the Bank.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, Defendant SCC has violated Section 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2) and (3)], Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

8.      By virtue of the foregoing conduct and as alleged further herein, Lane violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

9.      By virtue of the foregoing conduct and as alleged further herein, Fraher violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

10.      By virtue of the foregoing conduct and as alleged further herein, Martino violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-

5 and 240.13b2-1]; and aided and abetted (i) SCC's and Silvergate's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], (ii) SCC's and Silvergate's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5], (iii) SCC's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-11], and (iv) SCC's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

11.     Unless Defendants are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

13.     The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (c) prohibiting Martino from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (d) prohibiting Lane and Fraher from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5)]; and (e) ordering any other and

further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

15.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that, from November 2022 through March 2023 (the "Relevant Period"), SCC stock was listed, and actively traded, on the New York Stock Exchange ("NYSE"), and many purchasers and holders of SCC common stock resided within this District.

## DEFENDANTS

17.     SCC is a Maryland corporation founded in February of 2000 and is the public holding company for its wholly-owned subsidiary, Silvergate. SCC has a principal place of business in La Jolla, California. SCC filed with the SEC a Form S-1 registration statement dated October 28, 2019 (the "Form S-1") that became effective, and in November 2019, SCC listed its common stock—registered with the SEC pursuant to Section 12(b) of the Exchange Act and traded under the symbol "SI"—on the NYSE.

18.     Alan J. Lane, age 62, resides in California. Lane joined Silvergate in 2008 and served as SCC's and Silvergate's CEO until his departure on August 15, 2023.

19.     Kathleen Fraher, age 45, resides in California. Fraher joined Silvergate in 2006. Among other roles, from approximately 2006 to 2013, she served as Silvergate's BSA Compliance

Officer ("BSA Officer"). From approximately December 2018 to November 7, 2022, she served as SCC's and Silvergate's COO. From November 7, 2022 through March 2023, she served as Chief Risk Officer ("CRO") of both entities. Since March 2023, Fraher has served as the Chief Transition Officer overseeing the wind-down and liquidation of Silvergate.

20. Antonio Martino, age 56, is a Canadian citizen residing in California. Martino joined Silvergate in October 2019 as SCC's and Silvergate's CFO, until his departure in September 2023. Martino is a Chartered Professional Accountant licensed in Ontario, Canada.

## FACTS

### I. BACKGROUND REGARDING SILVERGATE'S BSA/AML COMPLIANCE PROGRAM.

#### A. The Silvergate Exchange Network.

21. Until 2013, Silvergate was a small private commercial bank focused on real estate lending.

22. In 2013—after Lane learned that crypto asset companies were struggling to find banking relationships because the industry viewed them as high-risk customers—Lane and Silvergate embarked on efforts to attract crypto asset companies to deposit their fiat currency in the Bank.

23. Foremost among the Bank's efforts to attract crypto asset companies was its 2017 launch of the SEN.

24. In its Form S-1, filed with the SEC in connection with SCC's initial public offering of securities, SCC described the SEN as "a network of digital currency exchanges and digital currency investors that enables the efficient movement of U.S. dollars between SEN participants 24 hours a day, 7 days a week, 365 days a year."

25. In other words, the SEN allowed Silvergate customers to make real-time, near instantaneous transfers of U.S. dollars from their Silvergate SEN account to any other account they had at the Bank, or to the SEN account of another unrelated SEN participant.

26.     The SEN thus allowed Silvergate's depositors—which were primarily crypto asset platforms and investors—effecting crypto asset transactions on other venues (*e.g.*, crypto asset trading platforms) to complete U.S. dollar transfers associated with those transactions.

27.     According to SCC, the SEN became critical for crypto asset trading platforms and investors because it enabled the "virtually instantaneous" movement of U.S. dollars between major crypto-trading entities outside of normal banking hours—facilitating the global crypto asset trading that occurs constantly, with no regular market hours.

28.     In addition, SCC touted that the enhanced execution speed of SEN transactions significantly mitigated market participants' exposure to crypto asset pricing fluctuations.

29.     The SEN thus enabled Silvergate to attract as customers many of the crypto asset industry's largest market participants, including some of the largest crypto asset trading platforms and global investors in the crypto asset industry.

30.     Indeed, the Bank developed the SEN as a result of conversations that Silvergate representatives had with its early crypto industry customers, including regarding how legacy banking could be altered to serve the needs of their industry.

31.     By 2021, the majority of Silvergate's customers were crypto asset companies, with 58 percent of its total deposits coming from crypto asset trading platforms.

32.     From 2017 to 2021, crypto asset customer deposits at Silvergate skyrocketed, growing exponentially from approximately $770 million to approximately $14.1 billion.

33.     In 2021 alone, $787.4 billion in U.S. dollar transfers occurred on the SEN.

34.     Recognizing the risk posed by its concentration in banking the crypto asset industry—and by allowing near instantaneous transfers of large sums of U.S. dollars between unrelated crypto asset entities—Silvergate claimed in its Form S-1 to have "proprietary compliance capabilities" constituting "policies, procedures and controls designed to specifically address the digital currency

industry," which served as a "distinct competitive advantage" for the Bank.

**B. Transaction Monitoring of the SEN.**

35.     The Currency and Foreign Transactions Reporting Act, commonly known as the "BSA," enacted in 1970, established requirements for record-keeping and reporting by banks and other financial institutions.  31 U.S.C. § 5311 *et seq.*

36.     The BSA is designed, among other things, to enable U.S. law enforcement and regulatory agencies to investigate potential criminal, tax, and regulatory violations (including money laundering and other financial crimes), by requiring individuals, banks, and other financial institutions to: file currency reports with the U.S. Department of Treasury; identify persons conducting transactions in currency and other monetary instruments; and maintain appropriate records of financial transactions.

37.     The Money Laundering Control Act of 1986 required banks to establish and maintain procedures reasonably designed to ensure and monitor their compliance with the BSA.  12 U.S.C § 1818(s).

38.     Since 1996, banks have been required to file a Suspicious Activity Report ("SAR") whenever they "detect[] a known or suspected violation of Federal Law, or a suspicious transaction related to a money laundering activity or a violation of the [BSA]."  12 C.F.R. § 208.62.

39.     The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") required financial institutions to establish AML programs, including, at a minimum: "(A) the development of internal policies, procedures, and controls [to assure ongoing compliance with the BSA]; (B) the designation of a [BSA] compliance officer; (C) an ongoing employee [BSA] training program; and (D) an independent audit function to test [the BSA compliance] program."  31 U.S.C. § 5318(h)(1); *see also* 12 C.F.R. § 208.63.

40. In addition, a financial institution's BSA compliance program must include a customer identification program, as well as procedures for conducting ongoing customer due diligence and complying with beneficial ownership requirements for legal entity customers. 31 C.F.R. §§ 1020.210 and 1020.220.

41. The Board of Governors of the Federal Reserve System (the "Federal Reserve") is a government agency whose work includes ensuring that the banks under its supervision comply with the BSA, including by evaluating a bank's BSA compliance program. 12 U.S.C. § 1818(s).

42. The Federal Reserve's supervisory processes assess whether banks have established the appropriate policies, procedures, and processes *commensurate* with their individual BSA/AML risk to identify and report suspicious activity; and that they provide sufficient detail in their reports to law enforcement agencies to ensure that the reports are useful for investigating reported suspicious transactions.

43. In general, a bank's BSA compliance program must be tailored to the bank's size, complexity, organizational structure, and unique illicit financial activity risk profile. Thus, for example, a bank's transaction monitoring system—used to identify, research, and report suspicious activity—should be *risk-based* to incorporate any necessary additional screening for higher-risk products, services, customers, and geographic locations. *See generally* 31 C.F.R. § 1020.210.

44. A bank also must implement *risk-based* customer due diligence policies, procedures, and processes necessary to enable the bank to understand the nature and purpose of customer relationships—which may include understanding the types of transactions in which a customer is likely to engage. *Id.* These processes assist the bank in determining when transactions are potentially suspicious.

45. BSA monitoring systems can include employee identification or referrals from law enforcement, transaction-based monitoring systems (manual), and/or surveillance monitoring systems

(automated).

46.     A transaction-based monitoring system targets specific types of transactions (*e.g.*, involving large amounts of cash or offshore transfers), which the bank compiles in a periodic report that its employees must manually review for suspicious or unusual activity.

47.     Surveillance monitoring systems typically use computer software programmed to identify individual transactions, patterns of unusual activity, or deviations from expected behavior indicative of suspicious activity.

48.     Surveillance monitoring systems include rule-based and intelligent systems.

49.     The rule-based systems typically detect transactions that are outside a set of established parameters or "rules," while the "intelligent" systems are generally adaptive programs that can identify transactions as unusual based on patterns or context.

50.     Between April 2021 and September 2022, Silvergate processed over 400,000 SEN transactions, totaling more than $1 trillion of activity.

51.     Because a large portion of Silvergate's SEN transactions consisted of transactions from, to, or between crypto asset trading platforms, SEN transactions posed a high degree of risk for the Bank for a variety of reasons—as the Bank itself specifically understood or recognized.

52.     Until April 2021, Silvergate used an automated monitoring system provided by a third-party to monitor the SEN—Automated Transaction Monitoring System A ("ATMS-A")—but ATMS-A had only a rules-based system and no intelligence-based capabilities.

53.     During this time, Silvergate conducted transaction monitoring by using a combination of automated and manual monitoring.  If the ATMS-A system triggered an alert for suspicious activity, BSA staff would review and track transactions on a spreadsheet.

54.     In April 2021, Silvergate implemented a new automated transaction monitoring system—Automated Transaction Monitoring System B ("ATMS-B")—that employed intelligence-

based surveillance and had behavioral analytics capabilities, as required by Silvergate's own internal policies.

55.     Between April 2021 and March 2023, ATMS-B was the Bank's primary automated transaction monitoring system.

56.     Silvergate's BSA staff intended for ATMS-B to monitor all transaction types at the Bank—including SEN transactions.

57.     Silvergate switched from ATMS-A to ATMS-B in part precisely because of the risk posed to the Bank by what the Bank referred to in the ATMS-B system implementation as its "unique clientele" and the "inherently higher-risk Cryptocurrency Industry," which necessitated the most sophisticated transaction monitoring system to maintain compliance with the BSA.

## II.     DEFENDANTS' FALSE OR MISLEADING PUBLIC STATEMENTS REGARDING THE EFFECTIVENESS OF SILVERGATE'S BSA/AML COMPLIANCE PROGRAM.

### A.     Significant Deficiencies Were Identified in Silvergate's BSA/AML Compliance Program Prior to November 2022.

58.     On several occasions prior to November 2022, Lane and Fraher—and through them SCC—became aware that the Bank had serious deficiencies in its BSA/AML compliance program.

59.     Silvergate's BSA staff provided Fraher with information that did or should have put her on notice that the SEN had not been subject to automated monitoring from April 2021 through at least September 1, 2022.

