**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiffs,

       against

 SILVERGATE CAPITAL CORPORATION,
ALAN J. LANE, KATHLEEN FRAHER, and
ANTONIO MARTINO,

              Defendants.

24-Civ-4987

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF**
**ANTONIO MARTINO'S MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    A.    Silvergate Bank And Its Disclosed Liquidity Crisis And Severe Distress ................. 3

    B.    The Bank's OTTI Analysis ...................................................................................... 6

    C.    The Missing Factual Allegations That Render The Complaint Deficient ................. 7

MOTION TO DISMISS LEGAL STANDARD.............................................................. 11

ARGUMENT .................................................................................................................. 12

I.    THE COMPLAINT FAILS TO PLEAD SECURITIES FRAUD ...................................... 12

    A.    Legal Standard ........................................................................................................ 12

    B.    The Bespeaks Caution Doctrine Precludes Liability For The Alleged False Statements ............................................................................................................... 14

    C.    The Complaint Fails to Allege Materiality as a Matter of Law. ................................ 17

    D.    The Complaint Fails To Allege Sufficient Facts To Prove Subjective Falsity. ......... 19

    E.    The Complaint Fails To Plead Scienter. .................................................................. 20

II.    THE COMPLAINT FAILS TO ADEQUATELY PLEAD THE ACCOUNTING CONTROLS OR AIDING AND ABETTING CLAIMS ...................................................... 24

III.    THE COMPLAINT IMPERMISSIBLY SEEKS INJUNCTIVE RELIEF ....................... 25

CONCLUSION ............................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
    693 F. Supp. 2d 241, (S.D.N.Y. 2010)......................................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................11, 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................11

*Berrian v. Pataki*,
    510 F. Supp. 2d 348 (S.D.N.Y. 2007)........................................................................11

*Billhofer v. Flamel Techs., S.A.*,
    No. 07 CIV. 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ...........................14

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)........................................................................18

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
    632 F.3d 751 (1st Cir. 2011)..................................................................................22, 25

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen.
    Holdings Corp.*,
    No. 19-CV-10825 (JPO), 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021), *aff'd
    sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach
    Police Officers' & Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL
    5142702 (2d Cir. Nov. 5, 2021).............................................................................20, 21

*In re Danimer Sci., Inc. Sec. Litig.*,
    No. 21-CV-02708, 2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) .........................14

*Dempsey v. Vieau*,
    130 F. Supp. 3d 809 (S.D.N.Y. 2015).........................................................13, 19, 21, 22

*In re: EZCorp, Inc. Sec. Litigations*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016) (Carter, J.) ............................................21, 23

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
    No. 14 CIV. 0950 LAK AJP, 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) .........14

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) ...................................................................9

*In re Finjan Holdings, Inc. Sec. Litig.*,
    No. 20-CV-04289-EMC, 2021 WL 1391539 (N.D. Cal. Apr. 13, 2021) ................14

*Gabelli Asset Fund v. Garrett Motion Inc.*,
    No. 23-668-CV, 2024 WL 1653451 (2d Cir. Apr. 17, 2024) ...............21, 22, 23, 25

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ...................................................................4, 12

*Gavish v. Revlon, Inc.*,
    No. 00 CIV. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ..............18

*Geiger v. Solomon-Page Grp., Ltd.*,
    933 F. Supp. 1180 (S.D.N.Y. 1996) ..................................................................13

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006) ...............................................................22

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................22

*Gluck v. Hecla Mining Co.*,
    657 F. Supp. 3d 471 (S.D.N.Y. 2023) (Carter, J.) ..............................................16

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...............13, 19, 20, 24

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) .......................................................................13

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)............................................................................14

*In re Hardinge, Inc. Sec. Litig.*,
    696 F. Supp. 2d 309 (W.D.N.Y. 2010) .............................................................15

*Holbrook v. Trivago N.V.*,
    No. 17 CIV. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd*
    *sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).........................23

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)............................................................................19

*In re iQIYI, Inc. Sec. Litig.*,
No. 20-CV-01830 (DG) (TAM), 2024 WL 4362509 (E.D.N.Y. Sept. 30,
2024) ............................................................................................................................. 20

*Jiehua Huang v. AirMedia Grp. Inc.*,
No. 1:15-CV-04966, 2017 WL 1157134 (S.D.N.Y. Mar. 27, 2017) (Carter, J.) ................... 16

*Johnson v. Sequans Commc'ns S.A.*,
No. 11 CIV. 6341 PAC, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ............................. 14, 16

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ........................................................................................ 21

*Kampe v. Volta Inc.*,
No. 22-CV-02055-JST, 2024 WL 4534732 (N.D. Cal. Oct. 21, 2024) ............................... 17

*Kasilingam v. Tilray, Inc.*,
No. 1:20-CV-03459-MKV, 2024 WL 4350118 (S.D.N.Y. Sept. 30, 2024) ......................... 22

*La Pietra v. RREEF Am., L.L.C.*,
738 F. Supp. 2d 432 (S.D.N.Y. 2010) ................................................................. 13, 17, 18

*Labul v. XPO Logistics*,
No. 3:18-CV-2062 (SRU), 2021 WL 1056828 (D. Conn. Mar. 19, 2021) ................. 17, 18, 19

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................................... 19

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ....................................................................................... 25

*Martin v. Prudential Bache Sec.*,
No. 84 CIV. 5055 (MJL), 1985 WL 1087 (S.D.N.Y. Apr. 29, 1985) ................................. 24

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024) ................................................. 16

*MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc.*,
913 F. Supp. 2d 1026 (D. Colo. 2012), *aff'd sub nom. MHC Mut. Conversion
Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109 (10th Cir.
2014) ............................................................................................................................. 6

*N. Port Firefighters' Pension Loc. Option Plan v. Temple-Inland, Inc.*,
No. CIV.A. 311-CV-3119 B, 2013 WL 4405537 (N.D. Tex. July 30, 2013),
*aff'd sub nom. Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015) ............................... 21

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........................................................................................ 22

*Oliver Wyman, Inc. v. Eielson*,
   No. 15 CIV. 5305 (RJS), 2016 WL 5339549 (S.D.N.Y. Sept. 22, 2016)...............................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................................................14

*Podany v. Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004)..................................................................................20

*Poindexter v. EMI Rec. Grp. Inc.*,
   No. 11 CIV. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012)............................12

*Polar Int'l Brokerage Corp. v. Reeve*,
   108 F. Supp. 2d 225 (S.D.N.Y. 2000)..................................................................................12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .............................................................................................15

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) .............................................................................................21

*In re PXRE Grp., Ltd.*, Sec. Litig.,
   600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*,
   357 F. App'x 393 (2d Cir. 2009) .....................................................................................21, 22

*Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012)..................................................................................................19

*Rivera v. Doe*,
   No. 16-CV-8809 (PAE) (BCM), 2018 WL 1449538 (S.D.N.Y. Feb. 26, 2018)....................19

*Roach v. Morse*,
   440 F.3d 53 (2d Cir. 2006)..................................................................................................25

*Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*,
   No. 21-CV-9582 (ALC)(OTW), 2024 WL 4362747 (S.D.N.Y. Sept. 30, 2024) ...................16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...........................................................................................15, 16

*S.E.C. v. Egan*,
   994 F. Supp. 2d 558 (S.D.N.Y. 2014)..................................................................................24

*S.E.C. v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008), *abrogated on other grounds*......................................25

*S.E.C. v. Fiore*,
   416 F. Supp. 3d 306 (S.D.N.Y. 2019)..................................................................................13

*S.E.C. v. Ginder*,
    752 F.3d 569 (2d Cir. 2014).................................................................................13

*S.E.C. v. Kopsky*,
    537 F. Supp. 2d 1023 (E.D. Mo. 2008), *as amended* (Mar. 21, 2008) ....................25

*S.E.C. v. Miller*,
    No. 2:17-CV-897-CBM (RAO), 2019 WL 1460615 (C.D. Cal. Feb. 6, 2019) .....................24

*S.E.C. v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999)..................................................................................13

*S.E.C. v. Perry*,
    No. CV-11-1309 R, 2012 WL 1959566 (C.D. Cal. May 31, 2012) ........................................14

*S.E.C. v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007).....................................................................24

*S.E.C. v. Price Waterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992)...............................................................21, 25

*S.E.C. v. SolarWinds Corp.*,
    No. 23 CIV. 9518 (PAE), 2024 WL 3461952 (S.D.N.Y. July 18, 2024) ...........................1, 17

*S.E.C. v. Solow*,
    No. 06-81041 CIV, 2007 WL 917269 (S.D. Fla. Mar. 23, 2007).........................................24

*S.E.C. v. Stanard*,
    No. 06 CIV 7736(GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) .................................24

*S.E.C. v. Straub*,
    No. 11 CIV. 9645 (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016)..............................24

