**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**U.S. SECURITIES AND EXCHANGE**
**COMMISSION,**

                **Plaintiff,**

    **-against-**

**SILVERGATE CAPITAL CORPORATION,**
**ALAN J. LANE, KATHLEEN FRAHER, and**
**ANTONIO MARTINO,**

                **Defendants.**

**24 Civ. 04987 (ALC)**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT ANTONIO MARTINO'S MOTION TO DISMISS**

Peter A. Mancuso
Hayden M. Brockett
Laura E. Meehan
U.S. SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004

February 28, 2025            *Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................................1

THE COMPLAINTS'S FACTUAL ALLEGATIONS ......................................................................3

   I.   Background: the Bank and FTX's Collapse ............................................................................3

   II.   Martino's 2022 OTTI Calculations .......................................................................................4

        A.  GAAP Requirements Regarding OTTI .....................................................................4

        B.  Martino Understood the Bank's Dire Need to Sell Securities in the First Quarter of 2023 ("Q1 2023") ................................................................................................5

        C.  Martino Used an Improper OTTI Calculation .........................................................6

        D.  Martino Intentionally Made, and Caused the Bank to Make, Material Misstatements and Omissions ...........................................................................................7

LEGAL STANDARD .......................................................................................................................9

ARGUMENT ..................................................................................................................................10

   I.   THE COMPLAINT ADEQUATELY ALLEGES SECURITIES FRAUD .......................10

        A.  The Complaint Adequately Alleges False Statements and Material Omissions ..........10

            1.  The Complaint Alleges False Statements of Fact ...........................................10

            2.  The Complaint Adequately Alleges Actionable False Opinions...................11

        B.  The Complaint Adequately Alleges That Martino Acted with Scienter ......................15

        C.  The Complaint Adequately Alleges Materiality................................................................16

        D.  The Bespeaks Caution Doctrine Is Inapplicable................................................................19

        E.  Martino Aided and Abetted the Bank's Fraudulent Conduct.......................................22

   II.   MARTINO'S BOOKS AND RECORDS VIOLATIONS.................................................23

   III.   MARTINO'S INJUNCTIVE RELIEF ARGUMENT IS PREMATURE..............................24

CONCLUSION..............................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145 (2d Cir. 2021)............................................17

*In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010) ........................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................................9

*In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010)....18

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ..........................................................................................9

*In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197 (S.D.N.Y. 2016) .................................................15

*Ganino v. Citizens Utility Co.*, 228 F.3d 154 (2d Cir. 2000)....................................................................18, 19

*Gavish v. Revlon, Inc.,* 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) .........................................................19

*Goldman v. Belden,* 754 F.2d 1059 (2d Cir. 1985) ........................................................................................9

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002).................................................................20

*Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022)............................................................13

*Iowa Pub. Employees Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137 (2d. Cir. 2010) ...................................20, 22

*Labul v. XPO Logistics*, 2021 WL 1056828 (D. Conn. Mar. 19, 2021) .........................................................19

*In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506 (S.D.N.Y. 2024) .....................................................14

*McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184 (2d Cir. 2007).................................................................9

*New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo,*
   122 F.4th 28 (2d Cir. 2023) ............................................................................. 10, 11, 12, 13, 14

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).........................................................................................15, 16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015 ........................... 14

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86 (2d Cir. 2010) ..16

*In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453 (S.D.N.Y. 2010)..................................................................22

*In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ..............................................20, 22

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004).........................................................................................20, 22

*SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020)........25

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .....................................................................22

*SEC v. Caserta*, 75 F. Supp. 2d 79 (E.D.N.Y. 1999) .............................................................14

*SEC* v. *China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014)...............23

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007).....................................24

*SEC v. DiMaria*, 207 F. Supp. 3d 343 (S.D.N.Y 2016) .........................................................16

*SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008) ...........................................................15

*SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013)............25

*SEC v. Genesis Global Capital, LLC*, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024)......................25

*SEC v. Goldstone*, 952 F. Supp. 2d 1060 (D.N.M. 2013) .......................................................20

*SEC v. Kopsky*, 537 F. Supp. 2d 1023 (E.D. Mo. 2008).........................................................25

*SEC v. Landberg*, 836 F. Supp. 2d 148 (S.D.N.Y. 2011) .......................................................15

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010)...............................................................10

*SEC v. Medallion Fin. Corp.*, 2022 WL 3043224 (S.D.N.Y. Aug. 2, 2022)..................................14

*SEC v. Rosenberger*, 2024 WL 308198 (S.D.N.Y. Jan. 26, 2024) .............................................23

*SEC v. Stanard*, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009)...................................................23

*SEC v. Thompson*, 238 F. Supp. 3d 575 (S.D.N.Y. 2017) ..................................................20, 21

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................22

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ................................................15

*Starbucks v. McKinney*, 144 S. Ct. 1570 (2024) ...............................................................25

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).....................................................25

### Statutes and Regulations

15 U.S.C. § 77t(b)..................................................................................................25

15 U.S.C. § 77t(d)..................................................................................................25

15 U.S.C. § 78u(d) ........................................................................................................... 25

15 U.S.C. § 78u(e) ........................................................................................................... 25

15 U.S.C. § 78u-5(b)(2)(A) .............................................................................................. 21

17 C.F.R. § 240.13b2-1 .................................................................................................... 23

*Rules*

Fed. R. Civ. P. 9(b) .......................................................................................................... 15

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this opposition to the motion to dismiss (D.E. 45, "Motion") of Defendant Antonio Martino ("Martino").

## PRELIMINARY STATEMENT

Martino is the former Chief Financial Officer ("CFO") of Silvergate Capital Corporation ("SCC") and its wholly owned subsidiary Silvergate Bank (collectively "the Bank"). The SEC's complaint (the "Complaint") charges Martino with orchestrating a fraudulent scheme to hide from investors the true amounts of the Bank's expected securities sales and the resultant losses at year-end 2022. Martino did so, in part, to conceal the impact of those losses on the Bank's "Tier 1 Leverage Ratio" ("Tier 1"), a key financial metric for banks. Martino's Motion mischaracterizes the SEC's fraud claims, ignores the Complaint's well-pleaded allegations, and otherwise misconstrues applicable law; and the Court should deny it in its entirety.

At the end of 2022, in the wake of the failure of one of the Bank's biggest customers—FTX—the Bank faced a liquidity crisis, which forced it to increase its borrowing dramatically, even as lenders required strict adherence to their debt repayment terms. As CFO, Martino knew that billions of dollars of that debt would mature in early 2023 and that the Bank's only means of repaying it was to sell billions of dollars of its securities holdings at substantial losses. Yet, in January 2023—to cover up the Bank's true financial condition—Martino repeatedly understated, by at least $800 million, the quantity of securities that the Bank expected to sell, as well as its resultant losses from anticipated sales of those securities (its "other than temporarily impaired" securities or "OTTI"). Because the amount of OTTI the Bank recorded directly impacted its Tier 1, Martino intentionally misled investors and potential investors about this fundamental metric of the Bank's financial health.

