**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. SECURITIES & EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **-against-** | **1:24-cv-04987 (ALC) (SDA)** |
| | **OPINION & ORDER** |
| **ANTONIO MARTINO,** | |
| **Defendant.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

The U.S. Securities and Exchange Commission brings this securities fraud action against Antonio Martino, the former CFO of Silvergate Bank. The complaint asserts a total of seven causes of action against Martino for allegedly misrepresenting Silvergate's financial health to investors and in its public filings. Before the Court is Martino's motion to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is denied.

## BACKGROUND

### I.    Factual History

#### a.    Silvergate Bank

The U.S. Securities and Exchange Commission ("SEC") accuses Antonio Martino ("Defendant" or "Martino")—the former Chief Financial Officer ("CFO") of Silvergate Bank ("Silvergate," "SCC," or "Bank")—of engaging in fraud to conceal Silvergate's precarious financial position following the bankruptcy of FTX in 2022. *See* ECF No. 1 ¶¶ 5, 107–08 ("Compl."). FTX was previously one of the largest crypto asset trading platforms in the world and one of Silvergate's biggest customers. *See id.* ¶¶ 104–08. When FTX declared bankruptcy,

Silvergate suffered a run on its customer deposits. *See id.* ¶¶ 109, 164. Allegedly Silvergate suffered a loss of nearly seventy percent (from $12 billion to $3.9 billion), initiating a liquidity crisis. *See id.* ¶¶ 109, 164–65. As a result, Silvergate borrowed billions of dollars in the fourth quarter of 2022. *See id.* ¶¶ 165–68.

To cover these debts, Silvergate was forced to sell portions of its debt securities holdings. *See id.* ¶ 168. Because many were in unrealized loss positions, Silvergate suffered $750 million in losses on its sale of $5.2 billion in securities. *See id.* ¶¶ 169, 171. All of Silvergate's remaining securities were categorized as available-for-sale ("AFS") by the end of 2022. *See id.* ¶ 175.

      **b.**  <u>Silvergate's Reporting Requirements</u>

Generally Accepted Accounting Principles ("GAAP") "required Silvergate to evaluate at the end of each quarter each AFS security it held that was in an unrealized loss position," calculate the AFS security's "other than temporary impairment" ("OTTI"), and report such information in its financial statements to the SEC. *Id.* This included "both: 1) securities it intended to sell; and 2) securities that it would 'more likely than not' be required to sell before maturity." ECF No. 47 at 4 (citing Compl. ¶¶ 177–78). In determining whether an AFS security would "more likely than not" be required to be sold, the Accounting Standards Codification ("ASC") indicates Silvergate should have considered "whether its cash or working capital requirements or contractual or regulatory obligations indicate that the security will be required to be sold." Compl. ¶ 178 (quoting ASC-320-10-35-33B). If Silvergate determined that it was "more likely than not [it] will be required to sell the security before recovery of its amortized cost basis, an other-than-temporary impairment [OTTI] shall be considered to have occurred." *Id.* (same).

The SEC alleges that at the end 2022, Silvergate was also required to report its Tier 1 Leverage Ratio ("Tier 1 Ratio")—"Tier 1 Capital" divided by Silvergate's total average assets. *See* Compl. ¶¶ 180, 182, 187. Silvergate's Tier 1 Capital had to be reduced by the amount of OTTI it recorded. *See id.* ¶ 181. If it failed to maintain a Tier 1 Ratio of more than five percent "it would no longer be considered 'well capitalized.'" *Id.* ¶ 183. "By contrast, if the Bank evaluated its debt securities in an unrealized loss position and did not recognize OTTI, it would continue to report those unrealized losses under accumulated other comprehensive income (loss) ('AOCI' or 'AOCL'), which did not impact Tier 1." ECF No. 47 at 5.

As CFO, Martino was responsible for ensuring Silvergate's end of year reporting—filed in a Form 10-K—was an accurate assessment of its financial condition. *See* Compl. ¶ 188. On December 20, 2022, Silvergate staff sent Martino an email "with the subject line 'Forced future sale'" (the "December 20 Email"). *Id.* ¶ 191. The email stated "that [Silvergate]'s auditor had 'raised the OTTI topic with us today for the remaining AFS securities'; that '[c]learly this could result in losses being accelerated into our 2022 net income that would otherwise be realized in 2023'; and that 'a forced sale or stated intent to sell appears to trigger this issue.'" *Id.* The email also included guidance specifying Silvergate's requirement to report OTTI "if the investor has the intent to sell or it is more likely than not the investor will be required to sell." *Id.* ¶ 192. "Martino responded to the December 20 Email the same day, asking if the OTTI issue was 'driven by accounting or regulatory regulation, or both?'" *Id.* ¶ 193.