60.     In addition, through the results of multiple examinations of Silvergate by the Federal Reserve, through the Federal Reserve Bank of San Francisco (the "FRBSF"), Lane and Fraher should have known that there existed critical deficiencies in the Bank's BSA/AML compliance program.

### i.     The SEN Was Not Subject to Automated Transaction Monitoring for At Least 15 Months Prior to November 2022.

61.     In 2021, Silvergate's then-BSA Officer led the Bank's implementation of ATMS-B to

provide transaction monitoring, and Fraher approved the Bank's transition to this new system.

62.     From April 2022 to November 7, 2022, the BSA Officer directly reported to the CRO who reported to Fraher.  On November 7, 2022, Fraher assumed the CRO role and supervision of the BSA Officer.

63.     Fraher herself was formerly the Bank's BSA Officer, making her one of the more experienced executives at Silvergate regarding BSA issues.

64.     The BSA Officer and Fraher had a close personal relationship and exchanged text messages on work-related issues.

65.     In addition, as COO, Fraher was considered a strategic partner to CEO Lane, and she generally shared with Lane major bank issues brought to her attention.

66.     As early as January 2021, the BSA Officer recognized that, because the Bank's customers were transferring billions of dollars via the SEN, the Bank needed to monitor SEN transactions using intelligence and behavioral analytics capabilities.

67.     However, the BSA Officer, despite working with employees at ATMS-B, was unable to devise a solution to apply ATMS-B's automated transaction monitoring to SEN transactions for many months.

68.     In January 2022, Silvergate was undergoing its annual regulatory exam, and the BSA Officer expressed her concerns to Fraher that the FRBSF would inquire regarding whether the Bank had adequate monitoring of the SEN.

69.     Throughout the remainder of 2022, the BSA Officer and Fraher exchanged several text messages and e-mails in which the BSA Officer indicated she was trying to find ways to apply automated monitoring to the SEN, indicating that Fraher knew or should have known that such monitoring was not occurring.

70.     On January 27, 2022, the BSA Officer emailed Fraher: "[ATMS-B] can't take SEN

transactions [into] consideration for risk rating purposes.  Internal transfers are not a transaction type that can be utilized in building a risk model."  Fraher responded: "We have known of this issue and either we have established other controls to account for it or we haven't and we have to take our lumps."

71.     Similarly, on February 18, 2022, the BSA Officer texted Fraher: "I think I found a way to monitor the SEN."  Fraher responded: "Oh good!"

72.     On June 1, 2022, the BSA Officer texted Fraher: "I think I finally got [ATMS-B] to build some monitoring rules for SEN," to which Fraher responded by "emphasizing" the BSA Officer's message with the Apple iPhone iMessage expression feature ("!!").

73.     On September 12, 2022, one of the Bank's BSA staff shared a written report with Fraher entitled "2022 Coverage Assessment: Transaction Monitoring (Anti-Money Laundering/Terrorist Financing)" (the "Coverage Assessment").

74.     The Bank's BSA staff had prepared the Coverage Assessment at Fraher's request to identify gaps in ATMS-B's monitoring capabilities as applied to the Bank's transactions.

75.     The Coverage Assessment concluded that ATMS-B had not been monitoring SEN transactions "as expected because [ATMS-B] does not consider internal transfers as risky activity within any financial crime typologies."

### ii.    From April 2022 through November 2022, Silvergate's Bank Examiners Identified Significant BSA/AML Compliance Deficiencies.

76.     On multiple occasions in 2022, in addition to the above-described warning from BSA staff that Silvergate's automated transaction monitoring of the SEN was deficient, government bank examiners made it apparent to Lane and Fraher that the Bank's BSA compliance program was insufficient given its risk profile.

77.     Silvergate operated under the supervision of the Federal Reserve (through the FRBSF);

the Bank was also supervised by the California Department of Financial Protection and Innovation ("DFPI").

78.     Silvergate was subject to periodic examination by FRBSF and DFPI.

79.     Federal regulations require that chartered banks such as Silvergate demonstrate the following "pillars" of BSA/AML compliance: (1) internal controls to assure ongoing compliance with the BSA; (2) designation of a qualified BSA Officer; (3) training of personnel; and (4) independent testing of the BSA compliance program.

80.     After two bank examinations, the results of which the Bank received in April 2022 and November 2022, respectively, the FRBSF and DFPI informed Lane and Fraher that the Bank's BSA/AML compliance program was critically deficient and needed improvement.

81.     On April 20, 2022, FRBSF and DFPI examiners issued a final exam report of their January 2022 full-scope examination of Silvergate ("April 2022 Exam Report"), which reviewed the Bank's finances and operations for the year 2021.

82.     The April 2022 Exam Report identified material internal control weaknesses over BSA/AML compliance.

83.     Lane and Fraher understood the seriousness of these weaknesses.

84.     In September 2022, FRBSF and DFPI examiners conducted an examination focused on the Bank's identification of suspicious activity, including ATMS-B transaction monitoring ("September 2022 Target Exam").

85.     The September 2022 Target Exam found that the Bank's transaction monitoring system (*i.e.*, ATMS-B) was not configured commensurately to the Bank's risk profile, and that Silvergate's BSA compliance program continued to inadequately dispose of suspicious activity alerts.

86.     At an October 7, 2022 meeting of the Board to review the preliminary findings of the September 2022 Target Exam, which Lane and Fraher attended, the Board discussed the possibility

of a bank examiner enforcement action or sanctions for the Bank's BSA compliance program deficiencies.

87.     At that meeting, Fraher recommended that the BSA Officer be replaced.

88.     While the BSA Officer transitioned to a new role, and the Bank searched for a replacement, Fraher took on more responsibility and oversight for the BSA program.

89.     In early October 2022, Fraher and the Bank's BSA staff had multiple discussions regarding examiners' findings that ATMS-B's default transaction monitoring, which the Bank historically used, was insufficient for the risk profile associated with the Bank's customers.

90.     In an October 13, 2022 letter from Fraher to the FRBSF, which Lane reviewed and edited, Fraher explained that the Bank was working with ATMS-B to customize its transaction monitoring software to better fit its risk profile, but the Bank had not yet achieved that goal.

91.      In an October 21, 2022 email to the Board, copying Fraher, Lane explained that, as a result of the September 2022 Target Exam, the FRBSF and DFPI would be accelerating the timing of the annual full scope exam from February 2023 to November 2022.

92.     As part of the Bank's strategy to manage this accelerated examination, Lane committed to identifying areas of potential weakness, appointed Fraher as the point of contact for the examination on all issues related to the BSA, and established a "Special Committee to monitor remediation of the weaknesses identified" in the September 2022 Target Exam.

93.     On November 23, 2022, the Board, Lane, and Fraher received the FRBSF and DFPI final exam report for the September 2022 Target Exam (the "Final Report").

94.     As a result of the September 2022 Target Exam, the bank examiners required the Bank to immediately improve its suspicious activity monitoring.

**B. Lane and SCC Made False or Misleading Statements and Material Omissions in SCC's 2022 Third Quarter Form 10-Q.**

95.     On November 7, 2022, Lane signed and SCC filed its Form 10-Q for the third quarter

of 2022 ("Form 10-Q"), which stated that there "have been no material changes to the risk factors disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2021, as filed with the SEC on February 28, 2022" (which Lane also had signed) (the "2021 Form 10-K").

96.     The 2021 Form 10-K, in turn, acknowledged the heightened risk of banking customers in the crypto industry—citing the characteristics of crypto assets that may "facilitate illegal activity such as fraud, money laundering, tax evasion and ransomware scams," which "could adversely affect" SCC's business if any of the Bank's customers engaged in or were alleged to engage in such activities.

97.     In response to these heightened risks, the 2021 Form 10-K also touted the "enhanced procedures" of the Bank's compliance program employed to mitigate these risks—framing them as a competitive advantage and stating that the company:

- [B]elieve[s] that our risk management and compliance framework, which includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers), is reasonably designed to detect any such illicit activities conducted by our potential or existing customers…

- [Has] developed enhanced procedures to screen and monitor these customers, which include … system monitoring rules tailored to digital currency activities, [and] a system of "red flags" specific to various customer types and activities … We believe these enhanced procedures adequately screen and monitor our customers associated with the digital currency initiative for their compliance with anti-money laundering laws…

- [Has] developed … proprietary compliance capabilities, which include ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers. We believe these capabilities are a distinct competitive advantage for us, and provide a meaningful barrier to entry against our potential competitors…

98.     These 2021 Form 10-K statements, which the Bank incorporated by reference into its November 2022 Form 10-Q, were designed to give investors comfort that Silvergate employed a state-of-the-art BSA compliance program specifically designed to minimize the heightened risks posed

by banking crypto industry customers.

99.     When the Bank issued its Form 10-Q in November 2022, which incorporated by reference the statements in paragraph 97 above, those statements were false or misleading in light of: (1) the inadequacy of Silvergate's BSA compliance program for its unique risk profile; and (2) Silvergate's defining financial services product—the SEN—having been operating without automated monitoring for a period of at least 15 months, as acknowledged by the Bank's BSA staff in the Coverage Assessment.

100.    Indeed, directly contrary to the 2021 Form 10-K (as incorporated into the Form 10-Q), the critical weaknesses identified by the FRBSF demonstrated that Silvergate's BSA compliance program had not used "thorough … due diligence … in connection with onboarding new customers or monitoring existing customers"; nor had it used "enhanced procedures to screen and monitor these customers … for their compliance with [AML] laws."

101.    Similarly, because more than $1 trillion dollars of SEN transactions were not subjected to automated monitoring for suspicious activity for a period of at least 15 months prior to the filing of the 10-Q, Silvergate was essentially not conducting adequate "on-going monitoring of customer activities," nor did it employ "system monitoring rules tailored to digital currency activities" that could "adequately screen and monitor [its] customers associated with the digital currency initiative for their compliance with anti-money laundering laws."

102.    In addition, the 2021 Form 10-K's statement (as incorporated into the Form 10-Q) that the Bank's "risk management and compliance framework … [was] reasonably designed to detect … illicit activities" was misleading in light of: (1) Silvergate's decision to remove its BSA Officer as unsuited to manage the risks posed by the Bank's customer activity; and (2) the serious deficiencies in Silvergate's BSA program.

103.    When Lane signed the Form 10-Q in November 2022, he knew or should have known

all the public statements set forth in paragraph 97 above were false or misleading because, among other things: (1) Lane had received the April 2022 Exam Report and was aware of the preliminary findings of the September 2022 Target Exam; (2) Lane had reviewed the Bank's October 13, 2022 letter to the FRBSF (set forth in paragraph 90 above), which acknowledged deficiencies in the BSA program; (3) Lane had updated the Board as to the severity of the examiners' findings and took part in its decision to replace the BSA Officer; and (4) Fraher was Lane's "strategic partner" and the most knowledgeable executive with regard to the BSA program and, thus, Lane should have consulted Fraher about transaction monitoring of the SEN—Silvergate's premier financial product designed specifically for the crypto industry—which was not subject to adequate automated monitoring for at least 15 months prior to these statements being made.