*S.E.C. v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017).....................................................................14

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)...................................................................................11

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024).........................................................................................25

*SUN, A Series of E Squared Inv. Fund, LLC v. Sundial Growers Inc.*,
    No. 1:20-CV-03579 (ALC), 2021 WL 4482276 (S.D.N.Y. Sept. 30, 2021)
    (Carter, J.) ...........................................................................................................16

iv

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards*
    *& Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013) ..........................................................17

*In re Xerox Corp. Sec. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) ............................................................................17

## **STATUTES**

15 U.S.C. § 77k ..........................................................................................................14

15 U.S.C. § 78m ..........................................................................................................24

Private Securities Litigation Reform Act ....................................................................16

## **OTHER AUTHORITIES**

12 C.F.R. § 208.43 ...................................................................................................8, 18

17 C.F.R. § 240.10b-5 .....................................................................................12, 14, 19

17 C.F.R. § 240.13b2-1 ........................................................................................24, 25

Fed. R. Civ. P. 9(b) ............................................................................................11, 18, 24

Wendy Gerwick Couture, *Optimal Issuer Disclosure of Opinions*, 86 U. Cin. L.
    Rev. 587 (2018) .......................................................................................................14

## PRELIMINARY STATEMENT

The Securities and Exchange Commission's ("**SEC**") Complaint is implausible. It accuses Antonio Martino, the former CFO of Silvergate Bank ("**Silvergate**" or the "**Bank**"), of engaging in a narrow fraud to misstate an other than temporary impairment ("**OTTI**") charge and related information, purportedly to conceal the Bank's precarious financial position, but: (a) it lacks any allegation that Mr. Martino had a personal financial motive; (b) Mr. Martino and the Bank contemporaneously disclosed, in voluminous detail, that the Bank was under severe stress; and (c) Mr. Martino and the Bank disclosed the very losses the SEC alleges to be at issue, as accumulated other comprehensive loss ("**AOCL**") instead of as OTTI. In short, "the market got the message" that the Bank was experiencing a financial and operational crisis. *S.E.C. v. SolarWinds Corp.,* No. 23 CIV. 9518 (PAE), 2024 WL 3461952, at *46 (S.D.N.Y. July 18, 2024).

The Complaint is also implausible because it characterizes the fraud as one involving alleged false *statements of fact* relating to OTTI (the "**Statements**"). In reality, however, these Statements all reflect the Bank's and Mr. Martino's *opinions and predictions* regarding highly technical OTTI accounting calculations, determined by a forward-looking assessment of the Bank's future expected securities sales and which: (a) Mr. Martino and the Bank expressly cautioned investors not to unduly rely upon; and (b) the SEC itself has acknowledged are highly "complex" calculations that require "judgment" and are especially difficult to evaluate in an "economic crisis" (such as the one facing the Bank upon the collapse of FTX Trading Ltd. ("**FTX**") and the larger cryptocurrency market in late 2022 and early 2023). Ex. A at 25, 30.[1]

The Complaint fails to state viable claims for these and several related reasons:

---

[1] *See* Declaration of Adam S. Lurie in Support of Antonio Martino's Motion to Dismiss, dated January 14, 2025 ("**Lurie Declaration**"). Citations in the form "Ex." are to the exhibits accompanying the Lurie Declaration.

*First*, Mr. Martino is effectively immune from this enforcement action under the "bespeaks caution" doctrine because (i) investors were told, *inter alia*, that the Statements were forward looking and uncertain, based on complex and subjective judgments, and dependent upon future deposit levels and customer behavior for which guidance would be speculation, and (ii) the Statements were accompanied by additional cautionary language and a "sobering picture" of the Bank's financial and operating state.

*Second*, even if these hyper-technical projection Statements were false (they were not), the Bank and Mr. Martino disclosed to investors in great detail that the Bank was under significant stress, and any losses allegedly understated within OTTI were indisputably disclosed within AOCL, rendering these Statements immaterial as a matter of law.

*Third*, because the Statements concern opinions and not purported facts, to plausibly state the securities fraud, accounting controls, and aiding and abetting claims, the Complaint must—but fails to—allege sufficient facts to demonstrate that Mr. Martino *subjectively* believed that the opinions were false. Under Generally Accepted Accounting Principles ("**GAAP**"), when accounting for OTTI, a company is only permitted to recognize financial data that reflects conditions that existed as of the balance sheet date – here, December 31, 2022 (the "**Balance Sheet Date**"). ASC 855-10-25-1 and 3. Any other financial data "shall not" be considered. ASC 855-10-25-3. Nevertheless, the Complaint (i) points to alleged events occurring after the Balance Sheet Date; (ii) claims these events and related facts conflict with the Statements; and (iii) reflexively concludes that the Statements were therefore knowingly false and made with scienter, without alleging *any* non-conclusory facts that could bridge these factual and analytical gaps (the "**Missing Facts**") – such as a non-conclusory allegation that Mr. Martino believed such subsequent events reflected conditions that existed *as of* the Balance Sheet Date. Indeed, the Complaint even alleges

facts (detailed below) that *undercut* scienter, as do the lack of materiality and personal financial motive, the complexity of OTTI accounting, and the pervasive cautionary language and robust disclosures of the Bank's position.

*Finally*, ignoring Supreme Court precedent, the Complaint seeks injunctive relief—including an officer and director bar—without alleging the lack of an adequate legal remedy or irreparable harm absent this relief.  The SEC's request for injunctive relief must be denied and the Court should dismiss the entire Complaint with prejudice.

**FACTUAL BACKGROUND[2]**

**A.**    **Silvergate Bank And Its Disclosed Liquidity Crisis And Severe Distress**

Silvergate Capital Corporation ("**SCC**" or the "**Company**") was a publicly traded corporation, which wholly owned Silvergate – originally a small commercial bank that expanded to serve the crypto asset industry.  ECF No. 1, Compl. ¶¶ 17, 21-22.  The cryptocurrency exchange FTX, and several related entities, were among the Bank's largest customers.  *Id.* ¶¶ 104-105.  Accordingly, FTX's November 11, 2022 bankruptcy filing led to a "devastating run on the Bank's customer deposits," *id.* ¶ 163, which in turn caused a severe liquidity crisis at the Bank.  *Id.* ¶¶ 109-10.  This forced management to secure liquidity to fund outflowing deposits and ensure that all crypto asset customer deposits could be honored.  *Id.* ¶¶ 164-68.  In December 2022, Silvergate had cash and cash equivalents on hand in excess of total deposits from digital asset customers.  *Id.* ¶ 165; Earnings Presentation (defined *infra* at 3) at 6.

On January 17, 2023, Silvergate issued an earnings release (the "**January 17 Release**"),[3] with an earnings presentation (the "**Earnings Presentation**") and held a related investor call (the

---

[2] For purposes of this Motion to Dismiss only, Mr. Martino treats all of the Complaint's well-pled factual allegations as true; this is not an admission that any of the Complaint's allegations are true.

[3] This Release was also filed with the SEC on Form 8-K.  Compl. ¶ 258.  Additionally, the Bank had previously issued a press release on January 5, 2023 (the "**January 5 Release**").  The January 5 Release is publicly available on SEC

3

"**Investor Call**") (together with the January 5 Release, the "**Disclosures**").  Compl. ¶ 275.[4]  The Disclosures noted the "transformational shift" in the digital asset industry and the resulting "crisis of confidence across the ecosystem."  Ex. B, January 17 Release at 1.  In addition to the Bank's OTTI charge, related future *expected* securities sales,[5] and Tier 1 leverage ratios, *see, e.g.*, Compl. ¶ 207, the Disclosures shared and/or reiterated substantial negative news about the Bank.[6]  In connection with the OTTI-related accounting disclosures, the Bank also included significant cautionary language and disclaimers that such disclosures, *inter alia*, were forward-looking statements,[7] resulted from "subjective or complex judgments about matters that are inherently

---

Form 8-K and is evidence of what information was publicly available at the time, rendering it proper for the Court to consider.  *See, e.g.*, *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009).

[4] The Complaint relies heavily on, and therefore incorporates by reference, both the January 17 Release and the Investor Call.  *See, e.g.*, Compl. ¶¶ 5, 207, 257-74, 275-88.

[5] Such Statements included, *inter alia*, the following: (i) "[T]he Company recorded a $134.5 million impairment charge related to an *estimated* $1.7 billion of securities it *expects* to sell in the first quarter of 2023 to reduce borrowings," Ex. B, January 17 Release at 5, 9 (emphasis added); (ii) "Looking ahead, we *expect* to sell a portion of these securities, *estimated* to be $1.7 billion, in early 2023 to reduce wholesale borrowings, which resulted in the recognition of impairment charge of $134.5 million in the fourth quarter related to the unrealized loss on those securities *expected* to be sold," Ex. C at 4 (emphasis added); (iii) "As we disclosed, we *anticipated* selling approximately $1.7 billion of securities and had recorded an impairment charge for that sale, which is part of the loss," *id.* at 6 (emphasis added); and (iv) "[A]n other than temporary impairment charge was recorded for securities that the Company will *more likely than not* be required to sell before recovery of its amortized cost basis," Ex. B, January 17 Release at 14 (emphasis added).