In his Motion, Martino asserts: (i) that the SEC's Complaint does not adequately allege the "subjective falsity" of his statements—which, Martino claims, were "opinions"; (ii) that Martino acted

without scienter; (iii) that his false statements were immaterial; and (iv) that the "bespeaks caution" doctrine precludes liability. Martino is wrong on all accounts.

*First*, Martino mischaracterizes his false statements as "opinions" and, thus, incorrectly contends that the SEC must allege his subjective belief in their falsity. Contrary to this argument, the Complaint alleges in detail Martino's numerous false statements of objective facts regarding the Bank's financial condition. Moreover, even if they were "opinions," Martino's statements were fraudulent; the Complaint amply alleges that Martino knew that the Bank's expected securities sales were far higher than it was reporting and, thus, that he intentionally misstated the Bank's OTTI and Tier 1.

*Second*, the Complaint adequately alleges scienter—that Martino knew facts that contradicted his public statements, including that the Bank would more likely than not be required to sell at least $800 million more in securities than he told investors, rendering false its OTTI and Tier 1 figures.

*Third*, the Complaint adequately alleges materiality—*i.e.*, that the Bank's expected securities sales, OTTI, and Tier 1 would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. For example, the Bank's inability to remain well-capitalized—which Tier 1 measures and Martino was attempting to hide—was a blaring indicator that the Bank was not on sound financial footing. Indeed, as the Complaint alleges, on the Bank's January 2023 earnings call, third-party analysts indicated the importance of these metrics by posing questions about them directly to Martino and other Bank executives, to which Martino responded with false and misleading information.

*Finally*, the "bespeaks caution" doctrine is inapplicable because the false statements at issue concerned present facts, which were not forward-looking, and which Martino knew at the time were false. In addition, the purported cautionary language that Martino relies on did not warn investors of the particular risk at issue here and, thus, cannot satisfy the bespeaks caution doctrine.

For these reasons and others described below, the Court should deny the Motion in its entirety.

## THE COMPLAINT'S FACTUAL ALLEGATIONS

I.     **Background: the Bank and FTX's Collapse.**

Silvergate started as a small private commercial bank, but in 2017, began attracting deposits from major crypto asset companies, and it went public in 2019.[1] Compl. ¶¶ 21-22. As a public company, SCC was required to file quarterly and annual financial reports with the SEC in conformity with GAAP. *Id.* ¶ 187. From 2019 through 2023, Martino—a Chartered Professional Accountant licensed in Canada—served as the Bank's CFO.[2] *Id.* ¶¶ 17, 20. Martino oversaw the Bank's accounting policies and was responsible for ensuring its financial statements' accuracy. *Id.* ¶¶ 188-89.

From 2017 to 2021, crypto asset customer deposits at the Bank grew exponentially—from $770 million to about $14.1 billion. *Id.* ¶¶ 32. FTX, one of the largest crypto asset trading platforms in the world, became one of the Bank's biggest customers, which the Bank touted to attract new business. *Id.* ¶¶ 104-06. In November 2022, FTX declared bankruptcy. *Id.* ¶¶ 107-08. Subsequently, in the fourth quarter of 2022 ("Q4 2022"), the Bank suffered a run on its customer deposits, which plummeted by nearly 70%—from about $12 billion to $3.9 billion. *Id.* ¶¶ 109, 164.

The bank run sparked a liquidity crisis, as the Bank, at its regulators' urging, elected to maintain enough cash on hand to cover every dollar of its crypto asset customers' deposits. *Id.* ¶ 165. This decision required the Bank both to sell assets and to borrow billions of dollars from the Federal Home Loan Bank of San Francisco ("FHLB"). *Id.* ¶¶ 165-68. By the end of Q4 2022, the Bank's FHLB debt—which was due to mature in January and February 2023—had risen from about $700 million to $4.3 billion. *Id.* ¶¶ 166-67, 173. In addition, the Bank took on $2.4 billion in short-term liabilities, called brokered certificates of deposit ("BCDs"), which likewise were due to be repaid in early 2023. *Id.*

To cover its debts and meet customer withdrawals, the Bank had no choice but to sell portions

---

[1] SCC went public at the end of 2019 and listed its common stock on the NYSE. Compl. ¶ 17.
[2] Martino served as CFO of both Silvergate Bank and its public holding company, SCC. Compl. ¶ 20.

of its debt securities holdings. *Id.* ¶ 168. Due to rising interest rates, however, many of the Bank's securities were in unrealized loss positions. *Id.* ¶ 169. Thus, during Q4 2022, the Bank incurred realized losses of $750 million on its sales of $5.2 billion in securities. *Id.* ¶ 171.

## II.    Martino's 2022 OTTI Calculations.

### A.    GAAP Requirements Regarding OTTI.

To complete the Bank's 2022 financial statements, GAAP required it to calculate and report any OTTI (*i.e.*, other than temporary losses) on all of its available for sale ("AFS") securities in an unrealized loss position that it held as of December 31, 2022. ASC 320-35-30; Compl. ¶ 177-78. GAAP thus required the Bank to report all OTTI on its expected securities sales, including *both*: 1) securities it intended to sell; and 2) securities that it would "more likely than not" be required to sell before maturity. ASC 320-10-35-33A, 33B; Compl. ¶ 177-78. Regarding the second set of securities, GAAP specified that Martino "shall consider available evidence … (for example, whether its *cash* or working capital requirements or *contractual or regulatory obligations* indicate that the security will be required to be sold….")." ASC 320-10-35-33B (emphasis added).

In evaluating the "available evidence," GAAP guidance stated that an entity "*shall* recognize in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, *including the estimates inherent in the process of preparing financial statements*." ASC 855-10-25-1 (emphasis added). GAAP specified that "[s]ubsequent events affecting the realization of assets" such as the securities held by the Bank "should be recognized in the financial statements when those events represent the culmination of conditions that *existed over a relatively long period of time*." ASC 855-10-55-1 (emphasis added).

For Q4 2022, the Bank also had to report its Tier 1—a key metric of its financial health. Compl. ¶¶ 180, 186. Tier 1 is calculated by dividing a bank's "Tier 1 Capital"[3] by its total average assets

---

[3] Tier 1 Capital is a measure of core equity—or the most loss-absorbing form of the Bank's capital. Compl. ¶ 182.

over a given period. *Id.* ¶ 180-85. If a bank's Tier 1 falls below 5%, it is no longer considered "well capitalized," a signal that it is not on sound financial footing. *Id.* ¶ 185. The Bank, its regulators, investors, and analysts monitored its Tier 1. *Id.* ¶ 186. The greater the Bank's recorded OTTI, the lower its Tier 1—and, thus, the more likely to be less than well capitalized. *Id.* ¶¶ 181-84. By contrast, if the Bank evaluated its debt securities in an unrealized loss position and did not recognize OTTI, it would continue to report those unrealized losses under accumulated other comprehensive income (loss) ("AOCI" or "AOCL"), which did not impact Tier 1. ASC 320-10-35-1b; Def. Ex. E at 16.