In a December 21, 2022 email, Martino directed Silvergate staff to create an OTTI model "in which Silvergate would sell $2.5 billion worth of securities in the First Quarter of 2023." *Id.* ¶ 197. "Martino stated that the fair market value loss for the securities Silvergate will 'have to sell'

needed to be 'recognized through earnings as a loss.'" *Id.* Martino also expressed concern about maintaining Silvergate's Tier 1 Ratio above five percent. *See id.* ¶ 201; *see also id.* ¶¶ 203–06.

        c.   <u>The January Presentations</u>

On January 4, 2023, Silvergate's Treasurer sent Martino a presentation detailing the projected impact of securities sales in the first quarter of 2023 on OTTI ("the January 4 Presentation"). *See id.* ¶ 228. "[T]he January 4 Presentation highlighted that the Bank needed $2.6 billion in liquidity that, due to the forced sale of the Bank's securities, would result in an OTTI charge of approximately $176.5 million." *Id.* ¶ 230. This liquidity was needed to repay $2.425 billion of Silvergate's debt. *See id.* ¶ 231.

The SEC alleges the January 4 Presentation properly calculated OTTI in compliance with GAAP "because it accounted for sales of [Silvergate's] AFS securities in an unrealized loss position as of December 31, 2022 that the Bank both intended to make and would more likely than not be required to make before recovery of the securities' amortized cost basis." *Id.* ¶ 233. The SEC additionally alleges that the January 4 Presentation would have calculated Silvergate's Tier 1 Ratio to be below five percent if it had properly accounted for an additional loss and Silvergate's sales in the first week of the year. *See id.* ¶¶ 235–36.

On January 5, 2023, Silvergate's treasury department prepared "another presentation ('the January 5 Presentation'), which projected only $1.7 billion in securities sales and a Tier 1 Leverage Ratio of 5.39% for the Bank." *Id.* ¶ 237. The SEC alleges that the January 5 Presentation "did not evaluate all securities sales that the Bank would more likely than not be required to make over the First Quarter of 2023; rather, it accounted only for the Bank's intended sales to pay off $1 billion." *Id.* ¶ 238. Because it no longer considered projections of declining total assets, Silvergate would

no longer be required to sell additional securities to maintain its borrowing limit. *See id.* ¶ 241. The SEC alleges that Martino's acceptance of the January 5 Presentation over the January 4 Presentation constitutes a knowing and reckless disregard of "available evidence" he was required to incorporate into an OTTI calculation per GAAP. *See id.* ¶ 244.

"On or about January 6, 2023, notwithstanding his knowledge of the proper GAAP accounting for OTTI, Martino approved an OTTI calculation of $134 million based on $1.7 billion in expected sales, using the methodology in the January 5 Presentation." *Id.* ¶ 246. The SEC alleges Martino knew this would impact Silvergate's Tier 1 Ratio and other financial statements filed publicly. *See id.* ¶¶ 247, 248 ("[O]n January 11, 2023, Martino received draft financial reports for his approval and was specifically told that OTTI has been booked at $134 million, which was calculated using the same methodology found in the January 5 Presentation.").

d. <u>The Alleged False Statements</u>

The SEC alleges that on January 11, 2023, Martino approved an earnings release based on an OTTI of $134 million and on January 17th, Silvergate issued it to the public and filed it with the SEC. *See id.* ¶¶ 252–58. Specially, the SEC alleges that earnings release made three false or misleading statements and omissions ("Statements 1–3"):

1. "An OTTI charge was recorded for securities that the Bank will more likely than not be required to sell before recovery of its amortized cost basis." *Id.* ¶ 267. The SEC contends this "was false and misleading because it failed to properly account for all such securities" while maintaining the OTTI was calculated in compliance with GAAP. ECF No. 47 at 8; *see also* Compl. ¶ 267.

2. That the Bank "recorded a $134.5 million OTTI charge related to an estimated $1.7 billion in securities it expects to sell in the first quarter of 2023 to reduce borrowings." Compl. ¶ 260. The SEC contends the "was false because, in fact, Martino knew the Bank would more likely than not be forced to sell at least another $800 million in securities to repay its obligations, resulting in an OTTI that should have been much higher." ECF No. 47 at 8.

3. That the Bank's Tier 1 was greater than 5 percent. *See* Compl. ¶ 271. The SEC contends this was false because, if the reported Tier 1 had used the GAAP-compliant OTTI calculation, it would have been under five percent. *See* ECF No. 47 at 8.

On an earnings call held January 17, 2023, the SEC alleges Martino made three more false and misleading statements and omissions ("Statements 4–6"):

4. "[W]e expect to sell a portion of these securities, estimated to be $1.7 billion, in early 2023 to reduce wholesale borrowings, which resulted in the recognition of impairment charge of $134.5 million in the fourth quarter related to the unrealized loss on those securities expected to be sold." Compl. ¶ 277. And that Silvergate "anticipated selling approximately $1.7 billion of securities and had recorded an impairment charge for that sale, which is part of the loss" and "[w]ith respect to the tangible book value per share, as I indicated previously, we recorded an impairment for $1.7 billion in securities sales, and that's already embedded in there." *Id.*

5. "[S]ubsequent to the end of the year, we sold approximately $1.5 billion of securities"; and that Silvergate "sold about $1.5 billion of what was left" in its securities portfolio." *Id.* ¶ 279.