### C. The FTX Collapse and the Bank's Failure to Detect Suspicious Activity in FTX Accounts.

104.    FTX, at the time one of the largest crypto asset trading platforms in the world, held bank accounts at Silvergate, as did many entities related to FTX—including Alameda Research ("Alameda"), a crypto asset hedge fund owned by Sam Bankman-Fried ("Bankman-Fried"), the CEO of FTX.

105.    Certain FTX entities were among Silvergate's largest customers, a fact that Silvergate used to its business advantage.

106.    On its website, Silvergate advertised the following testimonial by Bankman-Fried: "Life as a crypto firm can be divided up into before Silvergate and after Silvergate—it's hard to overstate how much it revolutionized banking for blockchain companies."

107.    At the beginning of November 2022, public allegations surfaced that Alameda held a large position in FTX-related crypto assets, which raised questions about the financial relationship between Alameda and FTX. FTX's customers began withdrawing their funds from the crypto asset trading platform en masse, resulting in a solvency crisis for FTX and shaking the volatile crypto

market.

108.    FTX declared bankruptcy on November 11, 2022, amid public uproar questioning whether FTX and Bankman-Fried had diverted billions of dollars of FTX customers' funds to Alameda for improper purposes.

109.    Soon after FTX's bankruptcy, Silvergate customers began to remove their deposits from their Silvergate accounts.

110.    By November 15, 2022, Silvergate was in the midst of an existential bank run; its crypto asset-related deposits had fallen to under $8 billion, down from over $14 billion at the beginning of the year; Silvergate was facing a liquidity crisis; and Lane and Fraher expected that the Bank's deposits would continue to fall.

111.    At this time, there was speculation on social media and other fora that: (i) Silvergate had facilitated FTX's misconduct—including by allowing FTX entities to launder money via the SEN and by processing wires of FTX customer funds sent to bank accounts held by Alameda and North Dimension, an Alameda subsidiary; and (ii) Silvergate had failed to follow AML requirements.

112.    Lane was aware of this social media criticism and, in an effort to save the bank amidst these allegations, wanted to assure the public that Silvergate did have a regulatory compliance program.

113.    As Lane stated in a November 15, 2022 email to the Bank's public relations staff, he was determined to issue a public statement in order to "go on the offensive" and get out in front of the "negative news from ongoing FTX contagion."

114.    At or about this time, Lane shared with Fraher a Board Member's request that the Bank review its relationship with FTX. Fraher responded that she had already directed the Bank's BSA staff to conduct a "forensic of FTX," essentially a review of the FTX entities' transaction activity through the Bank.

115.    By November 17, 2022—less than a week after FTX's collapse—Silvergate's BSA

staff had completed an analysis and identified as suspicious over 300 transactions by FTX-related entities in Silvergate accounts from January 2022 until November 2022.

116.    The BSA staff's analysis showed that FTX-related entities had engaged in roughly $9 billion in suspicious transfers—some of which occurred over the SEN—during that period.

117.    Most troubling to the BSA staff was the trend of funds that flowed from FTX's custodial accounts—which held FTX customer funds—to a series of non-custodial FTX-related entities' accounts, followed by transfers of these funds to other third parties—either through the SEN or to accounts external to the Bank.

118.    By November 18, 2022, the BSA staff had notified Fraher of the results of its FTX analysis and that the suspicious transfers totaled nearly $9 billion.

### D. After the FTX Collapse, SCC and Lane Made False or Misleading Statements—With Assistance From Fraher—in an Effort to Soothe the Market and Engaged in a Course of Business to Mislead.

119.    After the FTX collapse, Lane reassured depositors and the investing public that Silvergate's BSA compliance program was sound, and that the BSA program appropriately assessed FTX-related accounts and transaction activity, when he knew or should have known of the serious deficiencies in the BSA program, including as applied to FTX.

120.    As Lane and Fraher knew, the Bank's BSA program was important to its investors, particularly due to the high-risk nature of Silvergate's customer base, and particularly in the wake of the FTX collapse.

121.    In trying to alleviate concerns about the BSA program, Lane made three public statements—on November 21, November 30, and December 5, 2022—that contained false or misleading information and material omissions regarding Silvergate's BSA compliance program. Fraher participated in the November 21 and December 5 statements by reviewing and approving them.

### i. Lane's November 21, 2022 False or Misleading Statements on LinkedIn and Twitter.

122.    On November 21, 2022, Lane published a letter on LinkedIn and Twitter—that Fraher had reviewed, edited, and approved—entitled "A message from … ALAN LANE: A letter to our customers."  The letter included the following passage:

> Our business starts by knowing our customers, their business and the activity they plan to conduct at our institution.  Once we approve a new customer, if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship.  No exceptions.  The U.S. Bank Secrecy Act requires us to develop a robust compliance and risk management program.  It's a responsibility we take very seriously.

123.    The above statement was false or misleading because it implied that Silvergate conducted appropriate due diligence on new customers and that it used adequate ongoing transaction monitoring to identify suspicious activity.

124.    As Fraher knew or should have known by the date of, and contrary to, the November 21, 2022 letter, SEN transactions had gone without automated monitoring for at least 15 months from April 2021 to September 2022, and Silvergate's BSA compliance program had failed to detect (and therefore to take immediate action on) billions of dollars in suspicious transfers that had occurred between the FTX-related entities throughout 2022.

125.    Furthermore, Lane knew or should have known as of November 21, 2022 that the BSA staff, at the direction of Fraher, was conducting a "forensic" review of FTX activity at the Bank, yet he failed to inquire about the results of that review.

126.    In addition, the November 21 Letter misleadingly suggested that Silvergate had a "robust compliance and risk management program," when both Lane and Fraher knew or should have known of the deficiencies in the Bank's BSA compliance program.

127.    The Final Report from the September 2022 Target Exam discussed the severe deficiencies in the Bank's BSA compliance program and following receipt of it, Lane and Fraher knew or should have known of the possibility of an impending bank examiner enforcement action.

128.    In light of continued fallout from the FTX collapse, the Board requested an audit of the Bank's Know Your Customer, Enhanced Due Diligence, and transaction monitoring as it related to the FTX relationship.

129.    On November 23, 2022, Fraher reported in an email, copying Lane, that the Bank's BSA staff had completed a "full analysis" of the FTX relationship with Silvergate, which was ready for audit.

130.    By this time, Fraher was aware that this "full analysis" revealed close to $9 billion in suspicious transactions made among FTX-related entities in Silvergate accounts from January 2022 until November 2022.

131.    On November 30, 2022, Lane appeared on CNBC for an interview on the popular television program "Squawk on the Street."

132.    During the interview, Lane made the following false or misleading statements and material omissions while responding to questions about Silvergate's compliance program:

- The next step is we also then have to be monitoring on an ongoing basis the activity that is moving across the SEN … We monitor for activity that would be inconsistent with the purported use of the account.  But as long as the activity is consistent, then there … is nothing else that we would do.

- Again, we built this business compliance first.  We satisfy all the regulatory requirements.  And we have also, in the past, we have offboarded customers if we see activity that is inconsistent and if they can't correct it or can't explain it, then we offboard those customers.

133.    The preceding statements falsely imply that Silvergate conducted appropriate due

diligence and used ongoing automated monitoring to identify suspicious activity—specifically on the SEN—that is inconsistent with expected activity.

134.    The Bank's FTX review rendered Lane's above interview statements false or misleading, and/or omitted material facts, because, during the first 11 months of 2022, billions of dollars in suspicious transfers between the FTX entities had gone undetected.  Lane failed to inquire about these results before making the November 30, 2022 statement.

135.    Furthermore, Lane's statement suggests that Silvergate "satisf[ied] all the regulatory requirements," which Lane knew or should have known was false or misleading.

### iii.    Lane's December 5, 2022 False or Misleading Statements in a Letter Posted to LinkedIn and Filed on SCC's Form 8-K.

136.    On Friday, December 2, 2022, Lane and Fraher, along with other Silvergate executives learned confidentially that United States Senator Elizabeth Warren intended to publicize a letter asking Silvergate for an explanation of the Bank's handling of Alameda and FTX accounts.

137.    The Bank determined to issue a statement, to be made public by Monday, in advance of the likely media blitz that would ensue from the anticipated letter from Senator Warren.

138.    On December 4, 2022, Fraher reviewed and approved the proposed statement, texting the Bank President that the letter "looks excellent [in my opinion]" and "[y]ou have my approval." Lane also reviewed and commented on the statement.

139.    On December 5, 2022, the statement, entitled a "Public Letter from Silvergate Capital Corporation Chief Executive Officer Alan Lane," (the "December 5 Letter") was posted to LinkedIn and Twitter.

140.    Among other things, the December 5 Letter stated that:

- Silvergate operates in accordance with the Bank Secrecy Act and the USA PATRIOT Act.

- Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.

- After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags.

- By performing our risk management procedures and fulfilling our regulatory obligations, Silvergate plays a key role in helping law enforcement identify bad actors. We take this responsibility seriously.

- Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above.

141. On December 5, 2022, Fraher disseminated the December 5 Letter to bank examiners, and SCC filed a SEC Form 8-K attaching this letter as an exhibit (an SEC Form 8-K is used to report a public company's unscheduled material event).

142. Lane issued this letter to rebut public criticism of the Bank's BSA compliance program, to assure investors that Silvergate was regulatorily compliant, and to tout its supposedly significant due diligence on FTX and FTX's related entities, including through ongoing monitoring of those accounts.

143. The December 5 Letter's statements were false or misleading because of the critical deficiencies in the Bank's BSA compliance program, which Lane and Fraher knew or should have known at the time.

144. For example, the claim that Silvergate employed a system of account and transaction monitoring that was capable of detecting suspicious activity, especially with regard to FTX and its related entities, was in contravention of facts presented to Lane and Fraher in the weeks and months prior (as described in paragraphs 58-94 and 114-118 above).

145. In addition, Lane's assertions in the December 5 Letter regarding FTX were false or

misleading because, as Fraher should have known, from at least April 2021 to September 2022, the SEN had not been subject to automated monitoring, and Fraher knew, and Lane knew or should have known, that the BSA staff had found billions of dollars in suspicious transactions among the FTX-related entities, including SEN transfers, from January 2022 to November 2022.

### E. Lane and SCC Misrepresented the Bank's BSA Compliance Program to Senators.

146.     On December 5, 2022, United States Senators Elizabeth Warren, John Kennedy, and Roger Marshall issued a public letter, criticizing Silvergate's BSA program and requesting information about its relationship with FTX (the "Congressional Letter").