[6] This included disclosing (i) a nearly 70% decline in digital asset customer deposits in the fourth quarter of 2022 ("**Q4:22**"), Compl. ¶¶ 163-64, Ex. D at 2; (ii) that the Bank's securities portfolio had dropped by 49.8%, with over $750 million in realized losses resulting from $5.2 2023 in securities wholesale sales in Q4:22, Compl. ¶¶ 170-71, Ex. B, January 17 Release at 4, 9; (iii) any remaining unrealized losses of nearly $200 million as AOCL, Ex. B, January 17 Release at 12; (iv) a $1 billion drop in shareholder equity for Q4:22, *id.* at 1; and (v) layoffs of 40% of Silvergate's workforce, *id.* at 9, Ex. D at 3, among several other negative disclosures.

[7] These disclaimers, among other things, explained that language such as "expect," "anticipate," "estimate," and "will likely result," indicated that a statement including such language is forward looking.  Ex. B, January 17 Release at 10; *see also* Ex. C at 2.

uncertain,"[8] should not be unduly relied upon, and "should not be regarded as a representation by [the Bank] or any other person that such expectations, estimates and projections will be achieved."[9]

Further, the Disclosures and documents incorporated by reference made clear that (i) the success of the digital currency industry and "the concentration of [the Bank's] depositor relationships in the digital currency industry generally and among digital currency exchanges in particular" could impact the accuracy of forward-looking statements, Ex. E ("**2021 10-K**") at 2; (ii) the future expected securities sales and resultant OTTI charge disclosed were directly tied to and subject to change based on the Bank's deposit levels;[10] (iii) deposits were expected to remain low after the staggering run on deposits and could possibly decline further;[11] and (iv) any guidance on deposits is "speculation" and any guidance on further securities sales would be premature, further underscoring the extensive cautionary language in the Bank's Disclosures,  Ex. C at 6.

---

[8] The Bank's Form 10-K for 2021 incorporated by reference in the Disclosures, *see, e.g.*, Ex. B, January 17 Release at 10, cautioned, *inter alia*, that OTTI is one of the Bank's "significant accounting policies," which is based on "estimates and assumptions," that "[a]ctual results could materially differ from those estimates under different assumptions or conditions," Ex. E at 66-67, and that "critical accounting policies and estimates . . . require [the Bank] to make difficult, subjective or complex judgments about matters that are inherently uncertain," *id.* at 54.

[9] Ex. B, Earnings Presentation at 2; Ex. B, January 17 Release at 10.  The Disclosures also warned that (i) such forward-looking statements "are not historical facts, and are based on current expectations, estimates and projections about [the Bank's] industry and management's beliefs and certain assumptions made by management, many of which, by their nature, are inherently uncertain and beyond our control"; and (ii) "such forward-looking statements are not guarantees of future performance and are subject to risks, assumptions and uncertainties that are difficult to predict." Ex. B, January 17 Release at 10.

[10] Mr. Martino made clear that while the Bank "*expect*[*s*] to sell a portion of these securities, estimated to be $1.7 billion, in early 2023 to reduce wholesale borrowings, which resulted in the recognition of impairment charge [sic] of $134.5 million in the fourth quarter related to the unrealized loss on those securities *expected* to be sold" and that "[s]ubsequent to the end of the year, we sold approximately $1.5 billion of securities," that the Bank "*will continue to evaluate our balance sheet and liquidity management needs, which will depend on deposit flows and customer behavior*." Ex. C at 4 (emphasis added); *see also* Ex. B, January 17 Release at 14 (stating that "an other than temporary impairment charge was recorded for securities that the Company will more likely than not be required to sell before recovery of its amortized cost basis" and "[t]he likelihood that [this] will occur in subsequent periods may depend on deposit levels and customer behavior . . . .").

[11] The January 17 Release stated that "Silvergate [is] prepar[ing] for what *it expects will be a sustained period of lower deposits*," Ex. B, January 17 Release at 1 (emphasis added), and the CEO during the Investor Call stated that "[w]e saw a modest decline in Silvergate's digital asset customers in the fourth quarter, a trend that we expect to continue in 2023 as the digital asset industry undergoes further transformation.  In turn, total deposits from digital asset customers declined to $3.8 billion December 31, 2022, compared to $11.9 billion at September 30, 2022," Ex. C at 2.

**B.      The Bank's OTTI Analysis**

Under GAAP, OTTI is a highly technical, complex, and judgment-based accounting opinion regarding whether an entity intends or will be required in the future to sell a security before recovery of its amortized cost.  Compl. ¶¶ 176-79.[12]  GAAP mandates that this analysis *only* recognize in the financial statements the effect of conditions that existed as of the Balance Sheet Date and *not* recognize the effect of conditions that only existed after it.  ASC 855-10-25-1 and 3.

Accordingly, to assess whether the Bank intended to or would likely be required to sell securities before recovery, Silvergate needed to assess both (1) its liquidity needs *as of the Balance Sheet Date* that might create the need or intent to sell securities;[13] and (2) the Bank's possible sources of liquidity, which could include securities sales, but also any other available sources, *e.g.*, net interest income, or additional borrowing through a repurchase agreement ("**repo line**"), among others, *id.* ¶¶ 176-79, 191-93, 209-10, 214.

As to FHLB debt, in December 2022, Mr. Martino and Silvergate expected that the FHLB would limit Silvergate's borrowing to 25% of its total assets and were repeatedly modeling liquidity needs and OTTI.  *See, e.g.*, Compl. ¶¶ 197, 201.  However, the FHLB's payment schedule was not known until January 3, 2023, the date the FHLB provided it to the Bank by email.  Compl. ¶ 225.  That email also stated that the FHLB borrowing limit of 25% of Silvergate's total assets would be based on month-end asset levels, not projected future asset levels.  *Id.*[14]  This is important

---

[12] Indeed, the SEC has recognized that "[i]mpairment accounting can be complex," that "[j]udgment is required in assessing whether an OTTI exists," and that a significant "economic crisis"—*e.g.*, the crypto industry-wide crisis caused by FTX's collapse—will result in "difficulties in performing OTTI evaluations."  Ex. A at 25, 30; *see also MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc.*, 913 F. Supp. 2d 1026, 1034 (D. Colo. 2012), *aff'd sub nom. MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109 (10th Cir. 2014) ("The determination of OTTI reflects the entity's judgment regarding multiple factors.").

[13] These needs included (i) repaying maturing brokered certificates of deposit ("**BCDs**"), (ii) repaying borrowings from the Federal Home Loan Bank ("**FHLB**"), and (iii) funding any outflowing customer deposits.  Compl. ¶¶ 172-74.

[14] Ex. F at 1; Compl. ¶¶ 225-26 (incorporating by reference).

because if the Bank's assets were shrinking over time, then a borrowing limit based on 25% of projected future assets would be lower than one based on 25% of the previous month's assets. The Bank's January 5 slide deck (the "**January 5 Deck**") incorporated the FHLB's payment schedule and 25% of month-end asset levels borrowing limit[15] and estimated $1.7 billion in future expected securities sales and an OTTI of approximately $131.5 million. Compl. ¶¶ 237-38; Ex. G.[16]

During this time, Mr. Martino and the Bank were also considering obtaining a repo line to offset the need to sell securities in the future. Compl. ¶ 214. On January 12, 2023, the Bank received an offer from a financial institution which would have provided significant liquidity; Mr. Martino temporarily "pause[d]" these negotiations with this financial institution. Compl. ¶¶ 214-15.[17]

Ultimately, the Bank disclosed an OTTI charge of $134.5 million relating to an estimated $1.7 billion in future expected securities sales. *Id.* ¶ 260. Four days before the January 17 Release, the Bank provided this OTTI estimate and related information to its auditor. *Id.* ¶ 256, 309.[18] In mid-February 2023 (*i.e.* approximately a month later, and taking into account various developments of which the Bank would not have been aware as of the Balance Sheet Date), the auditor informed the Bank that it disagreed with its OTTI analysis. *Id.* ¶ 310.

C.    **The Missing Factual Allegations That Render The Complaint Deficient**

The Complaint alleges that in the midst of a financial crisis at the Bank and in the industry generally, Mr. Martino was focused on maintaining the Bank's Tier 1 leverage ratio above the

---

[15] *Compare* Ex. G, *with* Compl. ¶¶ 225-26; Ex. F.