### B.    Martino Understood the Bank's Dire Need to Sell Securities in the First Quarter of 2023 ("Q1 2023").

As Martino knew[4] at the end of 2022, the Bank's ongoing bank run and liquidity crisis would require it to sell a significant amount of securities in early 2023. Compl. ¶ 174. As Martino further knew, because the Bank held such high debt, the FHLB was further restricting the Bank's borrowing capacity for Q1 2023 to 25% of its total assets. *Id.* ¶¶ 172, 219-224. By mid-January 2023, to meet the FHLB's 25% borrowing restriction, the FHLB required the Bank to make large payments toward its $4.3 billion FHLB debt, with more due in February. *Id.* ¶¶ 221-22, 227. In addition, by the end of 2022, Martino knew that the Bank would have to repay an additional $1 billion in BCDs in Q1 2023. *Id.* ¶¶ 173-74. Finally, Martino knew that selling securities to pay FHLB and BCD debt decreased the Bank's total assets, and, thus, required the Bank to sell additional securities to pay down additional FHLB debt to remain within FHLB's 25% borrowing limit. *Id.* ¶ 218.

Against this $5.3 billion in debt due in Q1 2023, the Bank held securities worth just $5.7 billion, all of which it categorized as AFS, and much of which was "impaired" (in an unrealized loss position). *Id.* ¶ 170, 175. In addition to these liquidity pressures, the Bank needed to maintain enough cash to pay its depositors' withdrawals during a bank run that had already seen deposits drop by nearly 70%.

---

[4] The Complaint alleges that Martino "knew or recklessly disregarded" certain facts. S*ee, e.g.*, Compl. ¶¶ 190, 208, 217. For the sake of the reader's ease, "knew" in this brief is intended to encompass both mental states.

*Id.* ¶ 164-65. Thus, as of December 31, 2022, Martino was well aware of the Bank's deposit flight, high debts with known maturity dates, underwater assets, and the FHLB's reduction of its borrowing limit.

As Martino also knew, in accordance with GAAP, the Bank's unrealized losses associated with its 2023 expected AFS securities sales had to be reported as OTTI on its Q4 2022 public financial statements. *Id.* ¶¶ 187-219. Indeed, at least as early as December 20, 2022, Martino discussed these very matters with others at the Bank. *Id.* ¶¶ 194-97, 229-50.

Furthermore, in the lead up to the Bank's January 17, 2023 Earnings Release ("Earnings Release") and Earnings Call ("Earnings Call") held the same day, Martino was focused on keeping the Bank's Tier 1 above the "well capitalized" 5% threshold. *Id.* ¶ 200. Even so, his staff projected the Bank's Tier 1 dropping below 5% based on expected securities sales in 2023. *Id.* ¶ 203. Martino and the Bank's CEO, Alan Lane, discussed their shared "concern" Tier 1 could fall below 5%. *Id.* ¶ 206.

As 2023 dawned, and as Martino soon came to understand, the bank run and debt crisis continued and worsened. *Id.* ¶¶ 207-52. Customer deposits fell by another $1 billion in the first two weeks of 2023; and, because the Bank used cash to pay depositors, its total assets also fell. *Id.* ¶ 252. This was problematic because, as Martino knew, the $4.3 billion in short-term FHLB debt needed to be paid down to 25% of the Bank's (shrinking) total assets measured at the end of each month in Q1 2023. *Id.* ¶¶ 223-27. To reduce its FHLB debt to 25% of its total assets (as measured on December 31, 2022) by January 13, the Bank was required to pay the FHLB $1.475 billion, and Martino knew that the Bank still had approximately $1 billion in FHLB debt maturing in early February. *Id.* ¶¶ 226-27. At the same time, Martino knew that the Bank had no viable borrowing options and that, without any other sources of cash, it would be forced to sell billions of dollars in securities. *Id.* ¶¶ 210-17.

### C. Martino Used an Improper OTTI Calculation.

On January 4, 2023, Martino's staff sent him a presentation detailing the impact on OTTI of the Bank's anticipated required securities sales in Q1 2023 ("January 4 Presentation"). *Id.* ¶ 228. The

January 4 Presentation projected a decline in total assets throughout Q1 2023 and that the Bank would be required to sell $2.6 billion in securities to stay within the FHLB borrowing limit. *Id.* ¶ 231-32. This methodology appropriately incorporated projections and, thus, considered both intended securities sales and those the Bank "more likely than not" would be required to make. *Id.* ¶ 233. As a result, the January 4 Presentation showed the Bank's Tier 1 dropping dangerously close to 5%.[5] *Id.* ¶ 234.

The next day, however, Martino's staff circulated another presentation that showed a much rosier picture for the Bank—just $1.7 billion in securities sales and a Tier 1 well over 5% ("January 5 Presentation"). *Id.* ¶ 237. Unlike the January 4 Presentation, the January 5 Presentation no longer considered projections of a decline in total assets over Q1 2023, which would necessitate additional securities sales to stay within the FHLB borrowing limit. *Id.* ¶ 238-41. Contrary to GAAP, the January 5 Presentation thus failed to incorporate the "available evidence" that the Bank would more likely than not be required to sell additional securities—such as upcoming debt maturities and the iterative effects of a shrinking balance sheet—which would trigger additional sales required to stay beneath the FHLB's 25% borrowing cap. *Id.* ¶ 238-44. Consequently, the January 5 Presentation improperly included only the Bank's intended sales and failed to consider those securities sales that it would "more likely than not be required to make." *Id.* ¶ 238-40, 244.

Thus, as Martino knew, the January 5 Presentation failed to accord with GAAP and, if adopted, would result in the Bank's understating its OTTI and falsely inflating its Tier 1. *Id.* ¶¶ 231-250. Martino nevertheless incorporated the January 5 Presentation's methodology into the Bank's Earnings Release, rendering the release false and misleading. *Id.* ¶ 249-50.

### D. Martino Intentionally Made, and Caused the Bank to Make, Material Misstatements and Omissions.

On January 11, 2023, Martino approved the false and misleading Earnings Release, and on

---

[5] In fact, the presentation overstated Tier 1 because it failed to account for securities sales that would have, if correctly calculated, pushed Tier 1 below 5%. Compl. ¶¶ 235-36.

January 17, the Bank issued it to the public and filed it with the SEC. *Id.* ¶ 252-58. In addition, Martino

made similar false statements on the January 17 Earnings Call. *Id.* ¶ 275.

    The Earning Release included the following false and misleading statements and omissions:

- "[A]n [OTTI] charge was recorded for securities that the [Bank] will more likely than not be required to sell before recovery of its amortized cost basis," which was false and misleading because it failed to properly account for all such securities (*id.* ¶¶ 267-68);

- That the Bank "recorded a $134.5 [million OTTI] charge related to an estimated $1.7 billion in securities it expects to sell in the first quarter of 2023 to reduce borrowing," which was false because, in fact, Martino knew the Bank would more likely than not be forced to sell at least another $800 million in securities to repay its obligations, resulting in an OTTI that should have been much higher (*id.* ¶¶ 230, 260, 269, 290-92);

- That the Bank's Tier 1 exceeded 5%—which was false because, in fact, the reported Tier 1 should have been under 5% using the correct OTTI calculation, which left the Bank less than well capitalized (*id.* ¶¶ 271-74).