6. When pressed by an analyst about the $1.7 billion in anticipated sales, of which $1.5 billion had already been sold, Martino stated: "As we disclosed, we anticipated selling approximately $1.7 billion of securities and had recorded an impairment charge for that sale, which is part of the loss. And . . . we're only 2 weeks into the year, but we did execute on that plan. We've sold $1.5 billion of the $1.7 billion that we have earmarked." *Id.* ¶ 281.

The SEC alleges these "misstatements and omissions by Martino and SCC about the Bank's securities sales and OTTI were material, among other things, because investors, analysts, and the Bank tracked information about the Bank's assets, losses, customer deposits, solvency, and liquidity to determine the Bank's financial health." *Id.* ¶ 287.

e. The February Sale

At Martino's direction, on February 1, 2023, Silvergate "approved an additional $1 billion in securities sales to repay its . . . debt. Those sales began on or about February 2, 2023 and continued through on or about February 23, 2023." *Id.* ¶ 308. In mid-February, Silvergate's auditor "repeatedly informed Martino and Bank's accounting staff that the OTTI calculations it had

announced on January 17, 2023 were incorrect and needed to be retracted and corrected." *Id.* ¶ 310. On February 23, 2023, Silvergate authorized sales of an additional $2 billion of securities. *See id.* ¶ 312. On February 24th, Martino and Silvergate agreed to correct its books and public statements, *see id.* ¶ 313, but did not do so before Silvergate liquidated and ceased operations on March 8, 2023, *see id.* ¶¶ 328–29. Silvergate never filed "its 2022 annual report, Form 10-K, or its quarterly report, Form 10-Q, for the First Quarter of 2023" with the SEC. *Id.* ¶ 330.

## II.    Procedural History

On July 1, 2024, the SEC filed its complaint against defendants Silvergate, former Silvergate CEO Alan J. Lane ("Lane"), former Silvergate COO Kathleen Fraher ("Fraher"), and Martino, initiating this action. *See* ECF No. 1. The complaint alleges violations of Securities Act and the Exchange Act by defendants. *See generally* Compl. Relevant to this Opinion, the complaint asserts seven causes of action against Martino for (1) securities fraud under Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and 17(a) of the Securities Act of 1933 ("Securities Act"); (2) books and records violations under Exchange Act Section 13(b)(5) and Rule 13b2-1 thereunder; (3) aiding and abetting violations of Section 17(a)(2) of the Securities Act, Exchange Act Sections 10(b)(5), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 10b-5(b), 12b-20, and 13a-11. *See id.* at 53–62.

On July 3, 2024, the SEC submitted consents of and proposed final judgments as to Silvergate, Lane, and Fraher. *See* ECF Nos. 14, 16–17. On July 8, 2024, the Court entered the final judgments. *See* ECF Nos. 19–21. On July 31, 2024, the Court entered a satisfaction of judgment as to Lane in the amount of one million dollars paid to the SEC. *See* ECF No. 31. On August 6, 2024, the Court entered a satisfaction of judgment as to Silvergate in the amount of forty-three

million dollars paid to the Federal Reserve Board of Governors and twenty million dollars paid to the California Department of Financial Protection and Innovations. *See* ECF No. 33. On October 1, 2024, the Court entered a satisfaction of judgment as to Fraher in the amount of $250,000 paid to the SEC. *See* ECF No. 40.

On January 14, 2025, Martino filed his motion to dismiss the complaint. *See* ECF Nos. 44, 45 ("Mot."), 46 ("Lurie Decl.).On February 28, 2025, the SEC filed its opposition. *See* ECF No. 47 ("Opp."). Martino filed his reply on March 31, 2025. *See* ECF No. 48 ("Reply"). In May of 2025, Martino requested a discovery stay, *see* ECF No. 49, which this Court referred to Magistrate Judge Stewart D. Aaron under the scope of general pretrial matters, *see* ECF No. 53. On June 6, 2025, Judge Aaron granted Martino his stay. *See* ECF No. 55.

## STANDARD OF REVIEW

### I.      Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, courts accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

## II.    Federal Rule of Civil Procedure 9(b)

Allegations of securities fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

**DISCUSSION**

Martino moves to dismiss all the claims against him—the securities fraud claims, the book and record violations, and causes of action for aiding and abetting—along with the SEC's demand for permanent injunctive relief. He first moves to dismiss the complaint under the "bespeaks caution" doctrine. *See* Mot. at 14–17. He then challenges that his alleged statements were ones of opinion, for which the SEC does not sufficiently plead he was aware of their falsity or that they were material. *See id.* at 17–24. Martino argues these deficiencies also require the dismissal of the books and records violations, and claims he aided and abetted. *See id.* at 24–25; Reply at 9. Last, Martino moves to dismiss the request for injunctive relief as inadequately pleaded. *See* Mot. at 25.

The Court turns first to the securities fraud claims.