147.     Citing Bankman-Fried's admission that, because FTX did not originally have a bank account, FTX had "directed customers to wire money to Alameda's account with Silvergate in exchange for assets on FTX," the Congressional letter asserted that "Your Bank's involvement in the transfer of FTX customers funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients" as required by the BSA.

148.     The Congressional Letter asked for a response to eight direct questions regarding Silvergate's relationship with FTX, its BSA program, and the state of its liquidity, including:

- Did Silvergate flag as suspicious the movement of funds [among the accounts of FTX-related entities]?

- If so, did Silvergate file any [SARs] to the FinCEN regarding those transactions?

- If not, why did [the Bank's] BSA compliance program fail to identify these transactions as suspicious?

149.     The Congressional Letter indicated that the Senators intended to publicize Silvergate's response, pointedly writing that "[t]he public is owed a full accounting" of Silvergate's role in the transfer of FTX customer funds and that "the public deserve[s] to know whether Silvergate has the

ability to withstand current and future crypto market volatility."

150.     On December 19, 2022, Silvergate provided a response to the Congressional Letter (the "Response to the Congressional Letter").  The letter was signed by Lane, who reviewed it before it was sent.

151.     The Response to the Congressional Letter provided the Senators with false information and continued the false or misleading nature of the statements about Silvergate's BSA compliance program made to the public on November 7, 21, 30, and December 5, 2022, such as:

- Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.

- After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags.

- Silvergate conducted significant due diligence on FTX and its related entities, including Alameda Research, both during the on-boarding process and through ongoing monitoring, in accordance with our risk management policies and procedures.

152.     The information provided to the Senators in the Response to the Congressional Letter was false or misleading because, by this point, Lane knew or should have known that Silvergate did not have automated monitoring of SEN transactions for a period of at least 15 months from April 2021 until September 2022, and, specifically with regard to FTX, that the BSA staff did not detect in a timely fashion billions of dollars in suspicious transactions.

153.     Had Lane's Response to the Congressional Letter accurately depicted the facts at the time, it would have contradicted prior public statements by Silvergate, and investors would have learned of the deficiencies in the Bank's BSA program and could have appreciated the risks of investing in SCC stock.

154.     Although the Response to the Congressional Letter was not made public by SCC or

Silvergate, the language in the Congressional Letter indicated that the Bank's response would be made public—especially if it contradicted prior public statements. Had Lane and SCC not provided false or misleading information to the Senators, their prior misstatements to the public, including purchasers of SCC stock, would have been revealed.

### F. Lane Made False or Misleading Statements which also Omitted Material Facts, in a Year-End Earnings Call.

155. Subsequent to Lane's December 5, 2022 public statements, but before the Response to the Congressional Letter, Lane received more negative findings from bank examiners regarding the Bank's BSA compliance program.

156. At a December 13 Board meeting, Lane acknowledged to the Board that the BSA compliance program was deficient, predicting that the Bank will have "corrected the course" by spring 2023.

157. On January 5, 2023, Lane participated in a SCC preliminary earnings and business update call.

158. On the call, an analyst asked Lane to provide an overview of Silvergate's AML and know your customer procedures and its visibility with respect to transactions by FTX and Alameda.

159. Lane responded that "[Silvergate] follow[s] the Bank Secrecy Act, the USA PATRIOT Act for every account that we open and we conduct ongoing monitoring."

160. This statement was false or misleading because the Bank's BSA program was deficient at the time of the statement and the Bank's automated monitoring system did not adequately monitor SEN transactions from April 2021 to September 2022.

161. In the context of responding to a question regarding FTX, Lane stated that Silvergate is regulatorily compliant and conducts ongoing monitoring for every account. This statement was false or misleading, as Lane knew or should have known at the time.

\*  \*  \*  \*  \*

162.     On May 23, 2023, the Federal Reserve and DFPI issued a public order against SCC and Silvergate citing "numerous deficiencies, including with respect to both safety and soundness and compliance with banking laws and regulations."

### III.   MARTINO'S AND SCC'S FALSE OR MISLEADING STATEMENTS TO THE PUBLIC AND DECEPTION OF REGULATORS CONCERNING THE BANK'S TRUE FINANCIAL CONDITION.

#### A.   After FTX's Collapse, the Bank Fell into a Liquidity Crisis that Required It to Sell Securities at a Loss.

163.     In addition to raising questions about the Bank's BSA compliance, FTX's bankruptcy filing on November 11, 2023 sparked a devastating run on the Bank's customer deposits; in the ensuing weeks, Silvergate's liquidity tightened, as deposits plummeted and debt skyrocketed.

164.     On September 30, 2022, the Bank reported customer deposits of approximately $12 billion; by December 31, 2022, its customer deposits had dropped to about $3.9 billion, or by nearly 70%.

165.     In or around December 2022, at its regulators' urging, Silvergate decided to maintain cash balances sufficient to cover all its crypto asset customers' deposits (at a one-to-one ratio), which further increased pressure on the Bank's liquidity.

166.     To meet its liquidity needs in November and December 2022, the Bank borrowed large sums of cash from the Federal Home Loan Bank of San Francisco ("FHLB"). On September 30, 2022, the Bank reported $700 million in FHLB borrowings. By December 31, 2022, that debt had risen to about $4.3 billion, or by more than 600%.

167.     In addition, during the Fourth Quarter of 2022, the Bank issued brokered certificates of deposit ("BCDs") to increase short-term funding; by December 31, 2022, Silvergate had reported $2.4 billion in BCD liabilities, which were subject to regulatory scrutiny.

168.     During the Fourth Quarter of 2022, to cover its debts, Silvergate sold off large amounts of its securities.

169.     Due to rising interest rates, however, the Bank's securities portfolio had experienced a steep drop in fair value by the Fourth Quarter of 2022, and many of its securities were in an unrealized loss position.

170.     On September 30, 2022, the Bank reported securities holdings with a fair value of approximately $11.4 billion; by December 31, 2022, it held securities with a fair value of approximately $5.7 billion—a plunge in value of nearly 50%.

171.     The Bank incurred losses of more than $750 million with respect to the $5.2 billion in debt securities it sold in the Fourth Quarter of 2022.

172.     By December 2022, because the Bank's borrowings had increased so significantly, the FHLB was unlikely to extend it more credit.  Indeed, the FHLB by then was actively monitoring Silvergate's financial condition, including by reducing its cap on Silvergate's FHLB debt as a percentage of the Bank's total assets.

173.     Much of the Bank's debt had short repayment terms; Silvergate's $4.3 billion in outstanding FHLB debt was scheduled to mature in January and February 2023.  In addition, $1 billion of the Bank's BCD liabilities matured in the First Quarter of 2023.

174.     Thus, by the end of December 2022, Martino and other senior Bank management knew that the combination of customer deposit outflows and upcoming debt repayments would more likely than not require the Bank to sell additional securities in early 2023.

**B. The Bank's Recording of OTTI Threatened a Key Marker of Its Financial Health.**

175.     In addition, by December 31, 2022, Silvergate had categorized all its remaining securities to be available-for-sale ("AFS").  As explained below in paragraphs 176-179, during the Relevant Period, Generally Accepted Accounting Principles ("GAAP") required Silvergate to evaluate at the end of each quarter each AFS security it held that was in an unrealized loss position and to

determine the security's "other than temporary impairment" ("OTTI"), if any.[1]

176.     During the Relevant Period, GAAP required the Bank at the end of every quarter to evaluate each AFS security it held and determine whether its fair value was less than its amortized cost basis.  ASC-320-10-35-30.  If so, GAAP required the Bank to determine whether that impairment was temporary, or other than temporary, and provided steps for the Bank to identify whether OTTI had occurred, as set forth in paragraphs 177-179 below.

177.     First, "[i]f an entity intends to sell the debt security (that is, it has decided to sell the security), an other-than-temporary impairment [OTTI] shall be considered to have occurred."  ASC-320-10-35-33A.

178.     Second, "[i]f an entity does not intend to sell the debt security, the entity shall consider available evidence to assess whether it more likely than not will be required to sell the security before the recovery of its amortized cost basis (for example, whether its cash or working capital requirements or contractual or regulatory obligations indicate that the security will be required to be sold before a forecasted recovery occurs).  If the entity more likely than not will be required to sell the security before recovery of its amortized cost basis, an other-than-temporary impairment [OTTI] shall be considered to have occurred."  ASC-320-10-35-33B.

179.     In this context, for each security for which an OTTI was deemed to have occurred, the amount of OTTI recognized was to be based on the difference between the amortized cost basis and the fair market value of the security as of the date of the Bank's financial statements.

180.     During the Relevant Period, a crucial metric for determining the Bank's financial

---

[1] SCC's public reporting for AFS securities was governed by the Accounting Standards Codification ("ASC") Topic 320, Investments – Debt Securities.  FASB Accounting Standards Update No. 2016-13 moved guidance for AFS, including subsequent measurement topics relate to accounting for OTTI, to ASC Topic 326, Financial Instruments – Credit Losses. The relevant underlying source content for the authoritative guidance remained the same, FASB Staff Position Nos. 115-1 and FAS 124-1, The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments, and FASB Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity Securities.

health was its "Tier 1 Leverage Ratio," which was calculated by dividing the Bank's "Tier 1 Capital" by its total average assets over a given period.

181.    The Bank's Tier 1 Capital was reduced by the amount of OTTI it recorded for its debt securities.  Thus, when the Bank reported greater OTTI, its Tier 1 Leverage Ratio necessarily decreased.

182.    Tier 1 Capital was a measure of core equity—or the most loss-absorbing form of the Bank's capital.

183.    If the Bank failed to maintain a Tier 1 Leverage Ratio above 5%, it would no longer be considered "well capitalized."

184.    Banks that were less than well capitalized were subject to increased scrutiny from regulators, including potential corrective action under 12 U.S.C § 1831o.

185.    The Bank's becoming less than well capitalized was a signal that the Bank was not on sound financial footing, which, under certain circumstances, could affect the Bank's existing contracts or its ability to borrow.

186.    The Bank's regulators, its investors, and its analysts—as well as the Bank itself—monitored the Bank's and SCC's Tier 1 Leverage Ratios and whether the Bank was less than well capitalized.

### C.    Martino Knew that GAAP Required the Bank to Record OTTI on Both Securities It Intended to Sell and Those It Would More Likely than Not Be Required to Sell.

187.    As a publicly traded company, SCC was required to file quarterly and annual reports with the Commission that presented its financial condition in conformity with GAAP.  SCC's quarterly and annual reports included the Bank's and its balance sheets, asset levels, securities sales, and Tier 1 Leverage Ratios.

188.    As CFO, Martino was responsible for ensuring that the Bank's 2022 annual report on

Form 10-K ("2022 Form 10-K") accurately reported its financial condition.

189.    Throughout the Relevant Period, Martino oversaw the Bank's accounting policies, which referred generally to OTTI and the need to evaluate it "according to the guidance" in GAAP.