[16] In contrast, the Bank's January 4 OTTI slide deck (the "**January 4 Deck**") estimated $2.6 billion dollars in future expected securities sales with a resultant OTTI of $176.5 million. Compl. ¶ 230. Both Decks are incorporated by reference in and are integral to the Complaint. *See, e.g.,* Compl. ¶¶ 228, 237.

[17] Ex. H at 1; Compl. ¶¶ 214-15 (incorporating by reference).

[18] Ex. I; Compl. ¶¶ 256, 309 (incorporating by reference).

"well capitalized" threshold[19] and that he knowingly or recklessly underreported its future expected securities sales and OTTI to do so. *See, e.g.*, Compl. ¶¶ 198-99, 207, 272.[20] The Missing Facts below are directly relevant to these allegations and render them deficient, as the Complaint:

- Alleges that Mr. Martino was motivated to underreport OTTI to protect Tier 1 leverage, *see, e.g.*, Compl. ¶ 272, but does not—because it cannot—allege that he had any personal motive;

- Alleges that the Bank's Tier 1 leverage ratio in the January 4 Presentation and the Disclosures should have been below five percent, *id.* ¶¶ 235, 274, but does not—because it cannot—allege that the ratio (i) would not still have met the "adequately capitalized" (if not the "well capitalized") threshold, or (ii) would have remained below five percent after December 31, 2022. Indeed, the Bank's Tier 1 leverage would have automatically reset on January 1, 2023 and as the Bank's total assets (the denominator of the ratio) contracted through further securities sales, *see* Ex. C at 14-15;

- Alleges that Mr. Martino was motivated to avoid purported regulatory scrutiny that might occur if the Bank fell below the five percent threshold, *see id.* ¶¶ 184-86, but fails to take into account that the Bank was already under significant regulatory scrutiny, which itself makes any contemporaneous fraudulent conduct implausible, *see id.* ¶¶ 165-67;

- Alleges that the January 17 Release "did not account for the possibility that customer deposits would continue to fall in 2023," *see, e.g.*, *id.* ¶ 263, but does not—because it cannot—plausibly allege that Mr. Martino had reason to believe that this drop reflected conditions existing

---

[19] The Tier 1 leverage ratio measures a financial institution's Tier 1, or "core" capital ("**Tier 1 Capital**"), comprised of "the most loss-absorbing form of the Bank's capital," compared to "its total average assets over a given period." Compl. ¶¶ 180, 182. When this ratio is above five percent it is considered "well capitalized," while a ratio below five percent but above four percent renders the entity "adequately capitalized." 12 C.F.R. § 208.43(b)(1)(i)(D)(1), (b)(2)(iv). The Disclosures stated that the Company's and the Bank's ratios for Q4:22 were 5.36% and 5.12%, respectively. Ex. B, January 17 Release at 9.

[20] Relatedly, the Complaint alleges that by stating that the Bank had already sold $1.5 billion in securities, Mr. Martino misled investors into believing that the Bank would only sell $200 million more. *See* Compl. ¶¶ 269, 279.

as of the Balance Sheet Date (*i.e.*, the cut-off date for the financial data that informs an OTTI analysis – in this case, December 31, 2022). For example, the Complaint does not allege that deposits declined at a consistent pace after the FTX bankruptcy in 2022, such that Mr. Martino could have accurately predicted deposit levels in 2023.

• Alleges that differences in modelling between the January 4 and 5 Decks, and the SEC's preference for the January 4 Deck that allegedly "accorded with GAAP," Compl. ¶ 233, evidences wrongdoing, but does not—because it cannot—allege that: (i) the January 4 Deck incorporated the FHLB's *actual* payment schedule with 25% month-end asset borrowing limits, like the January 5 Deck, *see* Compl. ¶ 238, or (ii) the January 4 Deck reflected the *only* way to properly calculate OTTI, since GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management, and allow[s] reasonable accountants to reach different conclusions," *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (internal quotation marks omitted);

• Alleges that Mr. Martino "knew or recklessly disregarded that the bank sold" $81 million in securities in early 2023, Compl. ¶ 295, but does not—because it cannot—plausibly allege that Mr. Martino believed that the alleged $7 million in losses on those securities sales, Compl. ¶ 236, reflected conditions existing as of the Balance Sheet Date such that they should have been incorporated into the OTTI analysis;

• Alleges that Mr. Martino knew that the Bank would have to sell at least $800 million more in securities, Compl. ¶ 270, but does not—because it cannot—plausibly allege that Mr. Martino, if driven by OTTI concerns, could not have selected $800 million in securities, *see* Ex. B, January 17 Release at 4, whose gain/loss position would have permitted sale without incurring additional OTTI sufficient to push the Tier 1 leverage ratio below five percent;

- Alleges that the Bank's purported failure to obtain a repo line by January 17, 2023, Compl. ¶¶ 214-16, is evidence that further securities sales were the only viable method for securing additional capital, *id.* ¶ 5, but does not—because it cannot—allege that: (i) communications and productive negotiations concerning this repo line did not continue through January, or (ii) Mr. Martino believed, as of the Balance Sheet Date, that the Bank could not obtain a repo line, such that it should not have been considered when performing the OTTI analysis.

- Alleges that Mr. Martino failed to incorporate the iterative effect of a shrinking balance sheet, *see, e.g.*, *id.* ¶¶ 244, 266, but does not—because it cannot—allege that he did not consult with, or otherwise rely upon, his expert financial and accounting staff and external resources for the OTTI analysis, including with respect to any such iterative effect;[21]

- Alleges that the Bank's February 2023 securities sales, *see* Compl. ¶¶ 308, 312, and the auditor's mid-February disagreement with the Bank's OTTI approach, *see id.* ¶ 310, evidences wrongdoing, but does not—because it cannot—plausibly allege that these were conditions that existed as of the Balance Sheet Date, or even by the January 17 Disclosures.

- Alleges that the Bank's January 19 letter to the Federal Reserve Bank of San Francisco ("**FRB Letter**"), *see id.* ¶¶ 297-306, evidences wrongdoing because it contains a reference to the Bank's Tier 1 leverage ratio as being over five percent and was purportedly inconsistent with the Disclosures in certain respects.  However, it does not—because it cannot—plausibly allege that the Letter reflected an OTTI analysis – indeed, the Letter states that while the Tier 1 leverage ratios

---

[21] Indeed, the Complaint omits the fact that Mr. Martino explicitly told his staff that they would "need to modulate" borrowings with the FHLB in the projections to accommodate for the iterative effect, despite citing to this email exchange and therefore incorporating it by reference. Compl. ¶ 197; Ex. J.

disclosed therein were "at December 31, 2022," the financials attached to the Letter were as of January 18 or 19, 2023, *see* Ex. K at 2.[22]

The SEC's inability to allege these Missing Facts results in an implausible Complaint that should be dismissed with prejudice.

## MOTION TO DISMISS LEGAL STANDARD

A complaint must contain "enough facts to state a claim to relief that is plausible on its face" – when the SEC has not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat a motion to dismiss." *Berrian v. Pataki*, 510 F. Supp. 2d 348, 354 (S.D.N.Y. 2007) (internal quotation marks omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (internal quotation marks omitted). If allegations of illegal conduct are "more likely explained by" lawful conduct, the standard has not been met. *Id.* at 680.

Further, securities fraud claims and other claims that sound in fraud must satisfy the heightened pleading standard under Rule 9(b), which requires that the "allegations . . . (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields*

---

[22] Further, with regard to the line item in the balance sheet attached to the FRB Letter regarding a repo line, Compl. ¶ 302, while the Complaint alleges that as of January 19, 2023 the Bank had "made no progress towards" obtaining such a repo line, *id.*, it fails to allege that productive negotiations with such potential lenders were not ongoing.

*v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted); *see infra* at Section II.[23]

On a motion to dismiss, the Court is permitted to consider documents relied upon and/or incorporated by reference in the Complaint and documents of which it may take judicial notice, including publicly available documents introduced to establish that they "contained certain information" and/or were publicly available. *Garber* 347 F. App'x at 669; *Poindexter v. EMI Rec. Grp. Inc.*, No. 11 CIV. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012). Further, "the court need not adopt plaintiffs' subjective characterizations of documents properly before it," *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 241 (S.D.N.Y. 2000), and "[i]f a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true," *Poindexter v. EMI Rec. Grp. Inc.*, No. 11 CIV. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012).[24]

## ARGUMENT

## I.    THE COMPLAINT FAILS TO PLEAD SECURITIES FRAUD

### A.    Legal Standard

To plead securities fraud the SEC must adequately allege, *inter alia*, that Mr. Martino made (i) a material (ii) misrepresentation or omission (iii) with scienter (for Section 10(b), Rule 10b-5,

---

[23] And, while intent need not be pled with particularity, "the Federal Rules do not require courts to credit a complaint's conclusory statements [about intent] without reference to its factual context." *Iqbal*, 556 U.S. at 686.