Martino personally made the following false and misleading statements and omissions on the

Earnings Call:

- He repeated the false and misleading statements from the Earnings Release about $1.7 billion in expected securities sales, OTTI, and the Bank's Tier 1 (*id.* ¶¶ 277-88);

- He misleadingly stated that the Bank sold "1.5 billion of securities," out of an expected $1.7 billion, implying that it would sell only another $200 million in securities that quarter when, in fact, he knew the Bank would be required to sell significantly more (*id.* ¶ 279);

- When pressed by an analyst about the $1.7 billion in anticipated sales, of which $1.5 billion had already been sold, Martino falsely implied that the Bank would sell only an additional $200 million in securities in Q1 2023 (*id.* ¶¶ 279-83).

These false statements were material because investors, analysts, and the Bank tracked

information about the Bank's assets, losses, customer deposits, solvency, and liquidity to determine

the Bank's financial health. *Id.* ¶ 287. Indeed, as explained above, an analyst attending the Earnings

Call asked about the Bank's planned securities sales and its customer deposit levels. *Id.* ¶¶ 280-87.

    On February 1, 2023, at Martino's direction, the Bank approved $1 billion in securities sales

to repay FHLB debt. *Id.* ¶¶ 307-08. After the Bank's auditor repeatedly informed Martino and the

Bank that the OTTI disclosed in its financial statements and Earnings Release was incorrect, and that

its Earnings Release should be retracted, Martino and the Bank agreed to correct its books and public statements (but did not do so before the Bank closed on March 8, 2023). *Id.* ¶¶ 296, 310-13, 328-29.

In addition to the above false public statements, Martino caused the Bank to maintain false internal accounting records. As CFO, Martino was primarily responsible for preparing the Bank's financial statements and directing its adoption and implementation of internal controls. *Id.* ¶ 318. By approving the Bank's financial statements that included inaccurate OTTI, Martino intentionally falsified the Bank's books and records. *Id.* ¶¶ 237-251, 318-19. The Bank's accounting controls also did not include any specific policies or procedures for calculating OTTI or for determining which securities were more likely than not required to be sold. *Id.* ¶ 320. As a result, when the Bank's auditor reviewed its treatment of OTTI, it identified a "material weakness" in the Bank's internal control over identification of OTTI and a "material error" in the Bank's recording of OTTI. *Id.* ¶¶ 321-26. The Bank elected to wind down before formally addressing its auditor's findings. *Id.* ¶ 324.

## **LEGAL STANDARD**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court is to accept as true the complaint's allegations and draw all reasonable inferences in the plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007). The Court is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Thus, a complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

<u>**ARGUMENT**</u>

## I.    THE COMPLAINT ADEQUATELY ALLEGES SECURITIES FRAUD

The SEC charges Martino with securities fraud under Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and 17(a) of the Securities Act of 1933 ("Securities Act"). To state a claim under those provisions, the SEC must allege that the defendant (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the offer, sale or purchase of securities. *SEC v. Lee*, 720 F. Supp. 2d 305, 324 (S.D.N.Y. 2010). While proof of scienter is a necessary element under Exchange Act Section 10(b) and Securities Act Section 17(a)(1), it is not required for liability under Securities Act Sections 17(a)(2) and 17(a)(3). *Id.* As explained below, the Complaint adequately alleges securities fraud claims against Martino.

### A.    The Complaint Adequately Alleges False Statements and Material Omissions.

Martino argues that the SEC's Complaint alleges only false statements of opinion and, thus, should be dismissed for failing to plead the "subjective falsity" of those statements. Motion at 19. Martino's argument fails both because he ignores the Complaint's ample allegations that he made false statements of *fact*, not opinion, as well as of his intent (*i.e.*, subjective falsity). In addition, Martino fails to acknowledge recent Second Circuit precedent rejecting "the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made" where, as here, the "opinion … contains a factual misstatement or is rendered misleading by the omission of material facts." *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2023) (cleaned up) ("*DeCarlo*").

#### 1.    The Complaint Alleges False Statements of Fact.

*First*, the Complaint alleges that Martino caused the Bank to falsely report the methodology it used to calculate OTTI and its $1.7 billion in expected securities sales. Compl. ¶¶ 244-46, 254-55, 267. Specifically, the Earnings Release states that the Bank recorded OTTI for securities it "will more likely

than not be required to sell," as required by GAAP, when, in fact, the Bank did not use this methodology. *Id.* ¶¶ 238-46, 267-68. Although the Bank initially performed a GAAP-compliant analysis in its January 4 Presentation, Martino chose instead to use the January 5 Presentation, which failed to incorporate a "more likely than not" analysis or otherwise comply with GAAP. *Id.* ¶¶ 229-33, 243-44. Thus, the Earnings Release misled investors by falsely claiming that the Bank had made the GAAP-required "more likely than not" analysis in arriving at its $1.7 billion estimate of securities sales and resulting OTTI. Martino's Motion entirely ignores this false statement of objective fact.

*Second*, even setting aside the fact that the $1.7 billion figure was at least $800 million less than the Bank's likely upcoming securities sales, that $1.7 billion figure—and the $134.5 million in OTTI that Martino thus caused the Bank to report—were objectively false for another reason. *Id.* ¶¶ 244, 260, 266. The FHLB's borrowing limit was 25% of total assets measured at month-end (*i.e.*, at the end of each month in Q1 2023). *Id.* ¶¶ 220-25. Thus, as Martino knew, every asset sale—including the $1.7 billion reported—decreased the Bank's total assets, thus necessitating yet more securities sales to pay down debt to meet the 25% limit, and causing additional OTTI losses. *Id.* ¶ 218, 266. By failing to account for the "iterative effect" of even these indisputably intended securities sales, Martino understated both the $1.7 billion in sales and resulting OTTI. *Id.* ¶¶ 244, 266. Martino does not dispute this plain misstatement of fact, nor that the Complaint alleges that he knew of the proper calculation, but instead seeks to shift blame for the error onto his staff. Motion at 10.

### 2. The Complaint Adequately Alleges Actionable False Opinions.

In addition to the above objective false statements of fact, the Complaint adequately alleges that the Bank's and Martino's false statements of opinion were based on false facts and material omissions. The Second Circuit recently recognized that the Supreme Court has "expanded the scope of issuer liability for statements of opinion." *DeCarlo*, 122 F.4th at 40. Even a statement fairly characterized as an "opinion … may nonetheless be actionable if it contains a factual misstatement or

is rendered misleading by the omission of material facts." *Id.* at 40, 42 ("Opinions are thus actionable … not only when the speaker did not hold the belief she professed, but also if the statement of opinion contains embedded statements of fact that are untrue, or the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor.") (cleaned up). That is because, "[i]n the context of a securities transaction, a reasonable investor expects that opinion statements rest on some meaningful [] inquiry, fairly align with the information in the issuer's possession at the time, and do not reflect baseless, off-the-cuff judgments." *Id.* at 41.