## I.    Securities Fraud Claims

### a.    Legal Standard

To state claim for securities fraud, a plaintiff must adequately allege the defendant: (1) made a material misrepresentation; (2) with scienter; (3) in connection with an offer, sale or purchase of securities. *See S.E.C. v. Lee*, 720 F. Supp. 2d 305, 324 (S.D.N.Y. 2010) (citing *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)) (stating the standard under Sections 10(b) of the Exchange Act and 17(a) of the Securities Act).[1]

### b.    False Statements

Martino argues that the complaint only alleges false statements of opinion and therefore the SEC is required to plead the subjective falsity of those statements. *See* Mot. at 19. The SEC

---

[1] "[N]o showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). "A showing of negligence is sufficient." *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

maintains that the complaint pleads false statements of fact and that, even if some of them are construed as statements of opinion, it has adequately pleaded those under the Second Circuit's recent decision, *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2023). *See* Opp. at 10.

### i. Statements of Fact

The Court notes that the alleged falsity of all the statements relates to the alleged falsity of the first: Silvergate had recorded an OTTI that did not take into account all of the securities it was likely to need to sell and therefore not in compliance with GAAP.[2] *See* Compl. ¶ 267; *supra* Statements 1–6; Opp. at 10–11 ("[T]he Complaint alleges that Martino caused the Bank to falsely report the methodology it used to calculate OTTI and its $1.7 billion in expected securities sales."). Martino's choice to use the non-compliant OTTI then allegedly rendered Silvergate's Tier 1 Ratio and expected securities sales inaccurate. *See* Compl. ¶¶ 244–47. Martino contests whether the OTTI calculation was in fact non-compliant with GAAP.[3] *See* Mot. at 6–7. He asserts that given the timeline on which Silvergate received borrowing information and a payment schedule in estimating its debt, only the January 5 Presentation took this information into account. *See* Opp. at 7.

---

[2] "[A]n allegation of a violation of GAAP . . . without corresponding fraudulent intent . . . is not sufficient to state a securities fraud claim." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)). As the Court finds *infra* that the SEC "ha[s] pleaded sufficient evidence of 'corresponding fraudulent intent' to impute scienter," it may proceed with the misstatements of GAAP compliance. *In re Glob. Brokerage, Inc.*, No. 1:17-CV-00916, 2019 WL 1428395, at *12 n.5 (S.D.N.Y. Mar. 28, 2019).

[3] Regarding Martino's contention that GAAP tolerates a range of interpretations, *see* Mot. at 9, he fails to recognize that the SEC went beyond noting a discrepancy in Silvergate's calculations but alleged "facts indicating that i[t] exercised its judgment in a way that violated GAAP," *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) .

First, the Court finds it is improper for it to consider whether the January 5 Presentation incorporated the borrowing and payment information—and certainly that this incorporation rendered a more accurate OTTI—given that the SEC specifically alleges in the complaint that Martino "disregarded" the implications of this borrowing information and payment schedule for the expected securities sales in the January 5 Presentation. Compl. ¶¶ 241–42; *see* Opp. at 11. Even assuming it was proper for the Court to consider this on a motion to dismiss, Martino fails to address why this purported incorporation renders the SEC's allegation that the OTTI recorded in the Jananry 5 Presentation failed to account for all the expected necessary sales implausible. *See* Compl. ¶ 241.

Martino also asserts that the SEC should not be able to rely on 2023 data to argue the OTTI was improperly calculated, because "GAAP mandates that this analysis only recognize in the financial statements the effect of conditions that existed as of the Balance Sheet Date and not recognize the effect of conditions that only existed after it." Mot. at 6. The SEC's allegations, though, are that the data gleaned in January 2023 was "evidence about conditions that existed at the date of the balance sheet," ASC 855-10-25-1, principally that "a security the Bank held on December 31, 2022 'will more likely than not be required to be sold' before maturity," Opp. at 14. Whether the data really did offer such evidence is not a question for the Court to consider on Martino's motion. *See S.E.C. v. Medallion Fin. Corp.*, No. 21-CV-11125, 2022 WL 3043224, at *2 (S.D.N.Y. Aug. 2, 2022) ("[T]he Court should not find facts by weighing competing inferences on a motion to dismiss."). Taking the allegations in the complaint to be true, the Court finds the SEC has alleged that a calculation in compliance with GAAP would have accounted for this data.

Accordingly, the Court finds the SEC adequately alleges false statements of fact in the methodology Silvergate used for its OTTI calculation, and the Tier 1 Ratio incorporating that number, recorded in the earnings release and on the earnings call. *See In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 546 (S.D.N.Y. 2024) (analyzing alleged GAAP violations as statements of fact); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 407–12 (S.D.N.Y. 2010) (same). This also applies to the statements regarding the estimated sales, to the extent that they represented that the methodology used was GAAP compliant, rather than their actual value. Otherwise, the Court agrees with Martino that Silvergate's and Martino's statements as to the OTTI and expected securities sales are ones of opinion, although it determines these to be actionable as well.