190.    By at least December 20, 2022, Martino knew or recklessly disregarded that the Bank would more likely than not be required to sell impaired available-for-sale securities in 2023 and, therefore, record OTTI in its books and records and in its 2022 Form 10-K.

191.    Specifically, on December 20, 2022, Martino received an email from the Bank's Controller with the subject line "Forced future sale" (the "December 20 Email"), which stated that the Bank's auditor had "raised the OTTI topic with us today for the remaining AFS securities"; that "[c]learly this could result in losses being accelerated into our 2022 net income that would otherwise be realized in 2023"; and that "[a] forced sale or stated intent to sell appears to trigger this issue."

192.    The Controller also included in the December 20 Email accounting guidance specifying that OTTI had to be recorded "if the investor has the intent to sell [or] it is more likely than not the investor will be required to sell."

193.    Martino responded to the December 20 Email the same day, asking if the OTTI issue was "driven by accounting or regulatory regulation, or both?" and requesting additional accounting guidance.  Later that day, he received a publication issued by a bank regulator that described how banks were required to record OTTI both on securities a bank intended to sell and on those it would more likely than not be required to sell.

194.    From December 20, 2022 through March 2023, Martino regularly discussed—with the Bank's employees, its auditor, and others—OTTI, its calculation, and the Bank's obligation to report OTTI on its financial statements.

195.    Martino knew or recklessly disregarded throughout that time that, for purposes of calculating OTTI, GAAP required the Bank to determine which of its impaired AFS securities it would

more likely than not be required to sell.

196.    During the Relevant Period, Martino knew how to analyze and estimate the likelihood of the Bank's future securities sales.

197.    For example, in a December 21, 2022 email directing his financial planning leadership to create an OTTI model—in which Silvergate would sell $2.5 billion worth of securities in the First Quarter of 2023—Martino stated that the fair market value loss for the securities Silvergate will "have to sell" needed to be "recognized through earnings as a loss."  He further wrote that "[t]his is what the OTTI impairment account does—it forces recognition of loss on securities we need to sell."

### D.    Martino Knew that the Bank's OTTI Could Easily Cause Its Tier 1 Leverage Ratio to Fall Below 5% for the Fourth Quarter of 2022.

198.    By at least December 2022, Martino and other senior leadership at the Bank knew that the ongoing bank run, and the resulting securities sales that the Bank would be required to make, would dramatically affect the Bank's financial reporting for the Fourth Quarter of 2022, including its Tier 1 Leverage Ratio.

199.    Beginning in at least early December 2022, Martino repeatedly expressed to the Bank's treasury and accounting staff that he wanted Silvergate's Tier 1 Leverage Ratio to remain above 5%, which he knew would permit the Bank to report publicly that it remained well capitalized.

200.    For example, in a December 6, 2022 email to the Bank's accounting staff, Martino wrote "we are trying to sell as quickly as possible but ensure we remain about 5.0% tier 1 on spot and average basis."

201.    By way of further example, in a December 21, 2022 email—in which Martino directed his staff to create an OTTI model that would require the Bank to maintain its FHLB borrowing at 25% of total assets in 2023 and to sell $2.5 billion in securities in the First Quarter of 2023—Martino wrote that this scenario "will result in a hit to tier 1, and I estimate tier 1 leverage will drop to about 5.1%."

202.     In addition, in December 2022, Martino himself made OTTI projections of the Bank's securities sales in 2023.

203.     For example, on December 21, 2022, Martino sent his accounting staff a projection showing OTTI of $185 million and requested that they calculate the resulting Tier 1 Leverage Ratio as of December 31, 2022.  Martino's staff informed him that his projection would cause Tier 1 Leverage Ratio to drop to 4.9%, which would, in turn, cause the Bank to be less than "well capitalized," as of December 31, 2022.

204.     Again, in a December 23, 2022 email, Martino emphasized how close the Bank was to Tier 1 dropping below 5%, writing that it appeared "if we minimize selling securities next week, we may be able to glide to remain above 5%."

205.     Martino also knew his direct supervisor, CEO Alan Lane, also tracked the Bank's Tier 1 Leverage Ratio.

206.     For example, in a January 11, 2023 email to Martino, Lane wrote that Martino's earlier statements about the Bank's financial situation were "causing [him] anxiety around our year-end capital ratios," prompting him to ask whether the Bank was "going to be above a 5% Tier 1 Leverage ratio at year-end?"  Martino replied that day, "I expect tier 1 to be above 5% but not by a wide margin and I share the same concern."

### E. By the January 17, 2023 Earnings Release, Martino Knew or Recklessly Disregarded That Silvergate Could Not Rely On Sources of Funding Other Than Selling Its Securities.

207.     As set forth in more detail below, Martino approved a January 17, 2023 earnings release for the Bank for the Fourth Quarter of 2022 (the "Earnings Release") that falsely reported the amount of securities the Bank would be more likely than not to sell in the First Quarter of 2023, as well as the OTTI and Tier 1 Leverage Ratios that flowed from those sales.

208.     In the weeks leading up to Earnings Release, Martino knew or recklessly disregarded

that the Bank could not count on prior sources of liquidity to pay down debt that would become due in the First Quarter of 2023. Martino also knew or recklessly disregarded that the Bank would therefore more likely than not be required to sell far more securities than stated in the Earnings Release.

209. During the Relevant Period, to assess whether the Bank would more likely than not be required to sell a security, GAAP required the Bank to evaluate available evidence such as cash requirements and regulatory obligations.

210. From FTX's collapse through the January 17, 2023 Earning Release, as the Bank lost customer deposits and ballooned its debts, it considered three primary options to obtain the cash it needed to meet its regulatory requirements: (1) issuing more BCDs; (2) obtaining a repurchase agreement on its securities; or (3) selling more securities.

211. As for BCDs, by at least November 19, 2022, Martino knew or recklessly disregarded that, while Silvergate had relied on issuing BCDs to generate cash in the Fourth Quarter of 2022, it could not plan to issue additional BCDs for at least the First Quarter of 2023 because the Bank's regulators would disapprove of additional such funding.

212. In a November 19, 2022 email, Fraher relayed to Martino and Lane that, "increasing brokered CDs was not an option [regulators] would respond favorably to."

213. As a result, from at least December 2022 through March 2023, Martino knew or recklessly disregarded that BCDs were not available to the Bank for the First Quarter of 2023. During that time, Martino and the Bank's accounting staff planned to pay off its existing $2.4 billion in BCDs, but they did not plan for BCDs to be a source of cash for at least the First Quarter of 2023.

214. As for the second potential source of cash, in December 2022 and January 2023, in an effort to generate cash to pay debts without having to sell securities, the Bank approached major financial institutions to attempt to set up a repurchase agreement ("repo line" or "repo agreement")—

effectively a line of credit for which the Bank could use its existing securities as collateral to borrow cash from another financial institution.

215.    By January 12, 2023, however, Martino determined the Bank should "pause" discussions related to one such repo agreement because the terms that the Bank had received were so costly that, as Martino understood it at the time, it would not have made economic sense for the Bank to enter into the agreement.

216.    By at least January 17, 2023, Martino knew or recklessly disregarded that the Bank had not received an offer in response to its request from a second financial institution.  That financial institution ultimately never sent such an offer to the Bank.

**F.    By January 17, 2023, Martino Knew or Recklessly Disregarded That the Bank Was More Likely Than Not Required to Sell Billions of Dollars in Securities but Nonetheless Chose a Calculation that Understated those Sales, in Violation of GAAP.**

217.    In the lead-up to the January 17, 2023 Earning Release, the Bank's other sources of cash had dried up; its debt repayments were coming due (and being accelerated); and Martino knew or recklessly disregarded that the Bank would more likely than not be required to sell billions in securities to repay its debt in the First Quarter 2023.  Martino nonetheless rejected a methodology for evaluating the Bank's projected securities sales and OTTI that accorded with GAAP, in favor of a methodology that understated its securities sales and OTTI losses in violation of GAAP.

218.    Martino also knew or recklessly disregarded that using proceeds from any securities sales to pay off debt would decrease the Bank's total assets and, thus, require Silvergate to pay down additional debt to remain within FHLB's borrowing limit, which was based on a percentage of the Bank's total assets at the end of the period.

219.    Martino further knew or recklessly disregarded that selling securities to repay debt could thus result in additional cash needs and that such sales must be accounted for in assessing OTTI.

220.    By mid-December 2022, Martino knew that the FHLB had restricted the Bank's

further borrowing and would require it to pay down its FHLB debts during the First Quarter of 2023 to a cap of 25% of the Bank's total assets.

221.     On December 21, 2022, for example, Martino wrote to his accounting staff that the Bank had "come to agreement with the FHLB to pay down borrowings to 25%" by March 31, 2023 (the last day of the First Quarter of 2023).

222.     Then on December 22, 2022 Martino wrote in a message to the Bank's Treasurer that the FHLB was requiring the Bank to bring its debt down to 25% by mid-January.

223.     In addition, on December 27, 2022, Martino notified the Bank's Board to expect that its FHLB borrowings could not rise above 25% of total assets.

224.     As of December 31, 2022, the Bank owed the FHLB approximately $4.3 billion, and this debt was scheduled to mature in January and February 2023.

225.     In a January 3, 2023 email to the Bank's Treasurer, which was later forwarded to Martino, the FHLB confirmed the 25% cap on Silvergate's FHLB debt and required it to pay down that debt, as measured at month-end.

226.     On January 4, 2023, FHLB and Silvergate agreed that Silvergate would repay $1.475 billion of its debt by January 13, 2023, which would only reduce its borrowings to 25% of total assets as of December 31, 2022.

227.     Thus, as Martino knew or recklessly disregarded, the Bank's $1.475 billion payment to FHLB would not pay down its almost $1 billion in FHLB debt maturing in February, or its need to limit its borrowings to 25% of total assets as measured at the end of January, February and March 2023.

228.     On January 4, 2023, the Bank's Treasurer sent Martino and his senior staff an email entitled "OTTI materials," which attached a presentation detailing the projected impact of securities sales on OTTI in the First Quarter of 2023 ("the January 4 Presentation").

229.    Martino knew or recklessly disregarded that the January 4 Presentation accounted for the OTTI impact of securities that the Bank both intended to sell and more likely than not would be required to sell in the First Quarter of 2023.

230.    For example, the January 4 Presentation highlighted that the Bank needed $2.6 billion in liquidity that, "due to [the] forced sale" of the Bank's securities, would result in an OTTI charge of approximately $176.5 million.

231.    The January 4 Presentation further stated that "liquidity [was] needed from [security] sales" for repayment of $2.425 billion in FHLB debt as calculated by incorporating the FHLB's debt cap of 25% of Bank's total assets—which it projected would drop by almost $4 billion over the First Quarter of 2023, from $11.4 billion to $7.5 billion, given the ongoing crisis facing the Bank.