[24] Any documents cited herein are either (i) incorporated by reference or relied on in the Complaint or (ii) publicly available documents the Court may take judicial notice of in deciding Mr. Martino's Motion to Dismiss. Further, GAAP rules ASC 320-10-35 and ASC 855-10-25-1 and 3 bear directly on how to calculate OTTI, and therefore necessarily constitute "documents integral to the complaint on whose 'terms and effect' [the SEC] relied in drafting the complaint." *Oliver Wyman, Inc. v. Eielson*, No. 15 CIV. 5305 (RJS), 2016 WL 5339549, at *1 n.1 (S.D.N.Y. Sept. 22, 2016) (citation and quotation marks omitted).

and Section 17(a)(1)) or negligence (for Section 17(a)(2)-(3)).[25]  *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

To plead materiality, it must demonstrate that "there is a substantial likelihood that [the] statement or omission significantly altered the total mix of information made available, as viewed by the reasonable investor." *La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 440 (S.D.N.Y. 2010) (internal quotation marks omitted).  "[C]ourts do not hesitate to dismiss securities claims . . . where the alleged misstatements or omissions are plainly immaterial." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).[26]

Where the alleged misstatement is an opinion, to plead falsity, the SEC must establish that Mr. Martino did not sincerely believe the opinion to be true or that he represented facts supporting the opinion that were untrue.  *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 396 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)).[27]

"A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Dempsey v. Vieau*, 130 F. Supp. 3d 809, 814 (S.D.N.Y. 2015), *adhered to on reconsideration*, No. 13 CV 6883-LTS, 2016 WL 3351081 (S.D.N.Y. June 15, 2016); *see also S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 323 (S.D.N.Y. 2019).  And while ordinarily, recklessness can satisfy Section 10(b),

---

[25] *But see infra* at 13-14 (negligence insufficient under Section 17(a)(2)-(3) where the statement is an opinion).

[26] *See also Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1184 (S.D.N.Y. 1996).

[27] Further, while a plaintiff may allege that the defendant omitted certain facts that would have rendered a sincerely held opinion not misleading, courts make clear that "sincerely held statements of opinion are rarely actionable," *Gregory*, 297 F. Supp. 3d at 417, and that establishing omission liability in the opinion context is "no small task" and "should not be given an overly expansive reading," *id.* at 396-97 (internal citations and quotation marks omitted) (citing *Omnicare*, 575 U.S. at 176).

13

Rule 10b-5, and Section 17(a)(1), and negligence satisfies Sections 17(a)(2)-(3), those standards are insufficient for opinions – the SEC must establish actual disbelief in the opinion given.[28]

### B.    The Bespeaks Caution Doctrine Precludes Liability For The Alleged False Statements

"Under the [bespeaks caution] doctrine, [a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Johnson v. Sequans Commc'ns S.A.*, No. 11 CIV. 6341 PAC, 2013 WL 214297, at *9 (S.D.N.Y. Jan. 17, 2013).[29]    The doctrine "covers forward-looking statements regarding intention and expectation."  *Johnson*, 2013 WL 214297 at *15.  "[W]hen cautionary language is present, [the court] analyze[s] the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357, 359 (2d Cir. 2002).[30]

Accordingly, courts routinely hold that words and phrases connoting expectation (such as "expect," "anticipate," "estimate" and "likely") are forward looking and, when coupled with separate cautionary language, are unactionable under the bespeaks caution doctrine.[31]  Courts also

---

[28] *See Omnicare*, 575 U.S. at 176 (holding that for Securities Act Section 11's first clause regarding "untrue statement[s] of . . . fact," despite Section 11 being a strict liability offense, where the alleged misstatement is an opinion, the defendant must have actually believed the opinion to be untrue or provided untrue supporting facts); *Billhofer v. Flamel Techs., S.A.*, No. 07 CIV. 9920, 2012 WL 3079186, at *10 (S.D.N.Y. July 30, 2012); *In re Finjan Holdings, Inc. Sec. Litig.*, No. 20-CV-04289-EMC, 2021 WL 1391539, at *10 (N.D. Cal. Apr. 13, 2021); Wendy Gerwick Couture, *Optimal Issuer Disclosure of Opinions*, 86 U. Cin. L. Rev. 587, 603 (2018) ("The disbelief requirement . . . raises the mental state element in . . . 17(a)(2) claims from negligence to disbelief . . . .").

[29] Courts regularly apply this common law doctrine in SEC enforcement actions.  *See, e.g.*, *S.E.C. v. Thompson*, 238 F. Supp. 3d 575, 602 (S.D.N.Y. 2017); *S.E.C. v. Perry*, No. CV-11-1309 R, 2012 WL 1959566, at *7 (C.D. Cal. May 31, 2012).

[30] Courts also regularly find that cautionary language in one document applies to related forward-looking statements in separate documents, including where the document is incorporated by reference.  *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 303 (S.D.N.Y. 2013); *In re Danimer Sci., Inc. Sec. Litig.*, No. 21-CV-02708, 2023 WL 6385642, at *7 (E.D.N.Y. Sept. 30, 2023).

[31] *See, e.g.*, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 CIV. 0950 LAK AJP, 2015 WL 4931357, at *14-15 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, No. 14 CIV. 0950 LAK AJP, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

consider negative information in the defendant's contemporaneous disclosures to determine whether the disclosures as a whole bespoke caution.[32]

Under every standard, (i) the Bank's OTTI-related Statements, including those concerning future expected securities sales, were forward looking as they related to expectation, anticipation, estimation, and/or likelihood and included explicit language connoting this; *supra* note 5; (ii) the Disclosures stated that such language indicated that a statement was forward-looking, *supra* note 7; and (iii) the Statements were drenched in cautionary language.[33]   The Disclosures included further cautionary language and related information—including substantial negative disclosures— that bore on the inherent uncertainty in the Bank's Statements regarding its future expected securities sales, and therefore its OTTI and the Tier 1 leverage ratios.[34]   This all provided investors

---

Courts have even found that words like "expects" or "guidance" alone are sufficient for a statement to be covered under the bespeaks caution doctrine. *See In re Harding, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 323 (W.D.N.Y. 2010) (internal citation omitted) ("[Defendant's] statements about its 'Outlook' or prospective performance were accompanied by cautionary language. Defendants used words such as 'expects' and 'guidance' in its 'Outlook' to shareholders. Such language brings into play the 'bespeaks caution' doctrine.") (certain quotation marks omitted).

[32] *See Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (holding that the "cautionary statements . . . as a whole . . . provided a sobering picture of [the company's] financial condition and future plans" where the "documents contained cautionary language and information about the financial risks, including," *inter alia*, "that the company experienced a net loss of $3.6 million for fiscal year 1997 . . . and that the company's past performance was 'not necessarily indicative of future results'").

[33] Specifically, the Disclosures and 2021 10-K incorporated by reference therein emphasized, *inter alia*, the uncertainty of the Bank's future expected securities sales, made clear that these Statements should be viewed with caution and should not be unduly relied upon, and specifically cautioned readers that OTTI involves subjective or complex judgments about inherently uncertain matters.  *See supra* at 3-5; *supra* notes 5, 7-9.

[34] Namely, the Disclosures and documents incorporated by reference therein, *inter alia*, disclosed that the Bank's future expected securities sales and resultant OTTI—and thus, necessarily, the Tier 1 leverage ratios—are impacted by and subject to change as a result of deposit levels and customer behavior; that "the concentration of [the Bank's] depositor relationships in the digital currency industry generally and among digital currency exchanges in particular" could impact the accuracy of forward-looking statements, Ex. E at 2, and that there was a "transformational shift" in the digital asset industry and "crisis of confidence across the ecosystem," Ex. B, January 17 Release at 1; that the Bank had sustained a staggering decline in deposits which were expected to remain low and could possibly decline further; that Mr. Martino and the CEO could not give more guidance on deposit levels and further securities sales because it would be speculative and premature; and that the Bank had sustained over $750 million in losses on securities sales, a near halving of its securities portfolio, and nearly $200 million in any remaining unrealized losses, among several other pieces of substantial negative information.  *See supra* at 3-5; *see supra* notes 6, 10, 11.  Indeed, the totality of the cautionary language in the Disclosures and documents incorporated by reference therein is more than sufficient when compared to what other courts have found to be sufficient cautionary language.  *Compare with Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059-60 (9th Cir. 2014).

with an overall "sobering picture" of the Bank's financial and operating state and sufficiently bespoke caution to render the Bank's and Mr. Martino's Statements unactionable as a matter of law. *Rombach*, 355 F.3d at 176.