Here, the Complaint alleges that Martino made numerous statements that, even if considered "opinions," either contained embedded false statements of fact and/or did not align with objective financial information regarding the Bank that was in Martino's possession at the time. For example, during the Earnings Call, Martino falsely stated that the Bank would sell only $1.7 billion in securities over the entirety of Q1 2023—including only $200 million after the date of the call—when he knew that, in fact, it likely would be required to sell at least $800 million more in securities to cover FHLB debts coming due just two weeks later. Compl. ¶ 270.

Martino further knew that his and the Bank's public statements were predicated on the January 5 Presentation, which did not account for crucial facts about the Bank's financial condition, including that: (i) the FHLB required the Bank to pay down its debt to the 25% cap measured at the end of each month; (ii) customer deposits decreased by $1 billion in the first two weeks of January; and (iii) the bank sold an additional $81 million in securities in the first week of 2023.[6] *Id.* ¶¶ 237-50. In other words, Martino "said one thing and held back another." *DeCarlo*, 122 F.4th at 45 (cleaned up).

Thus, even if the Bank's OTTI calculation was an opinion, it was based on "embedded

---

[6] As discussed *infra*, and contrary to Martino's argument, he was required to consider these subsequent events when reporting the Bank's 2022 year-end financials.

statements of fact that [were] untrue" and had omissions that "convey[ed] false facts about [Martino's] basis for holding that view," which made the OTTI statements misleading to a reasonable investor. *Id.* at 42. Moreover, Martino's statements did not "fairly align" with the information he knew by January 17, 2023, which showed a far worse financial picture than he presented to investors. And Martino's use of the January 5 Presentation did not reflect a "meaningful inquiry" because it omitted key facts necessary for a true report of the Bank's financial position. *Id.* at 41.

In addition, to the extent they were "opinions," Martino's statements were fraudulent because there was "an accepted method for assessing" whether his statements were true, but they were "not justified by the accepted method," and they "clearly contradict[ed] the facts on which" that method purported to rest. *See id.* at 42. The Complaint alleges in detail that Martino knew that the January 5 Presentation did not conform with GAAP because it did not even attempt the requisite "more likely than not" analysis. Compl. ¶¶ 238-50. This false "embedded fact is not one as to which reasonable minds can differ" because, without proper application of the "more likely than not" analysis, Martino's statements based on the January 5 Presentation were "not justified by the accepted method" found in GAAP. *DeCarlo*, 122 F.4th at 42; Compl. ¶¶ 238-50.

Similarly, Martino does not dispute that his statements directly contradicted facts—such as the FHLB borrowing limit, repayment schedule and $1 billion in deposit flight—that the Complaint alleges he knew when he made the statements; nor that his analysis was flawed because it was based on these key omissions. *See* Motion at 7-11, 20; Compl. ¶¶ 220-32, 252-55.

Martino wrongly asserts that GAAP did not require him to consider the above facts when calculating OTTI and that the Complaint fails to allege that he "did not sincerely believe that an entity shall not recognize" events that occurred in 2023 when calculating OTTI. Motion at 7-11, 20. To the extent Martino challenges the GAAP treatment of OTTI, these are "[f]act-specific questions [that] cannot be resolved on the pleadings." *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir.

2022); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) ("Whether GAAP has been violated is a fact-specific issue."). Insofar as he attacks the Complaint's allegations of his subjective intent, Martino badly mischaracterizes both GAAP's well-established OTTI rules and applicable law.

*First*, far from barring disclosure of relevant facts to investors, GAAP required Martino to "consider available evidence" to determine whether a security the Bank held on December 31, 2022 "will more likely than not be required to be sold" before maturity. *See* ASC 320-10-35-33B. The Motion misleadingly quotes ASC 855-10-25-3 as preventing Martino from considering as "available evidence" on January 17 any facts that occurred after December 31. Motion at 20. Martino ignores, however, the plain language of ASC 855-10-25-1, which states that a company "*shall* recognize in [its] financial statements the effects of *all* subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet." (emphasis added).[7]

*Second*, the Complaint alleges that Martino knew of conditions that existed as of December 31—including the ongoing bank run, massive debt with near term maturity dates, and a decreased FHLB borrowing limit—and that by January 17 he knew of facts that revealed the true extent of those existing conditions. Compl. ¶¶ 240-43. Such crucial facts included deposits falling by another $1 billion in early 2023; the Bank's need to repay $1.475 billion of FHLB debt in January (with another $1 billion maturing in February); and its sale of an additional $81 million in securities that were not previously marked for OTTI. *Id.* ¶¶ 224-27, 263-65. Each of "those events represent[ed] the culmination of conditions that *existed over a relatively long period of time*" and thus the effects of those events "should be recognized" under GAAP.[8] ASC 855-10-55-1 (emphasis added).

---

[7] Martino's reading to the contrary fails because it is nonsensical for GAAP to mandate that he "shall not" disclose these bad facts to the Bank's investors. In any case, such factual disputes are not ripe at this stage. *See SEC v. Medallion Fin. Corp.*, 2022 WL 3043224, at *2 (S.D.N.Y. Aug. 2, 2022) ("[T]he Court should not find facts by weighing competing inferences on a motion to dismiss.").

[8] Martino's citation to *Dempsey v. Vieau* (Motion at 19-20) is misplaced because *Dempsey* relied heavily on case law that has been largely superseded by the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), which "unequivocally reject[ed]" the requirement to prove subjective falsity in opinion cases. *DeCarlo*, 122 F.4th at 40 (cleaned up); *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 546 (S.D.N.Y. 2024) (interpreting

**B. The Complaint Adequately Alleges That Martino Acted with Scienter.**

Martino argues that the Complaint fails to plead scienter because its charged motive is "insufficient," and because his alleged GAAP violations were "errors" of judgment rather than fraud. Motion at 20-22. Martino's arguments are unavailing, particularly at this stage.

Rule 9(b) requires the Complaint to allege facts that "state with particularity the circumstances constituting fraud or mistake," but "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, scienter may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (cleaned up). "The purpose of [Rule 9 is] to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based, and not to act as an insurmountable hurdle for plaintiffs to overcome." *SEC v. Dunn*, 587 F. Supp. 2d 486, 505 (S.D.N.Y. 2008) (cleaned up).[9] Recklessness is adequately pleaded "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

The SEC's Complaint satisfies Rule 9(b). At minimum, the Complaint sufficiently alleges that Martino acted intentionally when he falsely stated that the Bank planned to sell only $1.7 billion in securities in Q1 2023 because he knew that, in fact, the Bank would be required to sell at least $800 million more in that period. Compl. ¶¶ 237-47, 261-66. Martino also acted at least recklessly because he had "knowledge of facts or access to information [that] contradict[ed] [his] public statements"

---

DeCarlo and *Omnicare* to find that statements applying GAAP were false statements of fact).