### ii.  Statements of Opinion

"Statements that express expectations for the future rather than presently existing, objective facts are . . . statements of opinion." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). "Such statements 'include subjective statements that reflect judgments as to values that [are] not objectively determinable.'" *Id.* (quoting *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012)). A statement regarding the value of an OTTI is an opinion. *See Dempsey v. Vieau*, 130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015).

The statements made by Martino and Silvergate regarding the values of the OTTI, Tier 1 Ratio, and expected securities sales are properly considered statements of opinion. Martino maintains that as such the SEC was additionally required to plead he subjectively believed the statements to be false. *See* Opp. at 19. The Court disagrees. Martino relies on an opinion from

2018 for this requirement and fails to address the Circuit's more recent opinion in *DeCarlo*. *See id.* (citing *Gregory*, 297 F. Supp. 3d 372). In *DeCarlo*, the Circuit held that opinions are not only actionable when subjective belief is pleaded but "also if the statement of opinion contains embedded statements of fact that are untrue, or the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." 122 F.4th at 42.

The SEC argues that its pleaded misstatements of opinion are actionable because they "contained embedded false statements of fact and/or did not align with objective financial information regarding the Bank that was in Martino's possession at the time." Opp. at 12. To support this, the SEC cites the information contained in the January 4 Presentation which was omitted from the earnings release and call. *See id.* As the Court has already determined that the statements regarding the methodology have been adequately pleaded to be false, it is sufficient to allege Martino's opinions regarding the values resulting from those calculations were misleading. *See In re Lottery.com*, 715 F. Supp. 3d at 550.

Martino fails to meaningfully address this in reply and instead raises examples offered under ASC 855-10-25-1 and alternative considerations the SEC purportedly failed to rule out in its pleading. *See* Reply at 8–9. As previously noted, the Court will not select between competing inferences at this stage. Based on the complaint, the Court finds the SEC has adequately alleged that the statements of opinion contained false factual statements: that the values were calculated in compliance with GAAP.

Last, Martino argues these misstatements of opinion are inactionable under the bespeaks caution doctrine because of their "forward-looking" nature.

iii.  *Bespeaks Caution Doctrine*

The bespeaks caution doctrine protects "[a] forward-looking statement accompanied by sufficient cautionary language" as not actionable "because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d. Cir. 2010). For the doctrine to apply, the cautionary language must be set out in the same communication as the alleged misstatements. *See P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) ("[M]isrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus."); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 CIV. 0950, 2015 WL 4931357, at *14 (S.D.N.Y. Aug. 19, 2015) (The doctrine only applies when "the forward looking statement [is] accompanied by meaningful cautionary language set out in the same communication."), *report and recommendation adopted*, No. 14 CIV. 0950, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015). "In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 142.

"Generally, cautionary language must 'not be boilerplate' and must 'convey substantive information.'" *In re Lottery.com*, 715 F. Supp. 3d at 538 (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010)). "The cautionary language . . . must relate directly to that by which the plaintiffs claim to have been misled." *Daum*, 355 F.3d at 97 (internal quotation omitted). "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citing *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution

provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")). That is to say, cautionary words "must precisely address the substance of the specific statement or omission that is challenged." *Prudential*, 930 F. Supp. at 72.

While Martino maintains that all the opinion statements are forward-looking, the Court is not quite so sure. While the OTTI and Tier 1 Ratio are based on estimates of future conditions, they are also values which Silvergate was mandated to calculate based on its assessment of conditions at the end of 2022 (i.e., in the then-existing present). Ultimately, it is not necessary for the Court to find one way or the other as the cautionary language provided is insufficient to apply the bespeaks caution doctrine's protections.

At the beginning of the earnings call, Silvergate provided the following disclaimer:

[T]his call may contain certain statements that constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These include remarks about management's future expectations, beliefs, estimates, plans and prospects Such statements are subject to a variety of risks, uncertainties and other factors, including the COVID-19 pandemic, that could cause actual results to differ materially from those indicated or implied by such statements. Such risks and other factors are set forth in our periodic and current reports filed with the Securities and Exchange Commission. We do not undertake any duty to update such forward-looking statements.

ECF No. 46-3 at 6. Silvergate included a slightly more detailed disclaimer in the earnings release. *See* ECF No. 46-2 at 9. Neither of these disclaimers specifically mention the OTTI or Tier 1 Ratio calculations. *See id.*; ECF No. 46-3 at 6. They also do not warn of any risks due to the use of a methodology not complaint with GAAP. *See id.*

This is not a case where the risk that is alleged to have materialized was caused by unpredictable markets, or even the specific economic uncertainties caused by FTX's bankruptcy and the run on Silvergate. What the SEC alleges is that the future risk inherent in the statements

of opinion was that they did not consider all the *known* information at the time and therefore were not compliant with GAAP. [4] *See supra.*

That the disclaimers spoke to potential market fluctuations that could not be more accurately ascertained at the time did not disclose that these estimates bore some risk resulting from their methodology. While Martino maintains that the disclaimers warned that "the future expected securities sales and resultant OTTI charge disclosed were directly tied to and subject to change based on the Bank's deposit levels," this is not a warning that Silvergate's calculations failed to account for a decline in total assets, as alleged in the complaint. *See* Mot. at 5; *see also* Compl. ¶ 241. Therefore, an investor had no way to contemplate such a risk. In other words, the disclaimers did not "warn[] of the specific contingency . . . at the heart of the alleged misrepresentation." *Daum*, 355 F.3d at 97.