232.    The January 4 Presentation further highlighted the $2.6 billion in sales with a red box and explained that this amount of securities sales would balance the bank's cash needs to pay down its borrowings with its need to maintain liquidity, while providing a cushion above the $2.425 billion in FLHB debt the Bank expected to be required to repay in the First Quarter.

233.    In addition, Martino knew or recklessly disregarded that the January 4 Presentation's methodology for calculating OTTI accorded with GAAP because it accounted for sales of its AFS securities in an unrealized loss position as of December 31, 2022 that the Bank both intended to make and would more likely than not be required to make before recovery of the securities' amortized cost basis.

234.    The January 4 Presentation also stated that the sale of $2.6 billion and resulting OTTI charge would result in the Bank having a Tier 1 Leverage Ratio of 5.09%, with a margin of only $15 million for additional sales "before falling below 5.0%."

235.    In fact, both this small margin and the Tier 1 Leverage Ratio in the January 4 Presentation were overstated because, at that time, Silvergate's books failed to reflect an unrecorded

loss on securities of approximately $43 million. This loss had its own negative impact on Silvergate's Tier 1 Leverage Ratio. If that loss—and the Bank's expected sale of $2.6 billion in securities resulting in $176.5 million OTTI—had been properly taken into account, the January 4 Presentation's calculation of the Bank's Tier 1 Leverage Ratio would have fallen below 5%.

236.    In addition, during the first week of January 2023, the bank sold approximately $81 million of securities, resulting in approximately $7 million of additional losses not included in the January 4 Presentation's OTTI calculation, which if accounted for with the $43 million loss described above would have decreased its calculated Tier 1 Leverage Ratio further below 5%.

237.    On January 5, 2023, the Bank's treasury department prepared another presentation ("the January 5 Presentation"), which projected only $1.7 billion in securities sales and a Tier 1 Leverage Ratio of 5.39% for the Bank.

238.    As Martino knew or recklessly disregarded, unlike the January 4 Presentation, the January 5 Presentation did not evaluate all securities sales that the Bank would more likely than not be required to make over the First Quarter of 2023; rather, it accounted only for the Bank's intended sales to pay off $1 billion in BCDs over the First Quarter and FHLB debt through January 13, 2023, which totaled only $1.475 billion—the amount needed to bring the Bank's borrowing limit to 25% as of December 31, 2022.

239.    The January 5 Presentation likewise did not account for any projected change in total assets or deposit levels. Because Silvergate held cash one-to-one with deposits, a decrease in deposit levels would correspond directly with a decrease in cash, and thus, total assets.

240.    In fact, between December 31, 2022 and January 5, 2023, the Bank's crypto asset customer deposits fell by over $400 million, a loss of more than 10%.

241.    Thus, as Martino knew or recklessly disregarded, rather than account for all Bank securities sales that would more likely than not be required over the entire First Quarter (as the January

4 Presentation had done), the January 5 Presentation stated that the "Bank may need to adjust FHLB borrowings beginning 1/31/2023, based on changes to total assets." In fact, as Martino knew or recklessly disregarded, there was nothing hypothetical about the FHLB's requirement that the Bank pay down its debt to 25% of total assets as measured at the end of January 2023—the FHLB required it (and the Bank had agreed) to do just that.

242. In addition, as Martino knew or recklessly disregarded, rather than evaluate the likelihood of "incremental sales" resulting from a decrease in total assets at January 31, 2023—which is when FHLB would next assess Silvergate's 25% borrowing limit—Silvergate categorized "[a]ny incremental sales" as an "unknown[]." In other words, unlike the January 4 Presentation which incorporated a projected drop in total assets of nearly $4 billion over the First Quarter, the January 5 Presentation did not account for any drop in total assets over the quarter. In fact, as Martino knew or recklessly disregarded, the January 5 Presentation showed the bank now intended to sell $1.475 billion in securities to pay down its FHLB debt by January 13, 2023, and using such sales to pay down its debt would necessarily decrease Silvergate's total assets—and this fact rendered the presentation's OTTI calculation false.

243. In addition, as Martino knew or recklessly disregarded, unlike the January 4 Presentation, the January 5 Presentation no longer accounted for the amount or timing of the securities sales the Bank would more likely than not be required to make in the First Quarter of 2023, and it falsely reported the Bank's OTTI on the $1.7 billion in securities sales Silvergate intended to make.

244. Consequently, as Martino knew or recklessly disregarded, the January 5 Presentation did not calculate OTTI in accordance with GAAP. Instead, it omitted entirely the second part of the GAAP-required analysis of securities sales the Bank would more likely than not be required to make. As Martino knew or recklessly disregarded, the January 5 Presentation further failed to account for

the iterative effect on the Bank's total assets of the Bank's intended securities sales to pay down debt.

245.    As a result, and as Martino knew or recklessly disregarded, the Bank's Tier 1 Leverage Ratio listed in the January 5 Presentation's reflected an OTTI charge that was not calculated in accordance with GAAP.

246.    On or about January 6, 2023, notwithstanding his knowledge of the proper GAAP accounting for OTTI, Martino approved an OTTI calculation of $134 million based on $1.7 billion in expected sales, using the methodology in the January 5 Presentation.

247.    Martino also knew or recklessly disregarded that the January 5 Presentation method for calculating OTTI, which was not performed in accordance with GAAP, would impact SCC's financial statements and the Tier 1 Leverage Ratios of the Bank and SCC stated therein.

248.    For example, on January 11, 2023, Martino received draft financial reports for his approval and was specifically told that "OTTI has been booked at $134 [million]," which was calculated using the same methodology found in the January 5 Presentation.

249.    Later that day, after Martino and his accounting staff had a review call during which they discussed the effect of the $134 million OTTI charge on the Bank's financial statements and capital position, Martino wrote "I was able to go back and reconcile the [mark-to-market] and OTTI analysis we performed on the securities portfolio.  I also acknowledge the ending capital position is in line with what I was expecting based on our analysis of the various impact over the quarter."

250.    On January 11, 2023, Martino further wrote in an email to his accounting staff, "I have signed off on the financials."

251.    However, by on or about January 11, 2023, as Martino knew or recklessly disregarded, notwithstanding that the Bank had designated $1.7 billion for OTTI in its financials, the Bank had already sold $1.5 billion in securities in 2023.  In other words, for the Bank to not be required to sell more than the $1.7 billion designated for OTTI in its financials, the Bank could only sell an additional

$200 million in securities in the First Quarter after January 17, 2023, even though a sizable portion of the Bank's debt—billions of dollars' worth—was scheduled to mature over that same timeframe.

### G. Martino and SCC Made False or Misleading Statements to the Public, Which Also Omitted Material Facts, about the Bank's and SCC's Securities Sales, OTTI, Method of Calculating OTTI, and Tier 1 Leverage Ratios.

252. During the first two weeks of 2023, the bank run continued; as customer deposits fell by about $1 billion, Silvergate used its cash to repay depositors, decreasing its total assets by about $1 billion.

253. Furthermore, as described above in paragraphs 228-236 Martino knew that Silvergate's January 4 Presentation—which included a more likely than not analysis in accordance with GAAP and incorporated an almost $4 billion drop in total assets over the First Quarter of 2023—projected that the Bank would be required to sell $2.6 billion in securities to cover $2.425 billion in FHLB debt and $1 billion in BCD liabilities.

254. Nevertheless, by at least January 11, 2023, the Bank's accounting staff had prepared an Earnings Release that was based on the methodology in the January 5 Presentation which, as described above in paragraphs 237-246, did not account for any change in Silvergate's total assets, failed to accord with GAAP, and therefore only projected $1.7 billion in sales.

255. On or about January 11, 2023, Martino approved the Earnings Release, having previously directed the preparation of the accounting information included in the Earnings Release and knowing that the Bank intended to issue the Earnings Release to the public.

256. On January 13, 2023, the Bank's auditor told Martino and others at the Bank in writing that it could not provide an opinion on the appropriateness of the OTTI accounting in the Earnings Release until it completed its audit procedures.

### i. False Material Misstatements and Material Omissions in the January 17, 2023 Earnings Release.

257. On January 17, 2023, SCC issued the Earnings Release, and reported on the financial

results of its wholly-owned subsidiary, Silvergate, using the financials that Martino had approved on January 11, 2023.

258. Also on January 17, 2023, SCC filed a Form 8-K with the Commission disclosing and attaching the Earnings Release.

259. The Earnings Release stated that it was "unaudited."

260. On pages 5 and 9 of the Earnings Release, it stated that SCC "recorded a $134.5 impairment charge related to an estimated $1.7 billion in securities it expects to sell in the first quarter of 2023 to reduce borrowings."

261. The public statements contained in paragraphs 260 above were false or omitted material information because, for the reasons set forth in paragraphs 237-246 above, they materially understated the Bank's estimated securities sales in the First Quarter of 2023.

262. In fact, as shown in the January 4 Presentation and other Bank documents and as Martino knew or recklessly disregarded, to repay its FHLB debt during the First Quarter of 2023, the Bank more likely than not would be required to sell far more than $1.7 billion in securities.

263. In addition, the Earnings Release misleadingly omitted that the $1.7 billion figure did not account for the possibility that customer deposits would continue to fall in 2023, as Martino knew or recklessly disregarded had already occurred in the first two weeks of the year, and which would more likely than not require the Bank to sell additional securities.

264. Consequently, the Earnings Release falsely understated the amount of OTTI the Bank would need to record during the First Quarter of 2023; in fact, as shown in the January 4 Presentation and elsewhere, if the Bank had sold the $2.6 billion in securities it selected for sale on January 4, that would have resulted in OTTI of approximately $176.5 million.

265. In addition, the amount of OTTI reported in the Earnings Release was false because it did not account for the approximately $81 million of additional securities sales the Bank made in

the first week of January 2023.

266. Furthermore, the OTTI amount in the Earnings Release was false because it failed to account for the iterative effects of the Bank's shrinking balance sheet caused by $1.7 billion in securities sales. In fact, when the Bank used the cash from these sales to pay down debt, that would trigger additional cash needs, and thus securities sales, for the Bank to remain within its borrowing limit set by the FHLB.

267. Purporting to recite the second part of the GAAP OTTI standard, the Earnings Release further falsely stated that "an [OTTI] charge was recorded for securities that the Company will more likely than not be required to sell before recovery of its amortized cost basis."

268. The statement in paragraph 267 was false, and omitted material information, because the OTTI reported in the Earnings Release was calculated based only on the $1.7 billion that the Bank already intended to sell, and it did not reflect the total amount of securities that the Bank would more likely than not be required to sell, pursuant to GAAP.

269. The Earnings Release further misleadingly stated that the Bank had already sold $1.5 billion in securities between December 31, 2022 and January 17, 2023; thus, it falsely implied that the Bank would sell only an additional $200 million in securities in the First Quarter after January 17, 2023.