Indeed, this Court recently dismissed a securities fraud action on similar grounds. In *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, the defendants' cautionary language was "sufficiently specific to shield Defendants from liability for their forward-looking statements" under the PSLRA's safe harbor provision[35] No. 21-CV-9582 (ALC)(OTW), 2024 WL 4362747, at *10 (S.D.N.Y. Sept. 30, 2024).[36] The cautionary language in *Peloton* is strikingly similar to the language in the Bank's Disclosures and in the 2021 10-K, *see supra* at 3-5, which included language that cautioned investors about the very risk that actually occurred – a further drop in deposits and its impact on securities sales.[37]

"When read in [its] entirety, as [it] must be, [the cautionary language here] not only bespeak[s] caution, [it] shout[s] it from the rooftops." *Maso Cap. Invs. Ltd. v. E-House (China)*

---

[35] The safe harbor provision is closely related to the bespeaks caution doctrine. *See Johnson*, 2013 WL 214297, at *9 ("Similarly, [to the bespeaks caution doctrine] the Private Securities Litigation Reform Act ('PSLRA') contains a counterpart safe-harbor provision [that] provides (in pertinent part) that an issuer or underwriter shall not be liable with respect to any forward-looking statement . . . if and to the extent that . . . the forward-looking statement is . . . identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.") (citation and quotation marks omitted).

[36] Such language included "company-specific warnings that actual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated" and language warning, *inter alia*, of "the very risks alleged to have later occurred, including 'a change in consumer spending preferences' due to 'the COVID-19 pandemic,' and the 'uncertain[ty of] how the COVID-19 pandemic will impact Subscriber renewal rates in the long-term.'" *Id.* at *10.

[37] *See also Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 485 (S.D.N.Y. 2023) (Carter, J.) ("These warnings, when read together, caution investors of the very risks that Plaintiffs allege ultimately occurred . . . This language is sufficiently specific to insulate Defendants from liability for its forward-looking statements."); *SUN, A Series of E Squared Inv. Fund, LLC v. Sundial Growers Inc.*, No. 1:20-CV-03579 (ALC), 2021 WL 4482276, at *8 (S.D.N.Y. Sept. 30, 2021) (Carter, J.); *Jiehua Huang v. AirMedia Grp. Inc.*, No. 1:15-CV-04966, 2017 WL 1157134, at *8 (S.D.N.Y. Mar. 27, 2017) (Carter, J.).

*Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at *4 (2d Cir. June 10, 2024) (internal quotation marks omitted).  Accordingly, the Court should dismiss with prejudice on this basis alone.

### C.    The Complaint Fails to Allege Materiality as a Matter of Law.

Courts routinely find a lack of materiality where the allegedly misstated or omitted information was already publicly available, where "the market got the message [and] [t]he additional disclosure . . . that the SEC contends was obligatory was not materially different from the information that was already publicly disclosed," or where the entity's other public disclosures are sufficiently negative to overshadow it.  *SolarWinds,* 2024 WL 3461952, at *46.[38]

Here, the Complaint fails to plead that the Statements were *materially* misleading in light of the "total mix of information made available" at the time.  *La Pietra*, 738 F. Supp. 2d at 440 (internal quotation marks omitted).  As the Complaint and the Disclosures make clear, during the relevant period (the end of 2022 and early 2023), the Bank was in a financial crisis that—by January 17, 2023—was well-known to the investing public.  For example, the Bank disclosed layoffs of 40% of Silvergate's workforce, a nearly 70% decline in digital asset customer deposits in Q4:22, and that its securities portfolio had dropped by 49.8%, with over $750 million in realized losses resulting from $5.2 billion in securities sales in Q4:22, Ex. D at 2, 3; Ex. B, January 17 Release at 4, 9, among several other negative disclosures.  *See supra* note 6.  Further, any

---

[38] *See also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 488 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014) ("[N]o securities law disclosure violation can occur when information allegedly omitted from a corporation's public disclosures is already available to the market.") (quotation marks omitted); *In re Ambac Fin. Group, Inc. Securities Litig.*, 693 F. Supp. 2d 241, 278-79 (S.D.N.Y. 2010) (holding that statements that were "allegedly rendered misleading due to," *inter alia*, "[the company's] misstatement of its financials and failure to comply with GAAP" were immaterial in the context of, *inter alia*, the company having "announced a $5.4 billion mark-to-market loss on its CDO portfolio for the fourth quarter of 2007. . . as well as an impairment charge of over $1 billion and the sudden resignation of [the] CEO"); *Kampe v. Volta Inc.*, No. 22-CV-02055-JST, 2024 WL 4534732, at *8 (N.D. Cal. Oct. 21, 2024) (emphasis added) ("A statement is misleading if it would give a reasonable investor the impression of a state of affairs *that differs in a material way* from the one that actually exists.") (citations and quotation marks omitted); *Labul v. XPO Logistics*, No. 3:18-CV-2062 (SRU), 2021 WL 1056828, at *10 (D. Conn. Mar. 19, 2021); *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1266 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013).

unrealized losses that were not reported as OTTI were disclosed as AOCL – reflecting nearly $200 million in unrealized losses. *See* Ex. B, January 17 Release at 12. In this context, even if OTTI was understated, or the purportedly correct amount of OTTI (which the SEC conspicuously fails to allege) would have pushed the Tier 1 leverage ratio below five percent as of December 31, 2022, no reasonable investor would consider it to have "significantly altered the total mix of information made available," not least of all, because any investor considering OTTI would have known that the Tier 1 leverage ratio would reset, regardless, to above five percent on January 1, 2023.[39] *La Pietra*, 738 F. Supp. 2d at 440 (internal quotation marks omitted).

The Complaint also fails to allege materiality with particularity. A complaint must at least "approximate the magnitude or degree of [the] misstatements in relation to [the company's] total financial picture" to plead materiality with particularity. *Gavish v. Revlon, Inc.*, No. 00 CIV. 7291 (SHS), 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004).[40] Here, the Complaint does not quantify the amount by which the Bank allegedly misstated OTTI, failing to satisfy Rule 9(b). Instead, the Complaint makes contradictory statements about the accuracy of the January 4 Deck, upon which it heavily relies and is the closest the Complaint comes to alleging a specific OTTI

---

[39] *See* Compl. ¶ 180 (explaining that Tier 1 leverage ratio is, definitionally, "calculated by dividing the Bank's 'Tier 1 Capital' by its total average assets *over a given period*." (emphasis added)). With the start of a new period, in this case Q1 2023, investors would have understood that the average assets in the denominator of the equation are reset. *See* Ex. C at 14-15 (explaining that the Company's Tier 1 leverage ratio of 5.36% in the January 17 Disclosures was based on "average assets of approximately $15 billion," but that the balance sheet in Q4:22 actually ended at $11.3 billion and with the further sale of $1.5 billion in securities in early January, the Tier 1 leverage ratio by January 17 would have been significantly higher).

Furthermore, even if Tier 1 leverage fell below five percent for Q4:22, the Complaint does not allege that the Bank would not still be considered "adequately capitalized," 12 C.F.R. § 208.43(b)(1)(D)(1), and does not account for the fact that the Bank was already under regulatory scrutiny (which the Complaint concedes), *see* Compl. ¶¶ 165-67. In any case, to the extent the Court agrees with the SEC that a temporary drop in Tier 1 leverage may be "a blaring indicator of financial distress," ECF No. 38 at 3, under the circumstances described here, the public was already well aware that the Bank was under "financial distress," such that a drop in Tier 1 leverage could not have significantly altered the total mix of information.

[40] *See also Labul*, 2021 WL 1056828, at *19 ("[A] complaint must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture."); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007).

understatement.[41]  "These contradictions . . . render[] necessary elements of the [SEC's] fraud

claims internally self-contradictory, [and] constitute deficiencies warranting [their] dismissal."  *In*

*re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001).[42]  Accordingly,

the Complaint fails to establish materiality as a matter of law.

### D.     The Complaint Fails To Allege Sufficient Facts To Prove Subjective Falsity.

"It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively

optimistic, [or] not borne out by subsequent events.  The Second Circuit has firmly rejected this

'fraud by hindsight' approach."  *Gregory*, 297 F. Supp. 3d at 396 (internal citations and quotation

marks omitted).[43]  Courts recognize that OTTI is an opinion and dismiss complaints where there

is a failure to sufficiently allege that the defendant subjectively believed the OTTI statements were

untrue.[44]  Similarly, "[s]tatements that express expectations for the future rather than presently

---

[41] The Complaint alleges that the January 4 Deck "accorded with GAAP," *see* Compl. ¶¶ 232-233, 238, 253, but also states that the January 4 Deck "failed to reflect an unrecorded loss on securities of approximately $43 million" and did not account for "approximately $7 million of additional losses."  *Id.* ¶¶ 235-236.  The Complaint cannot have it both ways.