[9] Martino cites to decisions under the Private Securities Litigation Reform Act ("PSLRA"). Motion at 21 (citing *e.g.*, *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 210 (S.D.N.Y. 2016)). But its "heightened pleading requirements … do not apply to actions filed by the SEC." *SEC v. Landberg*, 836 F. Supp. 2d 148, 153 n.2 (S.D.N.Y. 2011).

(*Novak*, 216 F.3d at 308), such as: high debts with near-term maturity dates; a reduced FHLB borrowing limit and increased frequency at which that limit was assessed; and, required additional asset sales in early 2023—none of which were considered as part of the Bank's OTTI analysis. Compl. ¶¶ 289-96. Moreover, the Complaint alleges that Martino caused the Bank to falsely state that it was reporting OTTI on all securities it was "more likely that not" to sell when, as Martino knew, the Bank's calculation failed to accord with GAAP and was omitting at least $800 million in likely sales. *Id.* ¶¶ 267-72, 290.

Finally, Martino's argument that the Complaint does not disprove his strained and selective interpretation of OTTI (Motion at 7-11, 20) is inappropriate at the motion to dismiss stage where, as here, the Complaint alleges facts constituting strong circumstantial evidence of Martino's conscious misbehavior or recklessness. *SEC v. DiMaria*, 207 F. Supp. 3d 343, 357 (S.D.N.Y 2016) (denying motion to dismiss on scienter when complaint "alleged [defendant's] experience as an accountant, coupled with his alleged reactions to the specific accounting entries at issue").

## C.  The Complaint Adequately Alleges Materiality.

Martino further contends that the Complaint fails to adequately allege materiality because the "allegedly misstated or omitted information was already publicly available," and it fails to "allege materiality with particularity" under Rule 9(b). Motion at 17-18. These arguments are without merit.

To determine whether a misrepresentation is material, the Court must "look to whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 92 (2d Cir. 2010) (cleaned up). In other words, "[a] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Id.* at 92-93 (cleaned up). "Because the materiality element presents a mixed question of law

and fact, it will rarely be dispositive in a motion to dismiss" unless the alleged misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 (2d Cir. 2021).

Contrary to Martino's arguments, the Complaint's allegations are more than sufficient for a factfinder to conclude that Martino's false and misleading statements were material to investors.

The Complaint plausibly alleges that the Bank's expected securities sales, OTTI, and Tier 1 were part of the total mix of information important to investors because they were objective financial metrics indicative of the Bank's financial health. By misstating the Bank's expected securities sales and OTTI, Martino falsely inflated the Bank's Tier 1, and, thus, allowed the Bank to continue to publicly report that it was "well-capitalized." Compl. ¶ 183. Failing to remain "well-capitalized" was a blaring indicator of distress, as it signaled that the Bank was not on sound financial footing (*id.* ¶ 185) and could lead to other consequences material to a reasonable investor—such as affecting the Bank's ability to borrow. *Id.* Indeed, as happened here, a bank may resort to borrowing to pay customer deposits and thus an inability to do so could result in bank failure.

It was therefore unsurprising that, during the Earnings Call, analysts asked Martino about "deposit flows ... *driving decisions around selling securities*" and how "Tier 1 leverage ... took a big move down." *Id.* ¶¶ 280-83. Indeed, the analysts posed these questions even after Martino had disclosed the Bank's $1.5 billion in securities sales during the first two weeks of 2023—indicating the importance to investors of the Bank's expected securities sales beyond that amount. *Id.* ¶ 279-80. It thus strains credulity to argue, as Martino does, that falsely underreporting the Bank's securities sales to the tune of at least $800 million would be immaterial to the market. *Id.* ¶ 270.

In addition to analysts, the Bank's executives and its auditor recognized that that these financial metrics were important to investors. For example, in the lead-up to the Earning Release and Call, Martino and CEO Lane were closely tracking the Bank's Tier 1, how expected securities sales affected

it and OTTI, and specifically whether it may fall below 5%. *Id.* ¶¶ 198-206. Lane's and Martino's shared "anxiety" and "concern" around the Bank's year-end Tier 1 falling below 5% further demonstrates the materiality of misstating these financial indicators. *Id.* ¶ 206. Similarly, the Bank's auditor found that the Bank committed a "material error in recording OTTI" (including with respect to expected securities sales)—one significant enough that the auditor repeatedly informed Martino and the Bank that its publicly stated OTTI was incorrect and needed to be retracted and corrected. *Id.* ¶ 310, 323. Conceding the misstatement, Martino and the Bank agreed to correct it. *Id.* ¶ 313.

Citing the "truth on the market" materiality defense, Martino argues that the Bank's disclosure of its layoffs, deposit flight, and other negative news rendered immaterial any false or misleading statements he might have made regarding its expected securities sales, OTTI, or Tier 1. Motion at 17 ("the market got the message"). But Martino's argument misses the mark.

Under the "truth on the market" theory, "a misrepresentation is immaterial if the information is already known to the market." *Ganino v. Citizens Utility Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (cleaned up). "However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.* This includes analyzing whether the publicized information is sufficiently related to the substance of the misstatement as to nullify the false information. *See, e.g.*, *In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) (concluding that, at the Rule 12(b)(6) stage, the court was unable to determine whether public statements alluding to bonuses being paid by the defendant were sufficient to counteract alleged misstatements and omissions regarding billions of dollars in bonuses already paid to executives); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 278-79 (S.D.N.Y. 2010) (finding alleged misstatements on underwriting standards and CDO portfolio to be immaterial when defendant previously disclosed significant negative impacts on the same topics). For these reasons, "[a] truth-on-the-market defense

is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167.

Martino's truth on the market defense fails because the disclosures he cites—layoffs, deposit declines, and past losses in value to the Bank's securities portfolio—are insufficiently related to the subject matter of his misstatements (*i.e.*, expected securities sales, OTTI and Tier 1) and, therefore, fail to counter-act the false statements alleged in the Complaint. Motion at 17; Compl. ¶¶ 257-88.

Similarly, Martino misconstrues the purpose and effect of AOCL by suggesting that the Bank's mere disclosure of nearly $200 million in unrealized losses obviated its need to recognize OTTI for expected securities sales. Motion at 18. OTTI and AOCL provide distinctly different information to investors. Unlike AOCL, OTTI informs investors not only that the Bank had unrealized losses on certain of its debt securities but also: (1) that it had recognized those losses in the current reporting period because it was more likely than not to sell those securities before they recovered their amortized cost basis; and (2) the Bank had decreased its Tier 1 accordingly. ASC 320-10-35-34B; Compl. ¶¶ 176-179. By contrast, unrealized losses reported in AOCL did not impact the Bank's Tier 1 (Def. Ex. E at 16)—a financial metric material to investors.[10] *See supra* p. 17. Thus, the Bank's mere disclosure of its unrealized losses as AOCL provide Martino no refuge.

Finally, the Complaint alleges materiality with sufficient particularity[11]—*i.e.*, that Martino's misstatements were significant to a reasonable investor, which is all that is required to sufficiently plead materiality under Exchange Act Rule 10b-5. *See Ganino*, 228 F.3d at 161-62.