This renders Silvergate's disclaimers meaningfully different from those in *Robeco* and *In re Fairway*, upon which Martino relies. *See* Mot. at 16 (citing *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, No. 21-CV-9582, 2024 WL 4362747, at *10 (S.D.N.Y. Sept. 30, 2024), *aff'd in part, remanded on other grounds sub nom. City of Hialeah Employees' Ret. Sys. v. Peloton Interactive, Inc.*, No. 24-2803, 2025 WL 2457758 (2d Cir. Aug. 27, 2025)); *id.* at 14 (citing *In re Fairway*, 2015 WL 4931357, at *15–16). The disclaimers in those cases included language on the alleged risk *and* highlighted the specific information which could be influenced by those uncertainties. *See Robeco*, 2024 WL 4362747, at *10 (finding disclosures contained "extensive warnings about the risk and uncertainty of *future*

---

[4] The Court also notes that "cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *S.E.C. v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 168 n.12 (S.D.N.Y. 2023) (quoting *Prudential*, 930 F. Supp. at 72) (internal quotation marks omitted).

*subscriber growth*" (emphasis added)); *id.* (noting disclosure that future subscriber estimates were uncertain because of post-pandemic changes in consumer preferences); *In re Fairway*, 2015 WL 4931357, at *16 (S.D.N.Y. Aug. 19, 2015) (noting language in disclosure that "continued growth depend[ed] on new store openings"); *id.* (noting language in disclosure that Fairway's actual "ability to open new stores on a timely basis or at all" could materially differ from estimates at the time).

Accordingly, the cautionary language is insufficient for the bespeaks caution doctrine's protections to apply. The Court now turns to whether the alleged false statements were material.

    c.   <u>Materiality</u>

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)). This is an objective test that looks to the understanding of an "ordinary investor." *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). "Because materiality involves a fact-specific inquiry, . . . it can be decided on a motion to dismiss only if 'reasonable minds cannot differ on [it].'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 101 (2d Cir. 2021) (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)) (first internal quotation omitted).

Martino does not dispute that the earnings call and release were important to investors. *See generally* Mot. at 17–19. As courts have long recognized, "earnings reports are among the pieces of data that investors find most relevant to their investment decisions." *Ganino v. Citizens Utilities*

*Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (internal quotation omitted). Martino instead contests materiality based on the "total mix of information" available to investors. *See* Mot. at 17. He contends that, given the disclosures and publicly available assessments of Silvergate's financial health, the alleged misstatements could not have defrauded the market and therefore were immaterial. *See* Mot. at 18; *id.* n.38.

"In determining whether an allegedly false statement or omission of fact is material, [courts look] at whether there is a substantial likelihood that a statement or omission significantly altered the total mix of information made available, as viewed by the reasonable investor." *La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 440 (S.D.N.Y. 2010) (internal quotations omitted). "Under the 'truth on the market' theory, 'a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.'" *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act Litig.*, 757 F. Supp. 2d 260, 301 (S.D.N.Y. 2010) (quoting *Ganino*, 228 F.3d at 167). In order to

> rebut the presumption that [a defendant's] misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known . . . the corrective information must be conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements.

*Ganino*, 228 F.3d at 167 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)).

As the Court has already found the disclaimers in the earnings release and call to be insufficient to address the falsity at issue—because they only disclosed general risks about Silvergate's financial health—*see supra*, they similarly fail to render the alleged misstatements immaterial. Martino raises additional statements and specifically argues that "unrealized losses

that were not reported as OTTI were disclosed as AOCL." Mot. at 18. [5]  But at the motion to

dismiss stage, the Court cannot conclude that no reasonable investor would have been misled in

the context of the publicly available information cited. *See Ganino*, 228 F.3d at 167 (noting that

the "'truth on the market' doctrine is [an] appropriate [basis to dismiss] only if defendants show

that no rational jury could find that the market was misled"). As the SEC highlights in opposition,

reporting unrealized losses as AOCL may still result in an incorrect Tier 1 Ratio. *See* Opp. at 5, 19.

Drawing reasonable inferences in its favor, it would therefore be inappropriate to find the public

information completely counter-balanced the misstatements' effect.