270. In fact, as Martino knew or recklessly disregarded, and by the Bank's own projections, the Bank more likely than not would be required to sell significantly more than an additional $200 million in securities—at least $800 million more based on the Bank's December 2022 projection of $2.5 billion—in the First Quarter of 2023 to cover its FHLB borrowings.

271. The Earnings Release further falsely and misleadingly stated that SCC had a Tier 1 Leverage Ratio of 5.36% and that the Tier 1 Leverage Ratio for Silvergate was 5.12%.

272. These statements were false or omitted material information because they overstated

44

Silvergate's and SCC's Tier 1 Leverage Ratios. The reported ratios were based on the $134.5 million of OTTI calculated for the $1.7 billion in securities sales the Bank intended to make. But in fact, the $1.7 billion was estimated contrary to GAAP—and contrary to the claim in the Earnings Release itself—because it did not include the securities the Bank would more likely than not be required to sell in the First Quarter of 2023. As stated above, because the $1.7 billion figure was false, the OTTI calculation of $134.5 million was false, rendering the Tier 1 Leverage Ratios stated in the Earnings Release false.

273. The release further stated that SCC's and Silvergate's Tier 1 Leverage Ratios "exceeded the 'well capitalized' standards defined by federal banking regulations of 5.00% for tier 1 leverage ratio."

274. This statement was also false because it was based on the false $1.7 billion securities sales estimate, when in fact the Bank would more likely than not be required to sell far more securities that, if properly booked as stated in in paragraph 234-236 above, would have pushed the Tier 1 Leverage Ratio below 5%.

  ii. **False Material Misstatements, Which Included Material Omissions, that Martino and SCC Made in the January 17, 2023 Earnings Call.**

275. On January 17, 2023, Silvergate and SCC held a public earnings call, in which Lane and Martino participated, to discuss the Bank's earnings release (the "January 17 Earnings Call"). On January 23, 2023, SCC also filed a Form 8-K with the Commission releasing the transcript of the Earnings Call.

276. Martino approved and directed the preparation of the accounting information included in the January 17 Earnings Call.

277. During the January 17 Earnings call, Martino stated that: "we expect to sell a portion of these securities, estimated to be $1.7 billion, in early 2023 to reduce wholesale borrowings, which resulted in the recognition of impairment charge of $134.5 million in the fourth quarter related to the

unrealized loss on those securities expected to be sold"; the SCC "anticipated selling approximately $1.7 billion of securities and had recorded an impairment charge for that sale, which is part of the loss"; and "[w]ith respect to the tangible book value per share, as I indicated previously, we recorded an impairment for $1.7 billion in securities sales, and that's already embedded in there."

278.    For the reasons set forth in paragraphs 237-247 and 261-266 above, Martino's statements described in paragraph 277 above, were false or misleading and contained material omissions of fact.

279.    Martino further stated on the January 17 Earnings Call that "[s]ubsequent to the end of the year, we sold approximately $1.5 billion of securities"; and that "we sold about $1.5 billion of what was left" in its securities portfolio.

280.    In addition, an analyst asked about the Bank's upcoming securities sales, which would be driven by the Bank's deposits, and the amount the Bank had already sold in 2023:

> The one I wanted to start on was kind of your comment about deposit flows and customer behavior, *driving decisions around selling securities.* And I'm just—I guess I'm curious what the recent update is on both. I mean, *it seems like you sold some, but not all of the securities that you earmarked for sale when you pre-released earlier this month.* And I'm just curious if there's any update to deposit flows and customer behavior that you're willing to provide at this point.
>
> (emphasis added).

281.    In his response, Martino specifically repeated the false $1.7 total expected sales figure, and repeated that $1.5 billion had already been sold:

> As we disclosed, *we anticipated selling approximately $1.7 billion of securities and had recorded an impairment charge for that sale, which is part of the loss.* And as Alan said, we're only 2 weeks into the year, but we did execute on that plan. *We've sold $1.5 billion of the $1.7 billion that we have earmarked.* And so that's transpired in the first 2 weeks of the year. And beyond that, as Alan said, it's early, it's too early in the quarter to guide further. But as we said, we have earmarked those securities for sale. The purpose was primarily to reduce borrowings, and that's what we've done at this point in time.
>
> (emphasis added).

282. For the reasons set forth in paragraphs 251 and 270 above, Martino's statements in paragraph 281 above made false implications and contained material omissions. In addition, as Martino knew or recklessly disregarded, the Bank's crypto asset customer deposits had fallen by $1 billion and it was required to pay down FHLB debt to the 25% cap by the end of the month, meaning that the Bank would be more likely than not required to sell more than $1.7 billion during the First Quarter. Martino, however, falsely implied that the Bank would only be more likely than not required to sell an additional $200 million when he repeated the $1.5 billion sales figure in response to the analyst's question.

283. In addition, Martino stated, "Tier 1 leverage ratio was 5.36% based on average assets of approximately $15 billion." In response to an analyst's question about capital and how "especially Tier 1 leverage took obviously a big move down," he again stated "the Tier 1 leverage ratio that we disclosed of 5.36%."

284. These statements in paragraph 283 were false or contained material omissions for the reasons stated in paragraphs 234-236 and 274 above.

285. Martino further stated that the Tier 1 Leverage Ratio "continue[d] to exceed the well-capitalized standards as defined by federal banking regulations."

286. This statement in paragraph 285 was false or contained made material omissions for the reasons stated in paragraphs 234-236 and 274 above.

287. The misstatements and omissions by Martino and SCC about the Bank's securities sales and OTTI were material, among other things, because investors, analysts, and the Bank tracked information about the Bank's assets, losses, customer deposits, solvency, and liquidity to determine the Bank's financial health. Indeed, on the Earnings Call, an analyst specifically asked about the Bank's planned securities sales and its customer deposit levels.

288. The misstatements about the Bank's Tier 1 Leverage Ratio were likewise material,

because investors, analysts, and the Bank tracked this ratio to determine whether the Bank was well capitalized. A change in the Bank's regulatory classification, which could occur if the Tier 1 Leverage Ratio fell below the 5% threshold, was also material to investors, who tracked if the Bank dropped below the "well capitalized" category. On the Earnings Call, an analyst specifically asked the Bank about its Tier 1 Leverage Ratio, and Martino answered.

### iii. Martino Knew or Recklessly Disregarded that the Statements in the Earnings Release and Earnings Call Were False or Contained Material Omissions.

289. Martino knew or recklessly disregarded that the statements SCC and he made in the January 17, 2022 Earnings Release and Earnings Call were false or contained material omissions because he knew or recklessly disregarded that the $1.7 billion securities sales figure was not an accurate estimate of the sales the Bank would be required to make during the First Quarter of 2023.

290. Martino knew or recklessly disregarded that, contrary to GAAP and the Bank's own statements that he had authorized, the $1.7 billion figure included only intended sales and failed to include at least $800 million in additional sales the Bank would more likely than not be required to make.

291. As set forth above in paragraphs 201-203, in late December 2022, Martino knew or recklessly disregarded that the Bank's internal projections showed the Bank intended and would more likely than not be required to sell approximately $2.5 billion in securities to repay its FHLB debt to 25% of total assets.

292. Martino further knew or recklessly disregarded that the January 4 Presentation showed that the Bank would be more likely than not be required to sell $2.6 billion in securities in the First Quarter of 2023.

293. Martino nevertheless selected a much lower estimate of the Bank's securities sales, leading to a lower OTTI and a higher Tier 1 Leverage Ratio, despite knowing or recklessly disregarding

that this lower expected sales figure did not account for all expected sales throughout the full First Quarter of 2023, but would only be sufficient to repay FHLB borrowings through January 13, 2023.

294.    Martino further knew or recklessly disregarded that, while the Bank's OTTI calculations should have accounted for the effect on total assets of additional securities sales to pay down debt over the First Quarter of 2023, the $1.7 billion figure stated in the Earnings Release failed to do so and was therefore false.

295.    Martino also knew or recklessly disregarded that the bank sold an additional $81 million in securities in the first week of 2023, which were not recorded in the OTTI figures the Bank reported on January 17, 2023, and that if properly accounted for, these sales would have decreased the Bank's and SCC's Tier 1 Leverage Ratios—which facts rendered the ratios reported in the Earnings Release false.

296.    After the Earnings Release, Martino and others at the Bank were repeatedly informed by the Bank's auditor that its OTTI statements in the Earnings Release were incorrect and should be corrected.

### H. Martino and SCC Sent a Deceptive Non-Public Letter to the Federal Reserve Bank of San Francisco.

297.    During the Relevant Period, in addition to overseeing the Bank's BSA compliance, the FRBSF supervised the Bank's safety and soundness, including its ability to safeguard customer deposits, pay its debts as required, and remain in business.

298.    Among other things, the FRBSF monitored the Bank's assets, including its securities holdings, and evaluated its leverage—that is, its use of borrowed capital. The FRBSF and other banking regulators first began requiring banks to report their Tier 1 Leverage Ratio in the wake of the 2008 global financial crisis.

299.    On January 19, 2023, Martino authored a non-public letter to the Bank's main federal regulator, the FRBSF, seeking permission to issue its dividend.

300. Martino included in his January 19 letter the false Tier 1 Leverage Ratios of 5.36% for SCC and 5.12% for Silvergate, both in written and graph forms.

301. Martino further misleadingly represented in the January 19 letter that the Bank "remained well-capitalized."

302. Martino also misleadingly included in the January 19 letter a balance sheet item of $868 million for a repo line to limit the securities that needed to be sold, despite the Bank having made no progress towards reaching an economically viable agreement for such a repo line by January 19, 2023. By including a repo line on the balance sheet, Martino was misleadingly suggesting to FRBSF that the Bank would not have to sell additional securities to repay its First Quarter debt, thus falsely assuring FRBSF that the Bank's disclosed Tier 1 Leverage Ratio was accurate.

303. In addition, the letter requested that the Bank be permitted to issue dividends, without which, Martino wrote, its "going concern status" would be damaged.

304. The letter also contained a number of contradictions with the January 17, 2023 Earnings Release.

305. For example, Martino's letter included an estimated drop in customer deposits of about $800 million, whereas the January 5 Presentation projections used for calculating expected sales did not project any loss in customer deposits.

306. The letter further assumed securities sales of $1.86 billion in the First Quarter of 2023—more than the expected security sales publicly disclosed two days prior—and then an additional $1.656 billion in expected sales in Q2 2023, resulting in additional losses that were not accounted for as OTTI.

   **I.  In February 2023, the Bank Sold Approximately $2.5 Billion in Additional Securities, and the Bank's Auditor Refused to Issue an Audit Report on Its 2022 Financial Statements without the Bank Correcting Its OTTI Calculations.**

307. On January 31, 2023, the Bank's outstanding FHLB debt was about 33% of its total

assets, far exceeding the cap of 25% set by the FHLB.