[42] *See also Rivera v. Doe*, No. 16-CV-8809 (PAE) (BCM), 2018 WL 1449538, at *5 (S.D.N.Y. Feb. 26, 2018) ("[C]ontradictory allegations cannot support Plaintiffs' pleading burden.") (citation and quotation marks omitted) *report and recommendation adopted*, No. 16-CIV-8809 (PAE) (BCM), 2018 WL 1441386 (S.D.N.Y. Mar. 22, 2018). Further, even assuming that the Bank's OTTI should have been the $176.5 million from the January 4 Deck (*see* Ex. L at 2), that would represent an understatement of OTTI of only approximately $42 million.  Even if one adds the additional $43 million in losses as well as the $7 million in losses from securities sales in January 2023 (Compl. ¶¶ 235-36), that would represent less than $100 million in allegedly understated losses.  When compared to the Bank's total securities portfolio as of December 31, 2022—$5.7 billion, *id.* ¶ 170—this alleged understatement is approximately 1.61% of the Bank's portfolio, and therefore not material.  *See Labul*, 2021 WL 1056828, at *9 ("The SEC's Staff Accounting Bulletin ('SAB') No. 99 provides that a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality."); *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 488 (2d Cir. 2011) ("[A]ny alleged impairment of the Triton Loans must be analyzed in relation to CBRE's entire investment portfolio ($1.1 billion), consistent with the quantitative approach [under Second Circuit precedent].").

[43] *See also City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68-69 (2d Cir. 2012) (internal citations omitted) (holding that the plaintiff's Section 10(b) and Rule 10b-5 claims "were properly dismissed by the district court" where the "second amended complaint [was] devoid even of conclusory allegations that defendants did not believe in their statements of opinion regarding [the defendant corporation's] goodwill at the time they made them" and "even if the second amended complaint did plausibly plead that defendants were aware of facts that should have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim").

[44] *See Dempsey*, 130 F. Supp. 3d at 818 (internal citations omitted) (dismissing claim "insofar as it is based on Defendants' failure to disclose an OTTI in the value of the battery inventory" because "[a] statement regarding OTTI

existing, objective facts"—like the Bank's future expected securities sales—"are also statements of opinion," *Gregory*, 297 F. Supp. 3d at 406 (internal quotation marks omitted), which must be alleged with particularity.[45]

Here, the Complaint fails to adequately allege that Mr. Martino did not sincerely believe that the Bank's future expected securities sales and resultant OTTI amount were correct. Notably, the Complaint fails to allege—and given GAAP rules, cannot allege—that Mr. Martino did not sincerely believe that an entity "shall not" recognize (*i.e.*, incorporate into its OTTI analysis) the financial impact of conditions that did not exist as of the Balance Sheet Date. ASC 855-10-25-3. As described above (*supra* at 7-11), the Complaint merely cites to post-Balance Sheet Date events and related facts as purported evidence that Mr. Martino knew the OTTI and future expected securities sales disclosed to be incorrect, *i.e.*, textbook fraud by hindsight. Additionally, the Missing Facts reflect significant gaps in logic between the alleged facts and the necessary allegations to plead knowledge or fraudulent intent, making the claims implausible. *See supra* at 7-11. Accordingly, the Complaint fails to establish subjective falsity.

### E.    The Complaint Fails To Plead Scienter.

First, the Complaint does not allege any motive other than Mr. Martino's purported desire to help the Bank by ensuring that its Tier 1 leverage ratio remained above five percent for Q4:22. *See, e.g.*, Compl. ¶ 199. This is insufficient.[46] Indeed, the Complaint does not—because it

---

[45] *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) ("[P]laintiffs must allege with particularity that defendants did not sincerely believe the opinion they purported to hold.").

[46] Indeed, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute motive for purposes of this inquiry." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *6 (S.D.N.Y. Jan. 21, 2021) (citations omitted), *aff'd sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL 5142702 (2d Cir. Nov. 5, 2021); *see also In re iQIYI, Inc. Sec. Litig.*, No. 20-CV-01830 (DG) (TAM), 2024 WL 4362509, at *17 (E.D.N.Y. Sept. 30, 2024) (holding that a motive to "mask the disparity between .

is an opinion, not a matter of objective fact," and the plaintiffs did not adequately allege that the defendants "did not honestly believe the opinion").

cannot—allege any personal motive, financial or otherwise, and therefore does not adequately

allege scienter.[47]  In particular, the Complaint does not allege that Mr. Martino sold any securities

from December 2022 to February 2023 – or ever.

Additionally, the SEC itself recognizes how complex and judgment-based OTTI

calculations are and that a significant "economic crisis" will result in "difficulties in performing

OTTI evaluations."[48]  But "allegations of GAAP violations or accounting irregularities, standing

alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled

with evidence of corresponding fraudulent intent might they be sufficient."  *In re: EZCorp, Inc.*

*Sec. Litigations*, 181 F. Supp. 3d 197, 210 (S.D.N.Y. 2016) (Carter, J.) (quotation marks omitted).

Accordingly, even if the Complaint sufficiently alleged that the OTTI Disclosures were not—in

hindsight—technically correct, errors in such a complex and judgment-based accounting

opinion—especially during an economic crisis—are insufficient to establish scienter.[49]  Even if

Mr. Martino was "overzealous in predicting" that other sources of liquidity could offset the need

to sell further securities, "being wrong—even embarrassingly so—is not the same as being

---

. . real and overstated deferred revenue figures" was insufficient) (quotation marks omitted);  *In re PXRE Grp., Ltd.*, Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

[47] *See Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *7 (citation and quotation marks omitted) ("[T]he fact that neither named defendant was alleged to have sold any stock negates an inference of scienter.").  *See also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001); *Gabelli Asset Fund v. Garrett Motion Inc.*, No. 23-668-CV, 2024 WL 1653451, at *2 (2d Cir. Apr. 17, 2024) ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.") (citation and quotation marks omitted); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021) ("[I]f the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter.").

[48] Ex. A at 25, 30.  The Treasury Department's Office of Thrift Supervision also noted that "[a]ssessing OTTI is complex and involves significant judgment.  There are no 'bright lines'" JA 315 (Ex. M at 1).

[49] *See S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992) (holding that "no finding of fraud or recklessness can rationally be made" for "complex issues of accounting as to which reasonable accountants could reach different conclusions"); *Dempsey*, 130 F. Supp. 3d at 818 (holding that the defendant's failure to report an OTTI was an insufficient basis for scienter); *N. Port Firefighters' Pension Loc. Option Plan v. Temple-Inland, Inc.*, No. CIV.A. 311-CV-3119 B, 2013 WL 4405537, at *6 (N.D. Tex. July 30, 2013), *aff'd sub nom. Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015).

dishonest, as a securities fraud claim requires." *Kasilingam v. Tilray, Inc.*, No. 1:20-CV-03459-MKV, 2024 WL 4350118, at *14 (S.D.N.Y. Sept. 30, 2024) (quotation marks omitted).[50]

Further, the Complaint itself alleges facts that *undercut* scienter. First, if Mr. Martino was fraudulently seeking to ensure that the Tier 1 leverage ratio remained above five percent, it is a reasonable inference from the Complaint that he would have accepted the repo line offer provided to him on January 12. Compl. ¶ 215.[51] A repo line would have substantially reduced the need to sell securities in the future (and OTTI). *Id.*; Ex. H at 1. Moreover, if Mr. Martino were engaged in fraud, it is nonsensical that he would disclose the OTTI evaluation to the Bank's auditor four days before the January 17 Release, which the auditors challenged only a few weeks later.[52] Compl. ¶¶ 256, 309-310, Ex. I at 2-3.[53]

Scienter is further negated by (1) the lack of materiality, and (2) the extensive cautionary language discussed above.[54] Indeed, the SEC's theory that Mr. Martino fraudulently understated OTTI by a relatively small amount to protect Tier 1 leverage, while also simultaneously disclosing (i) that the Bank was in a crisis, and (ii) any remaining unrealized losses (not reported as OTTI) as

---

[50] *See also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (holding that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did" are insufficient).

[51] *See Dempsey*, 130 F. Supp. 3d at 814-15.

[52] In fact, the Complaint acknowledges that "[f]rom December 20, 2022 through March 2023, [Mr.] Martino regularly discussed—with the Bank's employees, its auditor, and others—OTTI, its calculation, and the Bank's obligation to report OTTI on its financial statements." Compl. ¶ 194.