### D. The Bespeaks Caution Doctrine Is Inapplicable.

---

[10] Even if Tier 1 "reset" in Q1 2023 (Motion at 18), the Complaint pleaded sufficient facts to demonstrate that the Bank's ability to report that it was "well capitalized" at the end of 2022 was material to investors. Compl. ¶ 206.

[11] The cases Martino cites are inapposite. Motion at 18-19. The *Gavish v. Revlon, Inc.* and *Labul v. XPO Logistics* courts concluded that to survive a motion to dismiss, "the materiality of the alleged false financials may not be pled in a conclusory or general fashion," instead requiring "specific allegation[s] of monetary consequences," which "quantify the scale of the alleged financial misstatement." *Gavish*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004); *Labul*, 2021 WL 1056828, at *19 (D. Conn. Mar. 19, 2021). As explained above, the Complaint amply alleges the specific accounting consequences of Martino's false statements, as well as their importance to investors. *See supra* Fact Sec. II.A-D; Compl. ¶¶ 200-04, 234, 277, 290. These allegations are anything but conclusory or general.

Martino's reliance on the bespeaks caution doctrine (Motion at 14-15) likewise fails as contrary to applicable law and the facts. Under the bespeaks caution doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Employees Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d. Cir. 2010) ("*MF Global*"). This doctrine, however, does not apply to "statements concerning present facts." *SEC v. Thompson*, 238 F. Supp. 3d 575, 603 (S.D.N.Y. 2017); *see also MF Global*, 620 F.3d at 142 ("It is settled that the bespeaks caution doctrine applies only to statements that are forward-looking."). In addition, "the cautionary language [must] expressly warn of [and] directly relate to the risk that brought about [the] loss." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *see also In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("Cautionary language cited to justify application of the [bespeaks caution doctrine] must precisely address the substance of the specific statement or omission that is challenged."). Finally, the doctrine cannot be "abused or gamed[,] [c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also In re Prudential*, 930 F. Supp. at 72 ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.").

Martino claims that "the Bank's OTTI-related Statements, including those concerning future expected securities sales, were forward-looking" and "drenched in cautionary language," rendering them not misleading to a reasonable investor. Motion at 14-15. Contrary to this argument, the bespeaks caution doctrine is inapplicable due to both the nature of Martino's OTTI-related false statements and the Bank's purported cautionary language.

*First*, notwithstanding Martino's use of certain "words and phrases connoting expectation" (*id.* at 14), his OTTI-related misstatements were statements of present fact, which are not forward-looking. *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1232-33 (D.N.M. 2013) (finding that because the

OTTI analysis expresses "the speakers' belief concerning then-present factual conditions," the bespeaks caution doctrine does not apply). Martino's OTTI-related false statements captured present facts concerning the Bank's financial condition. For example, GAAP required Martino to make a present evaluation of the Bank's expected securities sales based upon "available evidence." Compl. ¶¶ 175-78. This included a determined that further securities sales were necessary to increase liquidity (*id.* ¶¶ 209-16), and that the effects of those sales would reduce the Bank's total assets, thus, requiring additional securities sales to pay down debt to remain within FHLB's 25% borrowing limit (*id.* ¶¶ 218-27). By January 17, the "available evidence" also included $1.5 billion in completed securities sales and the Bank's total assets falling by another $1 billion due to the continued bank run. *Id.* 251-52. Thus, Martino's false and misleading OTTI-related statements were not forward-looking but, instead, described the Bank's current financial state.[12]

*Second*, the broad, boilerplate warnings that Martino relies upon are insufficient to satisfy the bespeaks caution doctrine because they do not "warn[] of the specific contingency that lies at the heart of the alleged misrepresentations." *Thompson*, 238 F. Supp. 3d at 603. Here, the "heart" of Martino's misrepresentations is that he did not consider all "available evidence" as required by GAAP to calculate OTTI and the Bank's expected securities sales—and as a result, falsely inflated the Bank's Tier 1 above the well-capitalized threshold. None of the warnings Martino cites account for this contingency. The cautionary language he relies upon is either unrelated to OTTI[13] or not specific enough[14] to conclude as a matter of law that a reasonable investor would not be misled when analyzing

---

[12] The PSLRA codified the bespeaks caution doctrine in a safe harbor provision for forward-looking statements but, notably, exempts matters "included in a financial statement prepared in accordance with [GAAP]." 15 U.S.C. § 78u-5(b)(2)(A). Because OTTI is included in a financial statement prepared in accordance with GAAP (*see* Def. Ex. E at 54, 66), false statements pertaining thereto are exempt from the safe harbor, making Martino's reliance on *Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.* (Motion at 16) inapplicable.

[13] *See* Motion at 4 n.6, 15 n.34 (relying on general negative news about the Bank's financial condition and warning of uncertainty caused by the concentration of the Bank's depositor relationships in the "digital currency industry").

[14] *See* Motion at 4-5 (relying on the Bank's 10-K and Earnings Release warnings that OTTI calculations result from "subjective or complex judgments about matters that are inherently uncertain" and "should not be regarded as a representation by [the Bank] … that such expectations, estimates and projections will be achieved").

the fraudulent materials in their entirety. *MF Global*, 620 F.3d at 141 ("The bespeaks-caution doctrine is a corollary of the well-established principle that a statement or omission must be considered in context."). Any warnings actually related to OTTI cautioned that OTTI calculations can produce uncertain results (*see* Motion at 4-5), but not that the GAAP prescribed methodology may be ignored.[15]

*Third*, as explained above (*supra* Arg. Sec. I.B)*,* the Complaint alleges that Martino's statements rested on facts that he knew were untrue or misleading at the time they were made, rendering the bespeaks caution doctrine inapplicable to his conduct. *Rombach*, 355 F.3d at 173; *In re Prudential*, 930 F. Supp. at 72; Compl. ¶¶ 201-03, 228-32, 237-47, 261-72, 289-96.

Accordingly, the bespeaks caution doctrine is inapplicable to Martino's conduct.

### E.  Martino Aided and Abetted the Bank's Fraudulent Conduct.

The Complaint adequately alleges that Martino knowingly or recklessly aided and abetted the Bank's fraudulent conduct. Compl. ¶¶ 347-351, 352-356. To establish aiding and abetting, "the SEC must prove: '(1) the existence of a securities law violation by the primary … party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (cleaned up). Recklessness satisfies the scienter requirement for an aiding-and-abetting claim concerning post-2010 conduct. *SEC v. Wey*, 246 F. Supp. 3d 894, 928 (S.D.N.Y. 2017).

Martino's knowledge and conduct should be imputed to the Bank. *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) ("Acts performed and knowledge acquired by a corporate agent within the scope of his or her employment are imputed to the corporation. The misconduct of an agent is imputed to the corporation if committed within the scope of the agent's employment."). As discussed above (*supra* Arg. Sec. I.A-D), Martino's primary violations of Rule 10b-5 and 17(a)(2) for

---

[15] The Bank's 2021 10-K—which Martino claims to supply protective cautionary language—only further undermines his argument because it specifically alerts investors that the Bank conducts a more likely than not analysis to determine its expected securities sales when reporting its earning, an analysis Martino did not undertake. *See* Def. Ex. E at 67.

statements he made and caused the Bank to make as its CFO: 1) apply to the Bank; 2) render it

primarily liable; and 3) establish that Martino knew of these violations and substantially assisted them.