Last, Martino asserts that materiality has not been pleaded with particularity. *See* Mot. at

18–19. Martino relies on *Gavish v. Revlon, Inc.* for the proposition that to satisfy Federal Rule of

Civil Procedure 9(b) "a complaint must contain allegations tending to demonstrate the materiality

of the alleged overstatements in light of the defendant's total financial picture." No. 00 CIV. 7291,

2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004); *see* Mot. at 18. *Gavish* continues:

> In other words, although there is no "numerical benchmark" for assessing the materiality
> of misstatements in financial reports, defendants (and the court) are still "entitled to be
> appraised of the approximate amount of overstatement involved."

*Gavish*, 2004 WL 2210269, at *16 (first quoting *Ganino*, 228 F.3d at 162–65 and then *Jacobson*

*v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 522 (S.D.N.Y. 1977)). In *Gavish*, "[n]one of

the complaint's allegations of improper sales practices contain[ed] a specific allegation of

monetary consequence." *Id.* The same cannot be said of the SEC's complaint here. The Court finds

that the SEC has sufficiently pleaded materiality with particularity as it includes copious

---

[5] The Court notes Martino's citation to the earnings release is to page twelve while the exhibit only contains ten pages. *See* ECF No. 46-2. Nevertheless, the SEC does not dispute that the unrealized losses would be reported as such. *See* Opp. at 5, 19.

allegations regarding Silvergate's financial accounting and specifically alleges the difference between the stated OTTI, Tier 1 Ratio, and expected securities sales, and values calculated in compliance with GAAP. *See* Compl. ¶¶ 233–48, 264, 269, 271–74.

The Court next considers whether the SEC has adequately pleaded scienter.

d.  <u>Scienter</u>

The element of scienter captures the requirement to plead a strong inference of a defendant's fraudulent intent: that a defendant made its statement with an "intent to deceive, manipulate, or defraud." *S.E.C. v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (internal quotation omitted). Scienter is adequately pleaded "where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation omitted).

> Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Id.* (same).

The SEC maintains it pleaded scienter by alleging Martino "had 'knowledge of facts or access to information that contradicted his public statements,'" demonstrating his conscious recklessness. Opp. at 15 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). There is no need to belabor this point. "[W]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect

to the corporate business." *S.E.C. v. Farnsworth*, 692 F. Supp. 3d 157, 186 (S.D.N.Y. 2023) (internal quotation omitted).

The complaint adequately alleges Martino's knowledge of the January 4 Presentation and facts therein. *See* Compl. ¶¶ 228–29. It additionally alleges that he knew the information in the January 4 Presentation contradicted his statements regarding the OTTI, Tier 1 Ratio, and expected securities sales. *See id.* ¶¶ 246, 257–88. Not only that, but it alleges that Martino knew the January 4 Presentation was calculated in compliance with GAAP and the January 5 Presentation—and calculations shared publicly thereafter—were not. *See id.* ¶¶ 233 ("Martino knew . . . the January 4 Presentation's methodology for calculating OTTI accorded with GAAP."), 241–44. Where "the correct information appears to have been readily available . . . 'an egregious refusal to see the obvious'" may give rise to an inference of recklessness. *See Farnsworth*, 692 F. Supp. 3d at 186 (quoting *Novak*, 216 F.3d at 308). The SEC's allegations are sufficient to raise such an inference. Martino's competing inferences—based on his judgment and motivations for disclosing Silvergate's financial issues—*see* Mot. at 22–23, cannot save his motion and may be considered after discovery is complete.

The Court finds the SEC has adequately pleaded its primary securities fraud claims against Martino.[6] The Court now considers the SEC's claims for aiding and abetting securities fraud.

    e.  <u>Aiding and Abetting</u>

To state its claim for aiding and abetting, a plaintiff must plead "(1) a securities law violation by a primary wrongdoer; (2) knowledge of the violation by the person sought to be

---

[6] The Court notes that Martino does not dispute the alleged statements were made in connection with the offer, sale or purchase of securities. *See generally* Mot.; Reply.

charged; and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010). "Aiding and abetting claims premised on . . . conduct after July 2010 . . . are subject to a knowing or recklessness standard." *S.E.C. v. Wey*, 246 F. Supp. 3d 894, 928 (S.D.N.Y. 2017).

The SEC's aiding and abetting claims rest on Martino's knowledge and conduct being imputed to Silvergate. *See* Opp. at 22. The SEC argues that then "Martino's primary violations . . . 1) apply to the Bank; 2) render it primarily liable; and 3) establish that Martino knew of these violations and substantially assisted them." *Id.* at 23. Martino does not meaningfully challenge the SEC's pleading other than to contest the falsity and materiality of the statements, *see* Mot. at 25, which the Court has already resolved, *see supra*.

While the SEC may plead its aiding and abetting claim by imputing Martino's knowledge and conduct to Silvergate "because he was acting within the scope of his employment" as CFO, under Federal Rule of Civil Procedure 9(b), the SEC was also "required to specifically connect the speakers and the misstatements." *Farnsworth*, 692 F. Supp. 3d at 192. The pleading clearly attributes the statements made in the earnings release to Silvergate. *See* Compl. ¶¶ 257–74. The Court finds that Martino's statements on the earnings call can also be attributed to Silvergate considering the SEC's allegations that "Martino and SCC [m]ade" those statements. *Id.* at 45, ¶ 289. Based on this Silvergate may also be imputed with "a 'strong inference of corporate scienter.'" *Farnsworth*, 692 F. Supp. 3d at 191–92 (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020)).