308. On February 1, 2023, at Martino's direction, the Bank approved an additional $1 billion in securities sales to repay its FHLB debt. Those sales began on or about February 2, 2023 and continued through on or about February 23, 2023.

309. While the Bank had shared a limited portion of its January 5 Presentation with its auditor before the Earnings Release, it did not disclose the January 4 Presentation showing it would more likely than not be required to sell $2.6 billion in securities in the First Quarter of 2023.

310. By mid-February 2023, the Bank's auditor also repeatedly informed Martino and the Bank's accounting staff that the OTTI calculations it had announced on January 17, 2023 were incorrect and needed to be retracted and corrected.

311. The Bank's auditor also informed Martino that it was concerned about the effects of the Bank's BSA remediation on its financial statements.

312. On February 23, 2023, the Bank authorized sales of an additional $2 billion of securities.

313. On or about February 24, 2023, Martino and the Bank agreed to make corrective entries in the Bank's books and to correct SCC's public statements about OTTI.

314. On February 27, 2023, the Bank's auditor informed Martino and others that it needed the Bank to provide information on a large number of outstanding issues before it would issue an audit report.

## IV. MARTINO AND SCC FAILED TO DEVISE AND MAINTAIN INTERNAL ACCOUNTING CONTROLS AND FALSIFIED SCC'S BOOKS AND RECORDS.

315. As a public company that held debt securities, SCC was required by GAAP to evaluate each security it held at the end of each quarter for potential impairment, including OTTI, and to appropriately value each security it held.

316. SCC was also required to maintain books and records in reasonable detail that

accurately and fairly reflected its transactions and dispositions.

317.    SCC was further required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets.

318.    As CFO, Martino had primary responsibility both for the preparation of the financial statements, as well as for directing the adoption and implementation of SCC's internal controls over financial reporting.  Martino also reviewed and approved the OTTI calculations reported by SCC.

319.    Martino falsified SCC's financials, which included its balance sheet and income statement, by approving an OTTI calculation that he knew or recklessly disregarded was false, as described above in paragraphs 237-251.  By understating OTTI in SCC's financials, Martino understated its full-year 2022 loss on securities and understated its Net Loss.

320.    During the Relevant Period, while SCC's general accounting policies discussed OTTI and the need to account for it, SCC did not have specific policies or procedures for calculating OTTI or determining which securities it would more likely than not to be required to sell.

321.    As part of its preparations for SCC's 2022 audit, SCC's auditor communicated to Martino and others at SCC on February 27, 2023 that it had preliminarily identified two material weaknesses in SCC's internal control over financial reporting.

322.    First, the auditor wrote "the control over market value testing related to AFS securities did not operate [at] a precise enough level to detect a material misstatement," which resulted in a "material error in the valuation of certain types of securities."

323.    Next, the auditor wrote that "the control over identification of OTTI related to management's intent and ability to hold available for sale securities did not operate effectively[,]" which resulted in a "material error in recording OTTI."

324. Although the auditor gave Martino and the Bank the opportunity to respond to these identified material weaknesses, SCC elected to wind down the Bank before the audit was completed.

325. However, as described above in paragraphs 163-250, Martino failed to ensure that the OTTI calculations properly accounted for both the Bank's expected sales of securities and securities it would more likely than not be required to sell, in accordance with GAAP.

326. Martino also knowingly and substantially assisted SCC's failure to devise and maintain a system of internal controls sufficient to prevent the improper valuation of securities and calculation and reporting of OTTI, as described above in paragraphs 163-250.

327. On March 1, 2023, SCC announced a delay in filing its 2022 Form 10-K and disclosed that the Bank had sold additional securities beyond the $1.7 billion previously reported.

328. On March 8, 2023, SCC announced it would liquidate and cease operations of the Bank.

329. Despite its auditor's warnings to Martino and others, SCC never corrected the misstatements in its January 17 earnings release or call, and it never booked correcting entries for the Fourth Quarter of 2022.

330. SCC never filed with the Commission its 2022 annual report, Form 10-K, or its quarterly report, Form 10-Q, for the First Quarter of 2023.

331. During the Relevant Period, Silvergate current and former employees exercised stock options and purchased SCC stock through their 401(k) plans.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2) and (3)
### (SCC)

332. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

333. Defendant SCC, by engaging in the acts and conduct described in this Complaint,

directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

334.    By reason of the foregoing, Defendant SCC directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a)(2) and (3) [15 U.S.C. § 77q(a)(2) and (3)].

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)(2) and (3)**
**(Lane)**

335.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

336.    Defendant Lane, by engaging in the acts and conduct described in paragraphs 1 through 162 of this Complaint, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (2) knowingly or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

337.    By reason of the foregoing, Defendant Lane directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(2) and (3) [15 U.S.C.

§ 77q(a)(2) and (3)].

### THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(3)
### (Fraher)

338.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

339.     Defendant Fraher, by engaging in the acts and conduct described in paragraphs 1 through 162 of this Complaint, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

340.     By reason of the foregoing, Defendant Fraher, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a)(3) [15 U.S.C. § 77q(a)(3)].

### FOURTH CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Martino)

341.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

342.     Defendant Martino, by engaging in the acts and conduct described in paragraphs 1, 5, 6 and 163-331 in this Complaint, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

343.    By reason of the foregoing, Defendant Martino, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Martino)

344.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

345.    Defendant Martino, by engaging in the acts and conduct described in paragraphs 1, 5, 6 and 163-331 in this Complaint, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

346.    By reason of the foregoing, Defendant Martino, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Martino)

347.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

348.     For the reasons set forth in paragraphs 1, 5, 6 and 163-331, SCC and Silvergate knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

349.     For the reasons set forth above in paragraphs 1, 5, 6 and 163-331 above, SCC and Silvergate violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

350.     By engaging in the acts and conduct described in in paragraphs 1, 5, 6 and 163-331 of this Complaint, Defendant Martino knowingly or recklessly provided substantial assistance to SCC and Silvergate with respect to their violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

351.     By reason of the foregoing, Defendant Martino is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting SCC's and Silvergate's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Martino will again aid and abet these violations.

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### Thereunder
### (Martino)

352.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

353.     For the reasons set forth in paragraphs 1, 5, 6 and 163-331, SCC and Silvergate directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national

securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

354.    For the reasons set forth above in paragraphs 1, 5, 6 and 163-331 above, SCC and Silvergate violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

355.    By engaging in the acts and conduct described in paragraphs 1, 5, 6 and 163-331 of this Complaint, Defendant Martino knowingly or recklessly provided substantial assistance to SCC and Silvergate with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

356.    By reason of the foregoing, Defendant Martino is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting SCC's and Silvergate's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] and, unless enjoined, Martino will again aid and abet these violations.

### EIGHTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder
### (SCC)

357.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

358.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of registered securities to file with the SEC factually accurate annual reports (on Form 10-K), quarterly reports (on Form 10-Q), and current reports (on Form 8-K).  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the

required statements, in light of the circumstances under which they were made, not misleading.

359.    By engaging in the conduct described in paragraphs 95-103, 136-145, and 257-288, Defendant SCC, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], filed a Form 10-Q for the Third Quarter of 2022, a Form 8-K disclosing its December 5, 2022 Letter, a Form 8-K disclosing its January 17, 2023 Earnings Release, and a Form 8-K disclosing the transcript of its January 17, 2023 Earnings call that each contained materially false or misleading statements and material omissions that rendered the statements in these filings, in light of the circumstances under which they were made, misleading.

360.    By engaging in the foregoing conduct, Defendant SCC, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], filed one or more reports with the Commission that contained materially false or materially misleading information.

361.    By engaging in the conduct described in paragraph 330, Defendant SCC, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], failed to file with the Commission an annual report Form 10-K for 2022 and failed to file a quarterly report Form 10-Q for the First Quarter of 2023.

362.    By reason of the foregoing, Defendant SCC violated and, unless enjoined, will again violate Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

### NINTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(5)
### (Martino)

363.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

364.    By engaging in the conduct described in paragraphs 1, 5, 6 and 163-331, Defendant Martino knowingly circumvented or knowingly failed to implement a system of internal accounting

controls and knowingly falsified, or caused to be falsified, Silvergate's and SCC's books and records.

365.     By reason of the foregoing, Defendant Martino violated and, unless enjoined, will again violate Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

## TENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(2)(A)
### (SCC)

366.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

367.     By engaging in the conduct described in paragraphs 1, 5, 6 and 163-331, Defendant SCC failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

368.     By reason of the foregoing, Defendant SCC violated and, unless enjoined, will again violate Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## ELEVENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(2)(B)
### (SCC)

369.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

370.     By engaging in the conduct described in paragraphs 1, 5, 6 and 163-331, Defendant SCC failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in accordance with GAAP or any other applicable criteria, and to maintain accountability for assets.

371.     By reason of the foregoing, Defendant SCC violated and, unless enjoined, will again violate Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

## TWELFTH CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-1
### (Martino)

372.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

373.     By engaging in the conduct described in paragraphs 1, 5, 6 and 163-331, Defendant Martino directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 13(b)(2)(A)].

374.     By reason of the foregoing, Defendant Martino violated, and unless restrained and enjoined, will again violate Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R § 240.13b2-1].

## THIRTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 12b-20 and 13a-11
### (Martino)

375.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

376.     As alleged above, Defendant SCC violated Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

377.     By engaging in the conduct described in paragraphs 1, 5, 6 and 163-331, Martino knowingly or recklessly provided substantial assistance to SCC with respect to its violations of Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

378.     By reason of the foregoing, Defendant Martino is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting SCC's violations of Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-

20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder, and, unless enjoined, Martino will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendants SCC and Lane and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)]; and permanently enjoining Defendant SCC and its agents, servants, employees and attorneys and all persons in active concert and participation with any of them from violating, directly or indirectly, Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13];

## II.

Permanently enjoining Defendant Fraher and her agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(3)];

## III.

Permanently enjoining Defendant Martino and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 13(b)(5), [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5(b) and 240.13b2-1] and from aiding and abetting any violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and (b)(2)(B)] and Rules 12b-20 and 13a-11

thereunder [17 C.F.R. 240.12b-20 and 240.13a-11];

## IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## V.

Prohibiting Defendant Martino from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. 78u(d)(2)];

## VI.

Prohibiting Defendants Lane and Fraher from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

## VII.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated:  New York, New York
      July 1, 2024

*/s  Jorge G. Tenreiro*
Jorge G. Tenreiro
Peter A. Mancuso
Hayden M. Brockett*
Laura E. Meehan
*Pro hac vice application forthcoming*

SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-5562 (Mancuso)
MancusoPe@sec.gov

*Attorneys for the Plaintiff*

<u>Of Counsel</u>
Mark R. Sylvester
Michael Brennan
Elizabeth Goody
Michael Keating
Amy Mayer
Heidi Mitza
Ivan J. Snyder
Katherine H. Stella
Katherine Zucca