[53] *See Gabelli*, 2024 WL 1653451, at *3 ("[E]ven if [the defendant] had succeeded in deceiving the market, its deception would have, at most, provided a short respite from an inevitable day of reckoning before the truth was discovered. The district court correctly concluded that the TAC did not adequately plead scienter.") (internal citation and quotation marks omitted); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) ("Courts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations."). *See also Owens*, 789 F.3d at 541 ("Additional transparency . . . further negates the inference of scienter.").

[54] *See e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011) ("If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact."); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("[P]laintiffs cannot rely on information generally known or available to the public to support to support circumstantial scienter allegations."); *In re PXRE Grp.*, 600 F. Supp. 2d at 533-34.

AOCL, is entirely implausible.[55]  Unlike situations where a defendant hides an asset's true value from the public through a lack of disclosure or proper accounting—*e.g.*, where management assigns an inappropriately low bad debt reserve to an accounts receivable balance on the financial statements despite knowing it will not collect the entire balance—the Bank and Mr. Martino communicated the fair value of its portfolio and its realized and unrealized losses.

In light of the above, the much more compelling inference (than scienter) is that Mr. Martino sought to accurately estimate OTTI, understanding that (i) an OTTI analysis may only incorporate facts about conditions that existed as of the Balance Sheet Date, and (ii) that conditions existing as of that Date suggested that the Bank would be able to offset the need to sell further securities at a loss through other sources of liquidity.  The SEC's allegations amount to nothing more than fraud by hindsight.[56]  Accordingly, the Complaint fails as a matter of law to allege facts sufficient to establish scienter and fails to plead securities fraud.[57]

---

[55] *See Gabelli*, 2024 WL 1653451, at *3 ("It is unlikely that Garrett believed it could deceive investors as to the long-term viability of its capital structure when investors could easily evaluate such claims in light of the financial information in its public filings."); *Holbrook v. Trivago N.V.*, No. 17 CIV. 8348 (NRB), 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26, 2019) ("[A]ny semblance of an inference of fraudulent intent . . . is rendered implausible by [the] numerous and fulsome disclosures . . . , and is therefore neither as cogent nor as compelling as an opposing inference of non-fraudulent intent."), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).  Further, Mr. Martino disclosed to the public that the Bank had sold $1.5 billion of the $1.7 billion the Bank had "anticipated" selling.  Compl. ¶ 279; Ex. C at 6.  While the Complaint attempts to frame this disclosure as misleading, Compl. ¶ 282, this is simply another example of Mr. Martino's willingness to be transparent and is thus inconsistent with scienter.

[56] *See In re: EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016) ("The fact that a financial item is accounted for differently, or in a later period, does not support an inference that a previously filed financial statement was fraudulent.  This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss.") (Carter, J.) (quotation marks omitted).

[57] This analysis applies equally even if a showing of recklessness or negligence were sufficient here (they are not). Namely, the Complaint fails to adequately allege that (i) Mr. Martino did not reasonably rely on GAAP guidance stating that only information about conditions existing as of the Balance Sheet Date may be incorporated into the OTTI analysis and all information about conditions that did not exist as of the Balance Sheet Date "shall not" be incorporated, *see* ASC 855-10-25-3, or (ii) in the midst of a crisis, Mr. Martino did not exercise the utmost care under the circumstances.

## II.    THE COMPLAINT FAILS TO ADEQUATELY PLEAD THE ACCOUNTING CONTROLS OR AIDING AND ABETTING CLAIMS

Under Section 13(b)(5), "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account."  15 U.S.C. § 78m(b)(5).  Adequately pleading Section 13(b)(5) requires a showing of scienter.[58]  Under Rule 13b2-1, "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act," and to plead aiding and abetting, the SEC must establish that the defendant knew of and substantially assisted in achieving a "securities law violation by the primary (as opposed to the aiding and abetting) party," *Martin v. Prudential Bache Sec.*, No. 84 CIV. 5055 (MJL), 1985 WL 1087, at *2 (S.D.N.Y. Apr. 29, 1985).  Further, as described in Section I.A., where—as is the case here—the allegedly false statement is an opinion, the Complaint must establish that the defendant knew the statement to be false even where the statute does not ordinarily require knowledge.[59] Finally, courts apply the Rule 9(b) heightened pleading standard to claims under Section 13 of the Exchange Act and related claims of aiding and abetting when the allegations sound in fraud.[60]

Here, the SEC has not met its burden.  As to Section 13(b)(5), even to the extent that only knowledge (and not scienter) is required, for the reasons detailed in Sections I.D., I.E., Mr. Martino did not knowingly fail to implement or circumvent the Bank's accounting controls or knowingly

---

[58] *See S.E.C. v. Stanard*, No. 06 CIV 7736(GEL), 2009 WL 196023, at *30 (S.D.N.Y. Jan. 27, 2009).

[59] *See Gregory*, 297 F. Supp. 3d at 396.  In any case, as to Rule 13b2-1, even when the misstatement is not an opinion, "the SEC must demonstrate that [a defendant] knew of facts that contradicted the substance of the reported accounting."  *S.E.C. v. Straub*, No. 11 CIV. 9645 (RJS), 2016 WL 5793398, at *21 (S.D.N.Y. Sept. 30, 2016) (internal citations and quotation marks omitted).  Indeed, some courts have also held that Rule 13b2-1 generally requires a showing of knowledge.  *See S.E.C. v. Miller*, No. 2:17-CV-897-CBM (RAO), 2019 WL 1460615, at *2 (C.D. Cal. Feb. 6, 2019).

[60] *See S.E.C. v. Egan*, 994 F. Supp. 2d 558, 564 (S.D.N.Y. 2014); *S.E.C. v. Power*, 525 F. Supp. 2d 415, 423-24 (S.D.N.Y. 2007); *S.E.C. v. Solow*, No. 06-81041 CIV, 2007 WL 917269, at *4 (S.D. Fla. Mar. 23, 2007).

falsify its accounting.[61]  The SEC has similarly failed to plead subjective falsity as to the Rule 13b2-1 claim, and aiding and abetting.[62]  *See supra* at 19-20.

## III.    THE COMPLAINT IMPERMISSIBLY SEEKS INJUNCTIVE RELIEF

The SEC seeks two permanent injunctions against Mr. Martino,[63] but fails to allege the lack of an adequate remedy at law[64] or irreparable harm.  Therefore, the injunctions must be denied. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024); *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims with prejudice.

Dated:      January 14, 2025
New York, New York

Respectfully submitted,

LINKLATERS LLP

By:      */s/ Adam S. Lurie*
_____

---

[61] Further, while the Complaint alleges that "SCC did not have specific policies or procedures for calculating OTTI or determining which securities it would more likely than not be required to sell [*sic*]," Compl. ¶ 320, the Complaint does not adequately allege that such specificity is required – especially as the Complaint also alleges that the Bank's policies specifically reference evaluating OTTI "'according to the guidance' in GAAP," *id.* ¶ 189, 320.  And, the Bank's after-the-fact disagreement with its auditor, *see id.* ¶¶ 310, 323, is insufficient to establish a knowing failure to implement or circumvention of the Bank's accounting controls.  *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) ("[T]hat Defendants changed auditors because of a difference in judgment about generally accepted accounting principles does not establish conscious behavior on the part of Defendants.").

[62] Moreover, given that the Statements were immaterial and that Mr. Martino oversaw the fulsome disclosure of substantially more negative and related disclosures and the pervasive cautionary language therein, as described in Section I.E., it would be implausible that Mr. Martino nonetheless knowingly underreported OTTI and thereby failed to implement or circumvented accounting controls regarding OTTI, falsified Silvergate's accounting, or aided and abetted the Company's alleged violations.  *See Gabelli*, 2024 WL 1653451, at *3; *Waters Corp.*, 632 F.3d at 757. Further, even if the standard were recklessness or reasonableness, the Complaint has failed to allege that Mr. Martino acted recklessly or unreasonably under the circumstances.  *See supra* note 57; *Price Waterhouse*, 797 F. Supp. at 1241; *S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 486 (S.D.N.Y. 2008), *abrogated on other grounds*.

[63] Compl. ¶¶ III, V.

[64] The SEC concedes an adequate legal remedy exists by seeking civil penalties.  *See S.E.C. v. Kopsky*, 537 F. Supp. 2d 1023, 1026 (E.D. Mo. 2008), *as amended* (Mar. 21, 2008) (citing *Tull v. United States*, 481 U.S. 412 (1987).

Adam S. Lurie
Patrick C. Ashby
Elizabeth Myers Raulston
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Fax: (212) 903-9100
adam.lurie@linklaters.com
patrick.ashby@linklaters.com
elizabeth.raulston@linklaters.com

Douglas J. Davison (*pro hac vice*)
601 13th St. NW #400
Washington, D.C. 20005
Telephone: (202) 654-9200
Fax: (202) 654-9210
doug.davison@linklaters.com

*Attorneys for Defendant Antonio Martino*