## II.    MARTINO'S BOOKS AND RECORDS VIOLATIONS

The Complaint adequately states a claim against Martino for primary violations of Exchange

Act Section 13(b)(5) and Rule 13b2-1 thereunder by alleging that he falsified the Bank's books and

records and failed to implement accounting controls. Materiality is not required for either claim. *SEC*

*v. Stanard*, 2009 WL 196023, at *29-30 (S.D.N.Y. Jan. 27, 2009).

*First*, under Rule 13b2-1, "[n]o person shall directly or indirectly, falsify or cause to be falsified,

any book, record or account subject to [Exchange Act] section 13(b)(2)(A)." 17 C.F.R. § 240.13b2-1.

"Scienter is not an element" of a violation of Rule 13b2-1. *SEC v. Rosenberger*, 2024 WL 308198, at *14

(S.D.N.Y. Jan. 26, 2024), *reconsideration denied*, 2024 WL 1313825 (S.D.N.Y. Mar. 26, 2024); *see also*

*Stanard*, 2009 WL 196023, at *29 (the SEC "need only establish, by a preponderance of the evidence,

that [the defendant] created, or caused to be created, the false accounting records").

Martino does not challenge that the financial statements he approved were false or that he

falsified them. Motion at 24-25. Nor can he: the Complaint sets forth in detail the false entries about

OTTI that he created or caused to be created, and recounts how the Bank agreed to correct its books

and records and Earnings Release at its auditors' request. Compl. ¶¶ 237-51, 310, 318-19, 324.

*Second*, Exchange Act Section 13(b)(5) prohibits any person from "knowingly circumvent[ing]

or knowingly fail[ing] to implement a system of internal accounting controls or knowingly falsify[ing]

any book, record, or account." The statute requires allegations of knowledge (*see Stanard*, 2009 WL

196023, at *30), which is met by alleging that the person charged "knew of facts that contradicted the

substance of the reported accounting." *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d

379, 393 (S.D.N.Y. 2014) (cleaned up).

Martino likewise cannot challenge, particularly at this stage, the falsity of the Bank's records

concerning OTTI and its asset sales that the Bank agreed to correct. Instead, he repeats his meritless assertions that the Complaint did not allege his subjective disbelief in the Bank's and his false statements. Motion at 24-25. To the contrary, for the reasons set forth above (*supra* Arg. Sec. I.A-B), the Complaint adequately alleges that Martino was aware of key facts that contradicted the amount of OTTI recorded in the Bank's books and, therefore, knowingly falsified these records.

The Complaint further charges that Martino had primary responsibility for devising and maintaining the Bank's accounting controls, which failed to include any specific policies or procedures for calculating OTTI. Compl. ¶¶ 318-20. Indeed, the Bank's controls did not set forth how it should comply with the specific GAAP requirements for calculating OTTI, *i.e.*, by using the "more likely than not" standard. *Id.* ¶ 320. Martino's argument that the Complaint "does not adequately allege that such specificity is required" (Motion at 25 n.61) fails because the Complaint alleges that the Bank failed to perform *any* "more likely than not" analysis in calculating OTTI. Compl. ¶¶ 238-41. In addition, its auditor identified a "material weakness" in the Bank's controls over the identification of OTTI, which led to the "material error" in its calculation. *Id.* ¶¶ 320-26. Rule 9(b) requires no greater detail to allege a 13(b)(5) violation. *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 497 (S.D.N.Y. 2007), *abrogation on other grounds recognized by SEC v. Hwang*, 692 F. Supp. 3d 362 (S.D.N.Y. 2023).

For the reasons stated above, the SEC's Complaint also adequately alleges Martino aided and abetted the Bank's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B), which relate to the financial statements Martino falsified and accounting controls he failed to implement. Compl. ¶¶ 367-68, 370-71, 375-78. In addition, for the reasons stated above (*supra* Arg. Sec. I.A-B), Martino caused the Bank to make false statements in its Earnings Release and Call, which were filed with the SEC. Compl. ¶¶ 358-62. Martino's actions were both knowing and reckless. *See supra* Arg. Sec. I.B.

## III. MARTINO'S INJUNCTIVE RELIEF ARGUMENT IS PREMATURE

A claim for permanent injunctive relief should not ordinarily be dismissed at the pleadings

stage, unless the underlying claim upon which relief is sought is dismissed. *See SEC v. Genesis Global Capital, LLC*, 2024 WL 1116877, *16 (S.D.N.Y. Mar. 13, 2024). Where, as here, the complaint plausibly alleges that defendant violated the securities laws, it would be "most unusual" to dismiss a prayer for injunctive relief at this "preliminary stage of the litigation." *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds,* 568 U.S. 442 (2013).

Moreover, Martino misstates the applicable standard. Motion at 25. In addition to civil penalties, the SEC is authorized by statute to seek injunctive relief to proscribe future violations of the federal securities laws. *See* Securities Act Section 20(b), (d) [15 U.S.C. § 77t(b), (d)] and Exchange Act Section 21(d)(1), (3) [15 U.S.C. § 78u(d)(1), (3)]. Sections 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d-e)] specifically authorize district courts to issue injunctive relief in SEC actions. *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020).[16] The SEC need not demonstrate a lack of an adequate remedy at law to obtain a permanent injunction. Rather, the SEC must demonstrate that: (1) the SEC has actually succeeded on the merits; (2) irreparable harm will likely result in the absence of the injunction; (3) the balance of the equities tips in the SEC's favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also Starbucks v. McKinney*, 144 S. Ct. 1570, 1576 (2024). Since the complaint adequately alleges that Martino made fraudulent statements that misled investors about the Bank's financial condition, and since "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations" the complaint sufficiently pleads that irreparable harm will likely result in the absence of an injunction. *Gabelli*, 653 F.3d at 6 (cleaned up).

## <u>CONCLUSION</u>

For the foregoing reasons, Martino's Motion should be denied.

---

[16] For these same reasons, Martino's argument that the SEC "concedes an adequate legal remedy exists by seeking civil penalties" fails. Motion at 25. That is not the standard, and the SEC is statutorily authorized to seek civil penalties in addition to injunctive relief. *SEC v. Kopsky*, 537 F. Supp. 2d 1023, 1026 (E.D. Mo. 2008), inapposite.

Dated:  February 28, 2025                    Respectfully submitted,

                                             /s/ *Peter A. Mancuso*
                                             Peter A. Mancuso
                                             Hayden M. Brockett
                                             Laura E. Meehan
                                             SECURITIES AND EXCHANGE
                                             COMMISSION
                                             New York Regional Office
                                             100 Pearl Street, Suite 20-100
                                             New York, New York 10004
                                             Tel: (212) 336-5562 (Mancuso)
                                             MancusoPe@sec.gov

                                             *Attorneys for Plaintiff*