Accordingly, the SEC has adequately pleaded these aiding and abetting securities fraud claims.

## II.        Books and Records Violations

The complaint asserts books and records claims against Martino for primary violations of and aiding and abetting violations of Exchange Act Section 13(b)(5) and Rule 13b2-1 thereunder.

Under Rule 13b2-1, "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to [Exchange Act] section 13(b)(2)(A)." 17 C.F.R. § 240.13b2-1. Neither scienter nor materiality are elements of a cause of action under Rule 13b2–1. *See S.E.C. v. Stanard*, No. 06 CIV 7736, 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009). "[T]he SEC need only [allege] that [a defendant] created, or caused to be created, the false accounting records." *Id.* The SEC has satisfied its pleading obligation by alleging that Martino approved false financial statements as to Silvergate's OTTI, Tier 1 Ratio, and expected securities sales, knowing they were not calculated in accordance with GAAP. *See* Compl. ¶¶ 237–51. Martino does not contest this and instead relies on his argument that the SEC fails to plead subjective falsity, *see* Mot. at 24–25, which the Court declines to revisit, *see supra*.

Exchange Act Section 13(b)(5) prohibits any person from "knowingly circumvent[ing] or knowingly fail[ing] to implement a system of internal accounting controls or knowingly falsify[ing] any book, record, or account." 15 U.S.C. § 78m(b)(5). "Materiality is not an element," but scienter is. *Stanard*, 2009 WL 196023, at *30. "[T]he standard is 'knowing,' not merely 'reckless.'" *Id.* This may be satisfied by allegations demonstrating "a defendant knew of facts that contradicted the substance of the reported accounting." *S.E.C. v. Espuelas*, 767 F. Supp. 2d 467, 476 (S.D.N.Y. 2011) (quoting *S.E.C. v. Lucent Tech. Inc.*, 610 F. Supp. 2d 342, 362 (D.N.J. 2009)) (internal quotation marks omitted). As established *supra*, the SEC has adequately alleged that Martino was aware off such facts. Taken in hand with its allegation that Silvergate "did not have

specific policies or procedures for calculating OTTI or determining which securities it would more likely than not to be required to sell," the Court finds the SEC has adequately alleged Martino's primary books and records liability. Compl. ¶ 320.

The standard for these aiding and abetting claims is identical to those for securities fraud violations. *See S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 394 (S.D.N.Y. 2014) (reciting the requirements of (1) a primary violation, (2) knowledge, and (3) substantial assistance, for a books and records aiding and abetting claim). Having found the SEC's allegations sufficient to state primary violations, the Court applies the same analysis as before, and finds the SEC's allegations adequate to plead that Martino aided and abetting Silvergate's imputed books and records violations. *See supra*; *see also* Compl. ¶¶ 258 (stating that Silvergate filed the Form 8-K with the SEC), 320 (alleging that Silvergate did not have adequate OTTI policies or procedures).

### III.    Injunctive Relief

The Court turns now to the motion's final argument: that the SEC fails to adequately plead a lack of legal remedy and irreparable harm to sustain its demand for permanent injunctive relief. *See* Mot. at 25. This too is unavailing.

"[A] motion for failure to state a claim properly addresses the *cause of action* alleged." *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) (emphasis added). "[A] claim for permanent injunctive relief should not ordinarily be dismissed at the pleadings stage, unless the underlying claim upon which relief is sought is dismissed." *In re Lloyd's Am. Tr. Fund Litig.*, 954 F. Supp. 656, 682 (S.D.N.Y. 1997) (noting that defendant challenged the allegations of irreparable harm); *see also S.E.C. v. Genesis Glob. Cap., LLC*, No.

23-CV-00287, 2024 WL 1116877, at *16 (S.D.N.Y. Mar. 13, 2024) ("[T]here is no reason to strike the request for permanent injunctive relief at this preliminary stage.").

Although unnecessary, the Court additionally notes that, upon a finding of "federal securities law violations, [trial courts have] broad equitable power to fashion appropriate remedies." *S.E.C. v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 244 (S.D.N.Y. 2019) (quoting *S.E.C. v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016)) (internal quotation marks omitted), *aff'd*, 982 F.3d 68 (2d Cir. 2020). "These remedies may include both civil penalties and injunctive relief." *Id.* (citing *Frohling*, 851 F.3d at 138).

At this preliminary stage, the attack on the SEC's request for permanent injunctive relief is premature.

## CONCLUSION

For the foregoing reasons, Defendant Martino's motion to dismiss is **DENIED**. The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 44. Defendant Martino shall file his answer to the complaint on or before **October 21, 2025**.

**SO ORDERED.**

Dated:    **September 30, 2025**
          **New York, New York**

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**

26