# EXHIBIT C

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 02/16/26    Page 2 of 45



**U.S. Securities and Exchange Commission**

### Current Accounting and Disclosure Issues in the Division of Corporation Finance

**March 4, 2005**

*Prepared by Accounting Staff Members in the Division of Corporation Finance*
*U.S. Securities and Exchange Commission*
*Washington, D.C.*

> *The Securities and Exchange Commission, as a matter of policy, disclaims responsibility for any private publication or statement of any of its employees. This outline was prepared by members of the staff of the Division of Corporation Finance, and does not necessarily reflect the views of the Commission, the Commissioners, or other members of the staff.*

**Table of Contents**

I. Recent Rules, Proposed Rules and Interpretive Bulletins

   A. Final Rules Regarding Asset-Backed Securities (Revised)>

   B. Final Rules and Concept Release Regarding the Use of Tagged Data (Revised)

   C. Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date

   D. Accelerated Filer

   E. Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports (Revised)

   F. Management's Discussion and Analysis

      1. Disclosure in Management's Discussion and Analysis about Off-Balance Sheet Arrangements and Aggregate Contractual Obligations

      2. MD&A Interpretive Release

      3. Disclosure in MD&A about the Application of Critical Accounting Policies

      4. Commission Statement About MD&A

   G. Conditions for Use of Non-GAAP Financial Measures

   H. Disclosure of Nominating Committee Functions and Communication Between Security Holders and Boards of Directors

   I. Proposed Rule regarding IFRS First-time Adopters

   J. Proposals Regarding Use of Form S-8 and Form 8-K by Public Shell Companies

   K. Proposed Rules Regarding Securities Offering Reform

   L. Proposals Regarding Security Holder Director Nominations


II. Other Current Accounting and Disclosure Issues

   A. Statement of Cash Flows (New)

      1. Classification of Cash Receipts from Inventory Sales

      2. Classification of Payments Related to Settlement of Pension Liabilities

   B. Oil and Gas (New)

   C. Leasing (New)

      1. Accounting

      2. Disclosure

   D. Revenue

      1. Buy/Sell Arrangements (New)

      2. Service Contracts and the use of EITF 81-1

      3. Disclosure

   E. Business Combinations

      1. Purchase Price Allocation and Use of Residual Method

      2. Date of Annual Goodwill Impairment Testing

   F. Investments

      1. Other Than Temporary Declines in Value

      2. Government-Sponsored Enterprises/a>

      3. Auction Rate Securities (New)

   G. Contingencies and Loss Reserves

   H. Pension, Post Retirement, and Post Employment Plans

      1. Selection of Discount Rates under FASB Statement Nos. 87 and 106 (New)

      2. Disclosure

   I. FIN 46 and Deconsolidation

   J. Segment Disclosure

1. Identification of Operating Segments

2. Aggregation of Operating Segments

3. Other Compliance Issues

4. Changes in segments

K. Issues Associated With SFAS 133, Accounting for Derivative Instruments and Hedging Activities

1. Formal Documentation Under Statement 133 (Revised)

2. Financial Statement Presentation and Disclosure (Revised)

3. Auditing Fair Values and SFAS 133

L. Market Risk Disclosures

M. Allowance for Loan Losses

1. Disclosure

2. Financial statement presentation

N. Loans and Other Receivables

1. Accounting for Loans or Other Receivables Covered by Buyback Provisions

2. Disclosures About Restructured Loans and Other Receivables/a>

3. Potential Problem Loans

4. Loans Held for Sale (New)

O. Materiality Assessments and the Use of Sampling (New)

P. Change of Accountants

1. Merger of Firms

2. PCAOB Registration

III. Other Information About the Division of Corporation Finance and Other Commission Offices and Divisions

A. Other Sources of Information

B. Corporation Finance Staffing and Phone Numbers

C. Division Employment Opportunities for Accountants

1. Staff Accountant

2. Professional Accounting Fellowships

3. Professional Academic Fellowships

*Current Accounting and Disclosure Issues*
*in the Division of Corporation Finance*

*March 4, 2005*

**I. Recent Rules, Proposed Rules and Interpretive Bulletins**

### A. Final Rules Regarding Asset-Backed Securities (Revised)

On December 15, 2004, the Commission voted to adopt new and amended rules and forms to address comprehensively the registration, disclosure and reporting requirements for asset-backed securities under the Securities Act and the Exchange Act (see Release No. 34-50905). Principally, the amendments will accomplish the following:

- update and clarify the Securities Act registration requirements for offerings of asset-backed securities, including expanding the types of asset-backed securities that may be offered in delayed primary offerings on Form S-3;

- consolidate and codify existing interpretive positions that allow modified Exchange Act reporting that is more tailored and relevant to asset-backed securities;

- provide tailored disclosure guidance and requirements for Securities Act and Exchange Act filings involving asset-backed securities; and

- streamline and codify existing interpretive positions that permit the use of written communications in a registered offering of asset-backed securities in addition to the statutory registration statement prospectus.

The amendments are intended to clarify the regulatory requirements for asset-backed securities in order to increase market efficiency and transparency and provide more certainty for the overall ABS market and its participants. In response to comments, the amendments have delayed compliance dates until January 1, 2006, to allow market participants to prepare for the new requirements.

The full text of the release can be found at
http://www.sec.gov/rules/final/33-8518.htm.

### B. Final Rules and Concept Release Regarding the Use of Tagged Data (Revised)

On February 3, 2005, the Commission adopted rules, in Release No. 33-8529, to establish a voluntary program related to eXtensible Business Reporting Language (XBRL). Registrants may voluntarily furnish XBRL data in an exhibit to specified EDGAR filings under the Exchange Act and the Investment Company Act. This program begins with the 2004 calendar year-end reporting season. The primary purpose of the voluntary program is to assess XBRL technology, including both the ability of registrants to tag their financial information using XBRL and the benefits of using tagged data for analysis.

On September 27, 2004, the same day the Commission issued the proposing release to establish the voluntary program to allow XBRL information to be filed, the Commission also issued a concept release, Release No. 33-8497. The concept release seeks public comment on the benefits of tagging data to improve reporting quality and efficiency, the implications of tagging data for filers, investors, the Commission and other market participants, and the adequacy and efficacy of XBRL as a format for reporting financial information.

Case 1:24-cv-04987-ALC-SDA Document 75-3 Filed 02/16/26 Page 6 of 45

Data tagging is gaining prominence as a format for enhancing financial reporting data using eXtensible Mark-Up Language (XML) derivatives, such as XBRL. Tagging provides greater context to data through standard definitions that turn text-based information, such as the filings currently contained in the Commission's EDGAR system, into documents that can be retrieved, searched and analyzed through automated means. Data tags describe information such as items included in financial statements. This enables investors and other marketplace participants to analyze data from different sources and allows for the automatic exchange of financial information across various software platforms, including web services.

Additional information on the Commission's tagged data and XBRL initiatives can be found at http://www.sec.gov/spotlight/xbrl.htm.

### C. Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date

On March 16, 2004, the Commission adopted in Release No. 33-8400 (see also Release No. 33-8400A, issued on August 4, 2004, for certain technical corrections) amendments to Form 8-K, the Exchange Act form used by public companies to disclose important corporate events on a current basis. The amendments add ten disclosure items to Form 8-K, including transferring two items to the current report from the periodic reports. The amendments also provide investors with timelier disclosure by replacing the current five business and 15 calendar day deadlines with a four business day deadline. The amendments are responsive to the current disclosure goals of Section 409 of the Sarbanes-Oxley Act by requiring public companies to disclose, on a "rapid and current basis," material information regarding changes in a registrant's financial condition or operations as the Commission, by rule, determines to be necessary or useful for the protection of investors and in the public interest.

The eight new disclosure items are:

- entry into a material non-ordinary course agreement,

- termination of a material non-ordinary course agreement,

- creation of a material direct financial obligation or a material obligation under an off-balance sheet arrangement,

- triggering events that accelerate or increase a material direct financial obligation or a material obligation under an off-balance sheet arrangement,

- material costs associated with exit or disposal activities,

- material impairments,

- notice of delisting or failure to satisfy a continued listing rule or standard; transfer of listing, and

- non-reliance on previously issued financial statements or a related audit report or completed interim review (restatements).


The two disclosure items transferred, in part, from the periodic reports are:

- unregistered sales of equity securities and

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 02/16/26    Page 7 of 45

- material modifications to rights of security holders.

Expanded disclosure items include:

- departure of directors or principal officers, election of directors, or appointment of principal officers and

- amendments to Articles of Incorporation or Bylaws and change in fiscal year.

The amendments include a limited safe harbor under Exchange Act Section 10(b) and Rule 10b-5 for failure to file timely seven of the new items on Form 8-K. The safe harbor does not apply to, or impact, any other duty to disclose that a registrant may have and extends only until the due date of the registrant's periodic report for the relevant period. Compliance with these amendments was required as of August 23, 2004.

Since the Commission's publication of the amendments, the staff have received a number of questions regarding the implementation and interpretation of the new Form 8-K items. Responses to some of these frequently asked questions are available at http://www.sec.gov/divisions/corpfin/form8kfaq.htm. Registrants and their counsel are reminded that one of the principal purposes of the revisions to Form 8-K is to increase the number of unquestionably or presumptively material events that must be disclosed currently, in accordance with the goals of Section 409 of the Sarbanes-Oxley Act. Registrants also should ensure that they have implemented appropriate disclosure controls and procedures in accordance with Exchange Act Rules 13a-14 and 15d-14 in order to ensure that information required to be disclosed by Form 8-K is brought to the attention of management and disclosed within the timeframes contemplated by Form 8-K.

### D. Accelerated Filer

*Summary*

On September 5, 2002, the Commission adopted final rules requiring that every registrant meeting the definition of "accelerated filer" file its annual report on Form 10-K and its quarterly reports on Form 10-Q on an accelerated basis. The changes for these accelerated filers will be phased-in, eventually paring down the due dates from 90 to 60 days after the end of the fiscal year for 10-Ks and from 45 to 35 days after the end of the first, second and third fiscal quarters for 10-Qs.

The Commission voted in November 2004 to postpone the final phase-in period for acceleration of periodic report filing dates (see Release No. 33-8507). As a result, for an additional year the deadline for accelerated filers will remain at 75 days after year end for annual reports and at 40 days after quarter end for quarterly reports. The accelerated filing phase-in will resume for reports filed for fiscal years ending on or after December 15, 2005, when an accelerated filer will have to file its annual report within 60 days after year end and file its quarterly reports within 35 days after quarter end. This will complete the phase-in and these deadlines will then remain in place for all subsequent periods.

*Accelerated Filer Definition*

A registrant becomes an accelerated filer if it meets all of the following criteria at the end of its fiscal year:

- the registrant has been a reporting company under Section 13(a) or 15(d) of the Exchange Act for a period of at least 12 calendar months,

- the registrant has filed at least one annual report pursuant to Section 13(a) or 15(d) of the Exchange Act,

- the registrant had a non-affiliated common equity public float of $75 million or more as of the last business day of its most recently completed second fiscal quarter, and

- the registrant is not eligible to use small business forms (10-KSB and 10-QSB) for its annual and quarterly reports.

A registrant remains an accelerated filer until it becomes eligible to file small business reports. In order to become eligible to file small business reports, a registrant's non-affiliated float and its annual revenues cannot exceed $25 million for two consecutive years. Thereafter, a registrant would again have to satisfy the accelerated filer definition to become subject to the accelerated filing requirements.

Foreign private issuers filing on Forms 20-F or 40-F are not subject to the new rules. However, a foreign private issuer electing to file on Forms 10-K and 10-Q in lieu of Form 20-F or 40-F will be subject to the accelerated filing rule if it meets the definition of an accelerated filer.

*Accelerated Filing Phase-In Schedule*

Registrants meeting the accelerated filer criteria will be required to accelerate their 10-K and 10-Q filings on the following schedule.

| For Fiscal Years Ending On Or After | Form 10-Q Deadline | Form 10-K Deadline |
| --- | --- | --- |
| December 15, 2003 | 45 days after fiscal quarter end | 75 days after fiscal year end |
| December 15, 2004 | 40 days after fiscal quarter end | 75 days after fiscal year end |
| December 15, 2005 | 40 days after fiscal quarter end | 60 days after fiscal year end |
| December 15, 2006 | 35 days after fiscal quarter end | 60 days after fiscal year end |

The deadlines provide for a scheduled phase-in over a defined period in time, so that all registrants who meet the definition of an accelerated filer will have the same reporting deadlines no matter when they became an accelerated filer.

Rule 12b-25 permits registrants an extension of time in which to file their Forms 10-K and 10-Q and still be considered to have filed those reports timely. The new rules do not change the 15 calendar day period (for Form 10-K) and 5 calendar day period (for Form 10-Q) provided for under Rule 12b-25.

Accelerated filers can file their Article 12 financial statement schedules by amendment within 30 days following the due date of their Form 10-K. Consequently, at the end of the phase-in period, accelerated filers will be required to file the schedules within 90 days of the end of the fiscal year.

If an accelerated filer changes its fiscal year end, the transition report deadlines are phased in under the same schedule as quarterly and annual reports on Forms 10-Q and 10-K.

*Forms 10-K and 10-Q Disclosures*

The new rules require that all Exchange Act registrants filing on Form 10-K include new cover page disclosures in their Forms 10-K for fiscal years ending on or after December 15, 2002. The amended cover page requires the registrant to indicate by check mark either that it is or is not an accelerated filer and to disclose its non-affiliated common equity public float as of the end

of the last business day of the registrant's most recently completed second fiscal quarter. The accelerated filing status disclosure is also required on Form 10-Q.

If a registrant's cover page to its Form 10-K mistakenly discloses its non-affiliated common equity public float as of the date of filing, rather than as of the last business day of its most recently completed second fiscal quarter, it should file an amended Form 10-K. That amendment should include a corrected cover page, a new signature page, and Exhibit 31, a revised 302 certification required by Item 601 of Regulations S-K and S-B which includes the first 2 certifying statements. Note that both the share price and outstanding share amount must be as of the last business day of the most recently completed second fiscal quarter.

For purposes of completing the cover page to their first Form 10-K, we have advised registrants who complete their IPO after their most recently completed second quarter to compute their common equity public float as of a date within 60 days of filing the report. This method was used prior to the adoption of the new rules. Note that this is only to fulfill the cover page disclosure requirement. It does not mean the issuer uses that common equity public float to determine whether it is an accelerated filer. In this scenario, the registrant would not qualify as an accelerated filer because it was not a public company for 12 months and it had not filed at least one annual report as of its fiscal year-end.

*Transactional Filings*

In addition to accelerating the Form 10-Q filing deadlines, the new rules accelerate the updating requirements of interim financial statements required in registration statements at the time of effectiveness and in proxy statements at the time they are mailed to conform to the accelerated phase-in filing deadlines of Form 10-Q. Therefore, if the registrant meets the definition of an accelerated filer, its interim financial statements must meet the following:

| For Fiscal Years Ending On Or After | Interim Financial Statements Cannot be Older Than |
| --- | --- |
| December 15, 2003 | 134 days |
| December 15, 2004 | 129 days |
| December 15, 2005 | 129 days |
| December 15, 2006 | 124 days |

An accelerated filer that meets the three tests specified in S-X Rule 3-01(c) will have to update to include its audited year-end financial statements using the same phase-in schedule for its Form 10-K. Therefore, an accelerated filer meeting the tests must include its audited year-end financial statements according to the following schedule:

| For Fiscal Years Ending On Or After | Audited Year End Financial Statements Must be Included by |
| --- | --- |
| December 15, 2003 | 75 days after year-end |
| December 15, 2004 | 75 days after year-end |
| December 15, 2005 | 60 days after year-end |

If the filer does not meet the Rule 3-01(c) tests, it will still be able to delay updating to include its year-end financial statements until 45 days after its year-end. The 45-day period has not changed. Note that, despite the stipulated timeframes, registrants are required to include their year-end audited financial statements in definitive proxy statements and registration statements at the time of effectiveness if they are available.

*Financial Statements under S-X Rules 3-05 and 3-09*

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 10 of 45

The requirement for updating interim and fiscal year-end financial statements of an acquired business included in an acquirer's Form 8-K or in its proxy/registration statement under S-X Rule 3-05 has been accelerated only when the acquired company is itself an accelerated filer. Therefore, an acquirer that is either an accelerated or non-accelerated filer must include the financial statements of the acquired business at least as current as the financial statements required to be filed by the acquired company in its own periodic reports. Accelerated filers will still have 75 days from consummation to file 3-05 financial statements on Form 8-K.

Separate financial statements of unconsolidated subsidiaries and 50% or less owned persons required by S-X Rule 3-09 will not be accelerated for inclusion in the parent's Form 10-K unless both the parent and the subsidiary/investee are accelerated filers.

### E. Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports (Revised)

Section 404 of the Sarbanes-Oxley Act directed the Commission to adopt rules requiring each annual report of a registrant, other than a registered investment company, to contain (1) a statement of management's responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) management's assessment, as of the end of the registrant's most recent fiscal year, of the effectiveness of the registrant's internal control structure and procedures for financial reporting. Section 404 also requires the registrant's auditor to attest to, and report on management's assessment of the effectiveness of the registrant's internal controls and procedures for financial reporting in accordance with standards established by the Public Company Accounting Oversight Board. The Commission adopted final rules on May 27, 2003, in Release No. 34-47986 concerning management's report on internal control over financial reporting and certification of disclosures in Exchange Act periodic reports.

The final rules require that management's annual internal control report include:

- a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant,

- management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year,

- a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting, and

- a statement that the registered public accounting firm that audited the registrant's financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

Under the new rules, a registrant is required to file the registered public accounting firm's attestation report as part of the annual report. The rules also require that management evaluate any change in the registrant's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 11 of 45

The Commission also adopted amendments to rules and forms under the Securities Exchange Act of 1934 and the Investment Company Act of 1940 to revise the Section 302 certification requirements and to require registrants to provide the certifications required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 as exhibits to certain periodic reports. The amendments permit registrants to furnish rather than file the Section 906 certifications with the Commission. Thus, the certifications will not be subject to liability under Section 18 of the Exchange Act. Moreover, the certifications will not be subject to automatic incorporation by reference into a registrant's Securities Act registration statements, which are subject to liability under Section 11 of the Securities Act, unless the registrant takes steps to include the certifications in a registration statement.

The compliance schedule for the rules regarding management's report on internal controls was revised in February 2004 in Release No. 33-8392 and further revised on March 2, 2005 in Release No. 33-8545. As a result of Release No. 33-8392, an accelerated filer must begin to comply with the rules regarding management's report on internal controls for its first fiscal year ending on or after Nov. 15, 2004 (originally June 15, 2004). As a result of Release No. 33-8545, a non-accelerated filer or foreign private issuer must begin to comply with these requirements for its first fiscal year ending on or after July 15, 2006 (originally April 15, 2005). As noted in Section I.D. of this outline, accelerated filer status is determined at the end of a registrant's fiscal year based on certain conditions, including its non-affiliated common equity public float as of the last business day of its most recently completed second fiscal quarter. Therefore, there may be registrants who are currently non-accelerated filers who become accelerated filers as of the end of their next fiscal year that will not be eligible for further extension under Release No. 33-8545.

On November 30, 2004 the Commission issued an exemptive order to grant certain accelerated filers up to an additional 45 days to include in their annual reports management's report on internal control over financial reporting and the related auditor's report on management's assessment of internal control over financial reporting. The exemptive order applies to an accelerated filer that has a fiscal year ending between and including November 15, 2004 and February 28, 2005, and that had a public equity float of less than $700 million at the end of its second fiscal quarter in 2004. All other information required in annual reports, including audited financial statements, would have to be filed on the original due date for the annual reports. The Public Company Accounting Oversight Board (PCOAB) also adopted a temporary rule that permits the delayed filing of auditor's internal control reports consistent with the Commission's order.

The Commission staff has received questions regarding the implementation and interpretation of the rules. For answers to some of the questions most frequently posed, please see *Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Frequently Asked Questions (revised October 6, 2004)* at http://www.sec.gov/info/accountants/controlfaq1004.htm and *Exemptive Order on Management's Report on Internal Control over Financial Reporting and Related Auditor Report, Frequently Asked Questions (January 21, 2005)* at http://www.sec.gov/divisions/corpfin/faq012105.htm. The PCAOB's Office of Chief Auditor has also issued staff questions and answers related to PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of Financial Statements* available at http://www.pcaobus.com/Standards/Staff_Questions_and_Answers/index.asp

### F. Management's Discussion and Analysis

### 1. Disclosure in Management's Discussion and Analysis about Off-Balance Sheet Arrangements and Aggregate Contractual Obligations

Section 401(a) of the Sarbanes-Oxley Act added Section 13(j) to the Securities Exchange Act of 1934, which required the Commission to adopt final rules by January 26, 2003, to require each annual and quarterly financial report required to be filed with the Commission, to disclose "all material off-balance sheet transactions, arrangements, obligations (including contingent obligations), and other relationships of the registrant with unconsolidated entities or other persons, that may have a material current or future effect on financial condition, changes in financial condition, results of operations, liquidity, capital expenditures, capital resources, or significant components of revenues or expenses."

On January 22, 2003, the Commission adopted rule amendments to implement section 401 of the Sarbanes-Oxley Act (see Release No. 34-47264). The amendments, which are effective, require a registrant to provide an explanation of its off-balance sheet arrangements in a separately captioned subsection of the Management's Discussion and Analysis (MD&A) section in its disclosure documents. The amendments also require registrants (other than small business issuers) to provide an overview of certain known contractual obligations in a tabular format.

The amendments include a definition of off-balance sheet arrangements that primarily targets the means through which registrants typically structure off-balance sheet transactions or otherwise incur risks of loss that are not fully transparent to investors. The definition of off-balance sheet arrangements employs concepts in accounting literature in order to define the categories of arrangements with precision. Generally, the definition will include the following categories of contractual arrangements:

- certain guarantee contracts,

- retained or contingent interests in assets transferred to an unconsolidated entity,

- derivative instruments that are classified as equity, or

- material variable interests in unconsolidated entities that conduct certain activities.

The amendments require disclosure of off-balance sheet arrangements that either have, or are reasonably likely to have, a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. That disclosure threshold is consistent with the existing disclosure threshold under which information that could have a material effect on financial condition, changes in financial condition or results of operations must be included in MD&A.

The amendments require disclosure of the following specified information to the extent necessary to an understanding of off-balance sheet arrangements and their material effects:

- the nature and business purpose of the registrant's off-balance sheet arrangements,

- the importance to the registrant for liquidity, capital resources, market risk or credit risk support or other benefits,

- the financial impact and exposure to risk, and

- known events, demands, commitments, trends or uncertainties that implicate the registrant's ability to benefit from its off-balance sheet arrangements.

Consistent with other MD&A requirements, the amendments contain a principles-based requirement that a registrant provide such other information that it believes is necessary for an understanding of its off-balance sheet arrangements and their material effects. In addition, the amendments include a requirement for registrants to disclose, in a tabular format, the amounts of payments due under specified contractual obligations, aggregated by category of contractual obligation, for specified time periods. The categories of contractual obligations to be included in the table are defined by reference to the applicable accounting literature.

### 2. MD&A Interpretive Release

On December 19, 2003, the Commission issued an interpretive release providing guidance regarding MD&A disclosure in registrants' disclosure documents. The guidance reminds registrants of existing disclosure requirements and provides additional guidance, designed to elicit more informative and transparent MD&A, that satisfies the principal objectives of MD&A:

- to provide a narrative explanation of a registrant's financial statements that enables investors to see the registrant through the eyes of management,

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed, and

- to provide information about the quality of, and potential variability of, a registrant's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

The guidance emphasizes that MD&A should not be merely a recitation of financial statements in narrative form or an otherwise uninformative series of technical responses to MD&A requirements, neither of which provides the important management perspective called for by MD&A. Instead, the release encourages top-level management involvement in the drafting of MD&A, and provides guidance regarding:

- the overall presentation and focus of MD&A (including through executive-level overviews, a focus on the most important information and a reduction of duplicative information),

- emphasis on analysis of financial information,

- known material trends and uncertainties,

- key performance indicators, including non-financial indicators,

- liquidity and capital resources, and

- critical accounting estimates (see also section below).

The release does not create new legal requirements, nor does it modify existing legal requirements. A copy of the release can be found on the Commission's Web site at http://www.sec.gov/rules/interp/33-8350.htm under Regulatory Actions / Interpretive Releases.

### 3. Disclosure in MD&A about the Application of Critical Accounting Policies

Reported financial position and results often imply a degree of precision, continuity and certainty that can be belied by rapid changes in the financial and operating environment that produced those measures. As a result, even a technically accurate application of generally accepted accounting principles (GAAP) may nonetheless fail to communicate important information if it is not accompanied by appropriate and clear analytic disclosures to facilitate an investor's understanding of the registrant's financial status, and the possibility, likelihood and implication of changes in the financial and operating status.

To facilitate better disclosure in this area, on December 12, 2001 the Commission issued Financial Reporting Release (FRR) No. 60, *Cautionary Advice Regarding Disclosure About Critical Accounting Policies* (http://www.sec.gov/rules/other/33-8040.htm). The purpose of the release was to remind management, auditors, audit committees, and their advisors that the selection and application of the registrant's accounting policies must be appropriately reasoned.

On May 10, 2002, the Commission proposed, in Release No. 34-45907, disclosure requirements that would enhance investor's understanding of the application of registrants' critical accounting policies. The proposals would encompass disclosure in two areas: accounting estimates a registrant makes in applying its accounting policies and the initial adoption by a registrant of an accounting policy that has a material impact on its financial presentation.

Under the first part of the proposals, a registrant would have to identify the accounting estimates reflected in its financial statements that required it to make assumptions about matters that were highly uncertain at the time of estimation. Disclosure about those estimates would then be required if different estimates that the registrant reasonably could have used in the current period, or changes in the accounting estimate that are reasonably likely to occur from period to period, would have a material impact on the presentation of the registrant's financial condition, changes in financial condition or results of operations. A registrant's disclosure about these critical accounting estimates would include a discussion of: the methodology and assumptions underlying them; the effect the accounting estimates have on the registrant's financial presentation; and the effect of changes in the estimates.

Under the second part of the proposals, a registrant that has initially adopted an accounting policy with a material impact would have to disclose information that includes: what gave rise to the initial adoption; the impact of the adoption; the accounting principle adopted and method of applying it; and the choices it had among accounting principles.

As proposed, registrants would place all of the new disclosure in the MD&A section of their annual reports, registration statements and proxy and information statements. In addition, in the MD&A section of their quarterly reports, U.S. registrants would have to update the information regarding their critical accounting estimates to disclose material changes. The proposal remains under consideration.

### 4. Commission Statement About MD&A

Case 1:24-cv-04987-ALC-SDA Document 75-3 Filed 03/16/26 Page 15 of 45

In December 2001, the five largest national accounting firms, with support from the AICPA, petitioned the Commission to issue an interpretive release covering enhanced MD&A disclosures in three areas. On January 22, 2002, the Commission issued FR No. 61, *Commission Statement About Management's Discussion and Analysis of Financial Condition and Results of Operations* (http://www.sec.gov/rules/other/33-8056.htm), which covers many of the items in that petition.

*Disclosures Concerning Liquidity and Capital Resources, Including "Off-Balance Sheet" Arrangements*

The first section of the release discusses disclosures relating to liquidity and off-balance sheet arrangements. The release suggested that investors would find disclosure of aggregated information about contractual obligations and commercial commitments beneficial if it were provided in a single location in MD&A so that a total picture of obligations would be readily available. In particular, a registrant's liquidity and capital resources and the integral role of on- and off-balance sheet arrangements may best be shown in tabular presentations of contractual obligations and commercial commitments. The Commission's off-balance sheet rules discussed above supercede this section of FR No. 61, except for the tabular presentation of commercial commitments.

*Certain trading activities involving non-exchange traded contracts accounted for at fair value*

The second section of the release discusses disclosures relating to trading activities that include non-exchange traded contracts accounted for at fair value. A registrant engaged in these activities should be considering disclosure of its critical accounting policies in this area. The release provides additional disclosures to consider.

*Relationships and transactions on terms that would not be available from clearly independent third parties*

The last section of the release discusses disclosures of related party transactions. By their nature, transactions with related parties create uncertainty as to the terms of the arrangements. When those transactions are material, GAAP and SEC regulations require that they be disclosed. Informative disclosures could include the business purpose of the arrangement, the reason for entering into the arrangement with a related party, how the transactions are priced, the nature of the ongoing contractual or other commitments, and a comparison of the terms of the related party transactions with terms that would result from transactions with unrelated parties.

### G. Conditions for Use of Non-GAAP Financial Measures

Section 401(b) of the Sarbanes-Oxley Act directed the Commission to issue rules requiring that any public disclosure or release of pro forma financial information by a public company be presented in a manner that (1) does not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the pro forma financial information, in light of the circumstances under which it is presented, not misleading; and (2) reconciles the pro forma financial information presented with the financial condition and results of operations of the registrant under GAAP. On January 15, 2003 the Commission adopted rules, in Release No. 34-47226, that satisfy the mandate of Section 401(b) by defining the category of financial information that is subject to that mandate and then taking a two-step approach to regulating the use of that financial information. On June 13, 2003, the Commission staff issued Frequently Asked Questions Regarding the Use of

Case 1:24-cv-04987-ALC-SDA   Document 75-3   Filed 03/16/26   Page 16 of 45

Non-GAAP Financial Measures
(http://www.sec.gov/divisions/corpfin/faqs/nongaapfaq.htm).

The Commission's rules apply to the public disclosure or release of material information that includes a non-GAAP financial measure. For this purpose, a non-GAAP financial measure is defined as a numerical measure of a registrant's financial performance that (1) excludes amounts, or is subject to adjustments that have the effect of excluding amounts, that are included in the comparable measure calculated and presented in accordance with GAAP in the statement of income, balance sheet or statement of cash flows (or equivalent statements) of the registrant; or (2) includes amounts, or is subject to adjustments that have the effect of including amounts, that are excluded from the comparable measure so calculated and presented. Statistical and operating measures are not considered non-GAAP financial measures.

The rules require registrants to furnish to the Commission, under Item 2.02 (formerly Item 12) of Form 8-K, within four business days of any public announcement or release disclosing material non-public information regarding a registrant's results of operations or financial condition for an annual or quarterly fiscal period that has ended. The requirements to furnish apply regardless of whether the release or announcement includes disclosure of a non-GAAP financial measure. Item 2.02 requires the registrant to identify briefly the announcement or release and include the announcement or release as an exhibit to the Form 8-K. Registrants are required to disclose:

- the reasons why the registrant's management believes that presentation of the non-GAAP financial measure provides useful information to investors regarding the registrant's financial condition and results of operations and

- to the extent material, the additional purposes, if any, for which the registrant's management uses the non-GAAP financial measure that are not otherwise disclosed.

Registrants may satisfy this requirement by including the disclosure in the Form 8-K or in the release or announcement that is included as an exhibit to the Form 8-K. Registrants may satisfy the requirement to provide these additional two statements by including the disclosure in their most recent annual report filed with the Commission (or a more recent filing) and by updating those statements, as necessary, no later than the time the Form 8-K is furnished to the Commission.

The Commission adopted new Regulation G, which applies whenever a registrant publicly discloses or releases material information that includes a non-GAAP financial measure. This regulation prohibits material misstatements or omissions that would make the presentation of the material non-GAAP financial measure, under the circumstances in which it is made, misleading, and requires a quantitative reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure presented and the comparable financial measure or measures calculated and presented in accordance with GAAP.

Regulation G provides a limited exception for foreign private issuers where (1) the securities of the registrant are listed or quoted on a securities exchange or inter-dealer quotation system outside the United States; (2) the non-GAAP financial measure and the most comparable GAAP financial measure are not calculated and presented in accordance with generally accepted accounting principles in the United States; and (3) the disclosure is made by or on behalf of the registrant outside the United States, or is

included in a written communication that is released by or on behalf of the registrant outside the United States.

The Commission adopted amendments to Item 10 of Regulation S-K and Item 10 of Regulation S-B that address specifically the use of non-GAAP financial measures in filings with the Commission. These amendments apply to the same categories of non-GAAP financial measures as are covered by Regulation G, but contain more detailed requirements than Regulation G. The Commission also amended Exchange Act Form 20-F to apply these requirements to annual reports filed with the Commission by foreign private issuers.

### H. Disclosure of Nominating Committee Functions and Communication Between Security Holders and Boards of Directors

On November 19, 2003 the Commission approved rules that will improve disclosure regarding the nominating committee process of public companies and the ways by which security holders may communicate with directors at the companies in which they invest (see Release No. 33-8340). The rules implement recommendations made by the Division of Corporation Finance to the Commission in its July 15 Staff Report: Review of the Proxy Process Regarding the Nomination and Election of Directors. The Staff Report is available on the Commission's Web site at http://www.sec.gov/news/studies.shtml. The new disclosure standards require registrants to disclose in proxy statements important additional information regarding a registrant's process of nominating directors, including:

- whether a registrant has a separate nominating committee and, if not, the reasons why it does not and who determines nominees for director,

- whether members of the nominating committee satisfy independence requirements,

- a registrant's process for identifying and evaluating candidates to be nominated as directors,

- whether a registrant pays any third party a fee to assist in the process of identifying and evaluating candidates,

- minimum qualifications and standards that a registrant seeks for director nominees,

- whether a registrant considers candidates for director nominees put forward by shareholders and, if so, its process for considering such candidates, and

- whether a registrant has rejected candidates put forward by large long-term security holders or groups of security holders.

The new disclosure standards also require registrants to disclose significant new information regarding shareholder communications with directors, including:

- whether a registrant has a process for communications by shareholders to directors and, if not, the reasons why it does not,

- the procedures for communications by shareholders with directors,

- whether such communications are screened and, if so, by what process, and

- the registrant's policy regarding director attendance at annual meetins and the number of directors that attended the prior year's annual meeting.

These rules apply to proxy and information statements of registered investment companies in the same manner that they apply to other companies. The rules require that any material change to the procedures for security holder nominations be disclosed in the registrant's Form 10-Q, 10-QSB, 10-K or 10-KSB filed for the period in which the material change occurs.

### I. Proposed Rule regarding IFRS First-time Adopters

On March 11, 2004, the Commission proposed to amend Form 20-F to provide an accommodation relating to financial statements prepared under International Financial Reporting Standards (IFRS) for foreign private issuers registered with the SEC (Securities Act Release 33-8397). Form 20-F generally requires a registrant to provide in its SEC filings three years of audited financial statements prepared on a consistent basis of accounting. The proposed amendments would apply to registrants that publish IFRS financial statements for the first time for any financial year beginning no later than Jan. 1, 2007.

The accommodation would permit eligible foreign private issuers for their first year of reporting under IFRS to file two years rather than three years of statements of income, changes in shareholder's equity and cash flows prepared in accordance with IFRS, with appropriate related disclosure. The accommodation would retain current requirements regarding the reconciliation of financial statement items to GAAP as used in the United States (U.S. GAAP), but modify the form in which the reconciliations are presented in the first filing that includes IFRS financial statements by requiring certain additional condensed US GAAP information.

The proposed amendments also would require any registrant that adopts IFRS for the first time, in any financial year to provide disclosure related to exceptions from IFRS on which it relied, and to include a specified level of information in the reconciliation from its previous system of accounting to IFRS.

The proposals are intended to ease the burdens that foreign companies may face when they adopt IFRS for the first time, while improving the quality of financial disclosure that they provide to investors. The proposals are addressed particularly at foreign issuers located in the European Union (EU), which under current EU law will generally be required to adopt IFRS for reporting on their 2005 financial year.

### J. Proposals Regarding Use of Form S-8 and Form 8-K by Public Shell Companies

On April 13, 2004 the Commission proposed rule and form amendments relating to public shell companies. The amendments would prohibit shell companies from using Form S-8, the form used by public companies to register securities in connection with employee benefit plans under the Securities Act of 1933. The amendments also would require a public shell company, when obligated to report a corporate event on Form 8-K that causes it to cease being a shell company, to include the same type of information as it would be required to file to register a class of securities under the Securities Exchange Act of 1934.

Case 1:24-cv-04987-ALC-SDA Document 75-3 Filed 03/16/26 Page 19 of 45

The Commission proposed the amendments to assure that investors in shell companies that acquire operations or assets have access on a timely basis to the same kind of information as is available to investors in public companies with continuing operations. The proposals are intended to protect investors by deterring fraud and abuse in the securities markets through the use of shell companies. The proposals would define the term shell company to mean a company with no or nominal operations, and with no or nominal assets or assets consisting solely of cash and cash equivalents. The definition would include foreign private shell companies, but the release solicits comment on the manner in which these companies should report the information that would be required on Form 8-K for a domestic shell company. The proposed amendments to Form S-8 would allow a company that ceases to be a shell company to use Form S-8 to register securities 60 days after it has filed information equivalent to the information filed by companies registering a class of securities under the Exchange Act.

### K. Proposed Rules Regarding Securities Offering Reform

On October 26, 2004, the Commission voted in Release No. 34-50624 to propose rules that would address communications related to registered securities offerings, delivery of information to investors, and procedural restrictions in the offering and capital formation processes (see Release No. 33-8501). The proposals would divide registrants into four categories, non-reporting issuers, unseasoned issuers, seasoned issuers, and well-known seasoned issuers. The most significant revisions to the Commission's communications rules and registration processes would apply to well-known seasoned issuers. The proposals would also require registrants to include disclosure in their Exchange Act periodic reports regarding risk factors (for Form 10-K filers), the registrant's status as a voluntary filer of Exchange Act reports, and, for accelerated filers, disclosure in their Exchange Act annual reports of written staff comments that were issued more than 180 days before the end of the fiscal year to which the annual report relates, where those comments remain unresolved at the time of filing the annual report and the registrant believes those comments to be material.

Comments on the proposals were due on or before January 31, 2005.

### L. Proposals Regarding Security Holder Director Nominations

On October 8, 2003, the Commission voted to propose rule changes that would, under certain circumstances, require registrants to include in their proxy materials security holder nominees for election as director (see Release No. 34-48626). These proposed rules are intended to improve disclosure to security holders to enhance their ability to participate meaningfully in the proxy process for the nomination and election of directors. The proposed rules would not provide security holders with the right to nominate directors where it is prohibited by state law. Instead, the proposed rules are intended to create a mechanism for nominees of long-term security holders, or groups of long-term security holders, with significant holdings to be included in company proxy materials where there are indications that security holders need such access to further an effective proxy process. This mechanism would apply in those instances where evidence suggests that the company has been unresponsive to security holder concerns as they relate to the proxy process. The proposed rules would enable security holders to engage in limited solicitations to form nominating security holder groups and engage in solicitations in support of their nominees without disseminating a proxy statement. The proposed rules also would establish the filing requirements under the Exchange Act for nominating security holders.

## II. Other Current Accounting and Disclosure Issues

Case 1:24-cv-04987-ALC-SDA Document 75-3 Filed 03/16/26 Page 20 of 45

### A. Statement of Cash Flows (New)

The statement of cash flows is one of the primary statements required with a full set of financial statements. It is relied upon by analysts and investors as much, if not more in some instances, as the statement of net income. The importance of appropriate classification and presentation of items in the consolidated statement of cash flows cannot be overstated. As such, registrants should give significant attention to the preparation of their consolidated statement of cash flows in order to ensure it provides an accurate presentation of their actual cash receipts and cash payments based on activity (operating, investing and financing), which in turn assists the reader in determining the registrant's ability to meet its obligations, pay dividends, generate cash flows sufficient to grow its business, etc. While the staff believes a statement of cash flows using the direct method provides investors with more useful information than the short-cut indirect method, we recognize that most registrants use the indirect method. Therefore, we encourage registrants to put more time and effort into ensuring that the statement of cash flows, and related disclosure in the financial statement footnotes and in MD&A, is meaningful and useful to users of the financial statements.

### 1. Classification of Cash Receipts from Inventory Sales

Registrants may finance the sale of inventory in various ways, such as on account or with a note or sales-type lease receivable (whether long-or short-term), using various entities in the consolidated group. Paragraph 22a of SFAS 95 states that cash receipts from the sales of goods or services are operating cash flows. Paragraph 22a clarifies that classification as an operating activity is required regardless of whether those cash flows stem from the collection of the receivable from the customer or the sale of the customer receivable to others; regardless of whether those receivables are on account or stem from the issuance of a note; and regardless of whether they are collected in the short-term or the long-term. It is important to note that FASB Statement No. 102, *Statement of Cash Flows – Exemption of Certain Enterprises and Classification of Cash Flows from Certain Securities Acquired for Resale* ("SFAS 102"), did not change this requirement. SFAS 102 addressed in part whether loans made by financial and similar institutions were sufficiently similar to product inventory of non-financial institutions such that the cash flow effects of those loans should be classified in the statements of cash flows in the same way as the cash flow effects from the sale of inventory, as operating activities. SFAS 102 did not alter the requirement in paragraph 22a of SFAS 95 to classify cash receipts from the sale of inventory as operating activities. As the SFAS 95 basis for conclusions indicates in paragraphs 93 to 96, the FASB considered and rejected classifying any portion of the cash receipts from the sale of inventory as investing activities.

Presenting cash flows between a registrant and its consolidated subsidiaries as an investing cash outflow and an operating cash inflow when there has not been a cash inflow to the registrant on a consolidated basis from the sale of inventory is not in accordance with GAAP. Similarly, presenting cash receipts from receivables generated by the sale of inventory as investing activities in the registrant's consolidated statements of cash flows is not in accordance with GAAP.

Registrants should ensure that footnote disclosure identifies where the cash flows related to the sale of inventory are classified in the consolidated statements of cash flows and explains the nature of the receivables/notes/loans and where the cash flows from these transactions are classified in the consolidated statements of cash flows. Registrants should also ensure that the line item descriptors on the consolidated statements of cash flows are consistent with those on the consolidated balance sheets and

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 21 of 45

in the financial statement footnotes detailing the components of finance receivables.

### 2. Classification of Payments Related to Settlement of Pension Liabilities

FASB Statement No. 95 states that cash flows from operating activities are generally the cash effects of transactions and other events that enter into the determination of net income. Paragraph 23(b) of SFAS 95 states that operating cash outflows includes cash payments made to other suppliers and employees for other goods and services. Contributions to pension plans are reported as operating cash outflows because they relate to employee compensation, an item reported as an expense in the income statement.

Registrants that reorganize in bankruptcy often enter into agreements with the Pension Benefit Guaranty Corporation (PBGC) regarding their liability under employee benefit plans that provide for a settlement of the plan liability through an assumption by the PBGC. The PBGC is a non-profit federally-created corporation that guarantees payment to plan participants of certain pension benefits under defined benefit plans should the plan sponsor be unable to fulfill its obligation. The agreements with the PBGC typically require that payments be made by the registrant at, and/or subsequent to, emergence from bankruptcy for the defined benefit plans that were assumed by the PBGC.

Despite the fact that payments made to the PBGC pursuant to these agreements may continue for several years, the cash outflows should not be classified as financing activities in the statement of cash flows. The form of settlement of the pension liability does not change the substance of the activity for which cash is being paid to any other classification than as an operating activity. In addition, the classification of these payments as an operating activity does not change in the event the registrant is required to apply "fresh start reporting" pursuant to AICPA Statement of Position 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, upon emergence from bankruptcy.

### B. Oil and Gas (New)

Staff reviews have uncovered diversity in practice among registrants in the oil and gas industry in several areas. Diversity has been noted in the areas of buy/sell transactions and capitalization of exploratory drilling costs. The accounting for these items is currently being considered by the accounting standard setters. The staff issued letters to registrants in the oil and gas industry in February 2005 requesting additional disclosure in order to provide investors with comparable information in light of the different practices in these areas. See the letter at http://www.sec.gov/divisions/corpfin/guidance/oilgas021105.htm. A brief description of the buy/sell transactions can be found in section II.D.1. of this outline, as the issue may have application outside the oil and gas industry.

The letter also discusses the staff's consideration of the accounting for a property disposition by a registrant using the full cost method that resulted in a less than 25% alteration of the proved oil and gas reserve quantities within a cost center and whether goodwill should be allocated to the property disposed. Goodwill associated with acquisitions of oil and gas properties that constitute a business is recognized in accordance with SFAS 141 but accounted for outside of the full cost rules. Therefore, when dispositions of these properties occur, the goodwill previously recognized does not affect the adjustments contemplated under Rule 4-10(c)(6)(i) of Regulation S-X. Rather, the accounting for the goodwill and any potential impairment should follow the provisions of FASB Statement No. 142, *Goodwill and Other Intangible Assets* (SFAS 142). Registrants should consider whether a property

3/11/26, 1:17 PM
Current Accounting and Disclosure Issues in the Division of Corporation Finance - March 4, 2005
Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 22 of 45

disposition that results in a less than 25% alteration of the proved oil and gas reserve quantities within a given cost center is a trigger that requires goodwill be evaluated for impairment under SFAS 142.

### C. Leasing (New)

#### 1. Accounting

There have been a number of restatements for lease accounting in the following areas: (1) the amortization of leasehold improvements by a lessee in an operating lease with lease renewals, (2) the pattern of recognition of rent when the lease term in an operating lease contains a period where there are free or reduced rents (commonly referred to as "rent holidays"), and (3) incentives related to leasehold improvements provided by a landlord/lessor to a tenant/lessee in an operating lease. The Commission's Office of Chief Accountant recently issued a letter outlining the current GAAP literature that should be looked to in determining the appropriate accounting. See the letter at: http://www.sec.gov/info/accountants/staffletters/cpcaf020705.htm

#### 2. Disclosure

Registrants should review the completeness and accuracy of disclosures concerning both operating and capital lease accounting to address the material terms of and accounting for leases. The disclosure should be concise and to the point. Basic descriptive information about material leases, usual contract terms, and specific provisions in leases relating to rent increases, rent holidays, contingent rents, and leasehold incentives may be best addressed in the description of properties or business section. In addition to the disclosures required by SFAS 13 and 29 and related interpretations, the accounting for leases should be clearly described in the notes to the financial statements, such as the accounting policy footnote, and in the discussion of critical accounting policies in MD&A as appropriate. Known or likely trends or uncertainties in future rent or amortization expense that could materially affect operating results or cash flows should be addressed in MD&A. Some disclosure examples follow:

- Describe material lease agreements or arrangements clearly;

- Disclose the essential provisions of material leases, including the original term, renewal periods, rent escalations, rent holidays, contingent rent, rent concessions, leasehold improvement incentives, and unusual provisions or conditions;

- Describe the accounting treatment for leases, to address each of the above components of lease agreements;

- Disclose the basis on which contingent rental payments are determined with specificity, not generality;

- Disclose the specific period used to amortize material leasehold improvements made either at the inception of the lease or during the lease term.

### D. Revenue

#### 1. Buy/Sell Arrangements (New)

In February 2005 the staff issued letters to certain registrants on several issues, including the accounting, presentation, and disclosure of buy/sell transactions. While the letters were issued to registrants in the oil and gas industry, there may be registrants in other industries who engage in

comparable transactions that should also consider the guidance. An example of the letter is posted on the Commission's website at
http://www.sec.gov/divisions/corpfin/guidance/oilgas021105.htm.

Buy/sell transactions typically involve contractual arrangements that establish the terms of the agreements to buy and sell a commodity either jointly in a single contract, or separately in individual contracts that are entered into concurrently or in contemplation of one another with a single counterparty. There may be provisions accommodating differences in quantities or grades, receipt and delivery locations, and stipulating that monetary consideration accompany the exchange. Such arrangements may be employed to facilitate the procurement of feedstock for a refinery operation, or to otherwise manage the supply chain or inventory generally. Some registrants may find it necessary to enter into a series of these transactions with different counterparties in an effort to obtain a given quantity of feedstock or inventory for a single location. We understand that these arrangements are undertaken due to market forces of
supply and demand, and may serve to increase the efficiency with which transportation assets are utilized, or to reduce the overall cost of acquiring inventory.

The Emerging Issues Task Force (EITF) of the Financial Accounting Standards Board (FASB) is currently considering the issue as to whether some or all of these buy/sell arrangements should be accounted for at historical cost pursuant to the guidance in paragraph 21(a) of APB Opinion No. 29, *Accounting for Nonmonetary Transactions*.
Additionally, we have questions regarding the appropriateness of reporting the proceeds and costs of buy/sell arrangements on a gross basis in the statement of operations. Although consideration of these issues is not yet complete, it is apparent that proceeds and costs associated with such transactions are fundamentally different in character than those of a registrant's primary operations.

Registrants who engage in buy/sell transactions should provide the disclosure requested in the sample letter posted on the Commission's website. Registrants should also consider the guidance in the letter when filing a registration statement under the Securities Act prior to including the requested disclosure in their annual report.

### 2. Service Contracts and the use of EITF 81-1

AICPA Statement of Position 81-1, *Accounting for Performance of Construction/Production Contracts*, specifically scopes out most service transactions. Footnote 1 of the SOP discusses its application to separate contracts to provide services essential to the construction or production of tangible property, such as design, engineering, procurement, and construction management. Nonetheless, long-term service contracts are not substantially different from other revenue arrangements. In determining whether delivery has occurred, registrants should pay careful attention to the terms of the arrangement, specifically the rights and obligations of the service provider and the customer. Provided all other revenue recognition criteria have been met, the revenue recognition method selected should reflect the pattern in which the obligations to the customer are fulfilled.

For example, in situations where a registrant cannot apply SOP 81-1 to their service contracts, a revenue recognition model that recognizes revenue as the service is performed using a proportional performance model, as contemplated by SAB Topic 13, is an often acceptable model. An output-based approach would generally be utilized. An input-based approach may be acceptable where the input measures are a reasonable surrogate for output measures. However, a cost-to-cost approach to revenue recognition is

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 24 of 45

generally not appropriate outside the scope of SOP 81-1 since it rarely gives a good estimate of proportional performance.

### 3. Disclosure

Since revenue recognition is often a critical accounting policy, registrants should review the completeness and accuracy of disclosures concerning their sources of revenues, method of accounting for revenues, and material considerations in evaluating the quality and uncertainties surrounding their revenue generating activity. The disclosure should be concise and to the point; more disclosure is not necessarily better. Basic descriptive information about revenue generating activities, customary contract terms and practices, and specific uncertainties inherent in the registrant's business activities may be most appropriate in Description of Business. Descriptive information about the effects of variations in revenue generating activities and practices, or changes in the magnitude of specific uncertainties, is most appropriate in MD&A. Accounting policies, material assumptions and estimates, and significant quantitative information about revenues should be included in notes to the financial statements or in MD&A, as appropriate (see Section I.A. above). Some disclosure examples follow:

*Disaggregate product and service information*

- Report product and service revenues (and costs of revenues) separately on the face of the income statement

- Furnish separate revenues of each major product or service within segment data

- Describe the major revenue-generating products, services, or arrangements clearly

- For major contracts or groups of similar contracts, disclose essential terms, including payment terms and unusual provisions or conditions

*Disclose when revenue is recognized (examples)*

- Upon delivery (indicate whether terms are customarily FOB shipping point or FOB destination)

- Upon completion of service

- After commencement of service, ratably over service period

- Upon satisfaction of a significant condition of sale – (identify the condition)

  - Only after customer acceptance?

  - Only after testing?

- Upon completion of all terms of contract

- Over performance period based on progress toward completion

- Upon delivery of separate elements in multi-element arrangement

*If revenue is recognized over the service period, based on progress toward completion, proportional performance, or based on separate contract elements or milestones, disclose how the period's revenue is measured*

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 25 of 45

- Disclose how progress is measured (cost to cost, time and materials, units of delivery, units of work performed)

- Identify types of contract payment milestones, and explain how they relate to substantive performance and revenue recognition events

- Disclose whether contracts with a single counterparty are combined or bifurcated

- Identify contract elements permitting separate revenue recognition, and describe how they are distinguished

- Explain how contract revenue is allocated among elements

  - Relative fair value or residual method?

  - Fair value based on vendor specific evidence or by other means?

*Disclose material assumptions, estimates and uncertainties*

- Disclose contingencies such as rights of return, conditions of acceptance, warranties, price protection, etc.

- Describe the accounting treatments for the contingencies

- Describe significant assumptions, material changes, and reasonably likely uncertainties

- Special disclosures and conditions are specified by SAB Topic 13 for companies that recognize refundable revenues by analogy to SFAS No. 48, *Sales With the Right of Return*.

### E. Business Combinations

#### 1. Purchase Price Allocation and Use of Residual Method

FASB Statement No. 141 requires that the cost of an acquired entity be allocated to the assets acquired and the liabilities assumed based on their fair value at the acquisition date. Any residual of the purchase price in excess of the identified assets and liabilities is accounted for as goodwill. Because FAS 141 eliminates the requirement to amortize goodwill, it is important for registrants to ensure they are identifying all intangible assets acquired rather than inappropriately adding their value to goodwill if unidentified.

Staff reviews have uncovered registrants that allocated the excess purchase price to an intangible asset rather than goodwill, under the premise that the intangible asset could not be separately valued because it is indistinguishable from goodwill. However, this method, called the residual method, does not comply with FAS 141 which requires that intangible assets that meet the recognition criteria be recorded at fair value. As a result, the SEC staff made a Staff Announcement, No. D-108, *Use of the Residual Method to Value Acquired Assets Other Than Goodwill*, at the September 2004 EITF meeting. EITF D-108 states that the residual method should no longer be used to value intangible assets other than goodwill. Rather, intangible assets should be separately and directly valued and the resulting fair value recognized. Registrants that have applied the residual method to the valuation of intangible assets should refer to EITF D-108 for transition guidance.

#### 2. Date of Annual Goodwill Impairment Testing

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 26 of 45

FASB Statement No. 142, *Goodwill and Other Intangible Assets*, requires that goodwill be tested, at the reporting unit level, for impairment on an annual basis. An impairment test also could be triggered between annual tests if an event occurs or circumstances change. A reporting unit is required to perform the annual impairment test at the same time every year, however, nothing precludes a registrant from changing the date of the annual impairment test. If a registrant chooses to change the date of the annual impairment test, it should ensure that no more than 12 months elapse between the tests. The change in testing dates should not be made with the intent of accelerating or delaying an impairment charge. The staff will likely raise concerns if a registrant is found to have changed the date of its annual goodwill impairment test frequently.

Any change to the date of the annual goodwill impairment test would constitute a change in the method of applying an accounting principle, as discussed in paragraph 7 of APB Opinion No. 20, *Accounting Changes*, and therefore would require justification of the change on the basis of preferability. The registrant is required by Rule 10-01(b)(6) of Regulation S-X to disclose the date of and reason for the change. The registrant is also required by Item 601 of Regulation S-K to file, as an exhibit to the first Form 10-Q or 10-QSB after the date of the change, a letter from the registrant's independent registered public accounting firm indicating whether or not the change is to an alternative principle which in his judgment is preferable under the circumstances. See Staff Accounting Bulletin Topic 6.G.2.b. for additional guidance.

### F. Investments

#### 1. Other Than Temporary Declines in Value

Temporary declines in the value of debt securities held-to-maturity are not recognized in earnings; temporary declines in value of available-for-sale debt and equity securities are netted with unrealized gains and reported as a net amount in a separate component of shareholder's equity. However, a decline in fair value below amortized cost that is other than temporary is accounted for as a realized loss. FASB Statement No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* specifies that "[i]f the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value… and the amount of the write down shall be included in earnings." This write down results in a new cost basis for the security, which cannot be recovered if the fair value subsequently increases.

Bright line or rule of thumb tests are not appropriate for evaluating other-than-temporary impairments. The determination of whether a decline is other than temporary must be made using all evidence that is available to the investor, and not just that related to the registrant such as its financial condition and near-term prospects, but also the severity and duration of the decline in fair value and the investor's intent and ability to hold an investment for a reasonable period of time sufficient for a forecasted recovery. Guidance in evaluating whether a security's recent decline in value is other than temporary has in the past only been found in SAB Topic 5:M, *Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities*.

The EITF recently issued No. 03-01, *Other-Than-Temporary Impairments*, which is similar to the staff's historical analysis discussed above. Issue 03-01 requires disclosures addressing impairments in a qualitative and quantitative manner. The consensus requires the securities to be segregated by SFAS 115 classifications and also by length of decline – those with declines of less than a year and those in excess of a year. Remember that SAB Topic 5:M states that management should perform this analysis "[a]cting upon the premise that a write-down may be required." Registrants should not infer that

securities with declines of less than one year are not other-than-temporarily impaired, nor should they infer that those declines of greater than a year are automatically impaired. Rather, an other-than-temporary decline could occur within a very short period or, if the facts and circumstances support it, a decline in excess of a year might still be temporary.

Since the typical equity security does not have a contractual cash flow at maturity on which to rely, an investor's intent and ability to hold an equity security for a reasonable period of time should be analyzed differently than a typical debt security. The ability to hold an equity security indefinitely would not, by itself, allow an investor to avoid an other-than-temporary impairment.

As a practical matter there are limitations on the period of time that management can incorporate into its forecast of market price recoveries. As the forecasted market price recovery period lengthens, the uncertainties inherent in management's estimate increase, which impact the reliability of that estimate. Market price recoveries that cannot reasonably be expected to occur within an acceptable forecast period should not be included in the assessment of recoverability.

A recognized or potential other than temporary impairment may require discussion in MD&A, if material, if it is considered to be a known material event or uncertainty, an unusual or infrequent event or transaction, or necessary to an understanding of financial condition or results of operations. Some items to consider in an MD&A discussion, including discussion of critical accounting policies, include the amount of the charge, the underlying reasons for the charge and its timing, an identification of which segment the charge relates, to whether or not it is included in the segment's profit or loss measure under SFAS 131, potential risk and uncertainties regarding future declines, and the estimated effects that material declines would have on the registrant's liquidity.

In several Accounting and Auditing Enforcement Releases, e.g., *In the Matter of Fleet/Norstar,* AAER No. 29557; *In the Matter of Excel Bancorp, Inc.,* AAER No. 29675; *In the of Matter Abington Bancorp, Inc.,* AAER No. 30614; and *In the Matter of Presidential Life Corporation,* AAER No. 31934, the Commission has taken action in instances when other than temporary declines in value were not reported in a timely and appropriate fashion. In these releases, the Commission observed that a registrant's assessment of the realizable value of a marketable security should begin with its contemporaneous market price because that price reflects the market's most recent evaluation of the total mix of available information. Objective evidence is required to support a realizable value in excess of a contemporaneous market price. That information may include the registrant's financial performance (including such factors as earnings trends, dividend payments, asset quality, and specific events), the near term prospects of the registrant, the financial condition and prospects of the registrant's region and industry, and the registrant's investment intent.

Additionally, the releases state that the Commission expects registrants to employ a systematic methodology that includes documentation of the factors considered. The methodology should ensure that all available evidence concerning declines in market values below cost are identified and evaluated in a disciplined manner by responsible personnel. Auditors are reminded of the need to closely examine the documentation concerning their client's determinations of other than temporary declines in market values.

### 2. Government-Sponsored Enterprises

Government-Sponsored Enterprises (GSEs), such as Fannie Mae, Freddie Mac and the Federal Home Loan Banks, issue marketable debt to the public. In addition, Fannie Mae and Freddie Mac have publicly held common stock and

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 28 of 45

also issue guaranteed mortgage-backed securities to the public. None of the debt securities issued by any of these GSEs is backed by the full faith and credit of the United States government. Section II of Industry Guide 3 requires disclosure of the book value of a bank holding company's investment portfolio based on specified categories of obligations, such as obligations of the U.S. Treasury and obligations of States of the U.S. Because the GSE obligations are not backed by the full faith and credit of the United States government, registrants should not disclose these investments aggregated with the Guide 3 category, obligations of the U.S. Treasury. Separate categorization of these obligations is appropriate, as their nature is not consistent with any of the categories currently listed in Guide 3. Registrants should consider similar disclosure categorization when providing disclosure pursuant to FASB Statement No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* and FASB Statement No. 107, *Disclosures about Fair Value of Financial Instruments*.

### 3. Auction Rate Securities (New)

Auction rate securities are long-term variable rate bonds tied to short-term interest rates that are reset through a "dutch auction" process which occurs every 7 – 35 days. The holder can participate in the auction and liquidate the auction rate securities to prospective buyers through their broker/dealer. The holder does not have the right to put the security back to the issuer.

Auction rate securities are considered highly liquid by market participants because of the auction process. However, because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows*. Registrants should refer to FASB Statement No. 115 to determine the proper accounting and Statement No. 95 to determine the proper classification on the Statement of Cash Flows. To determine if the auction rate securities should be presented on the balance sheet as current or noncurrent assets, registrants should refer to ARB No. 43, Chapter 3A, *Working Capital – Current Assets and Current Liabilities*.

### G. Contingencies and Loss Reserves

FASB Statement No. 5, *Accounting for Contingencies*, requires accrual of payments for contingent liabilities if payment is both probable and estimable. SFAS 5 also requires disclosure of the nature of any contingency, including the amounts that might be paid, if a loss is at least reasonably possible. Other literature also provides accounting and disclosure guidance, such as Staff Accounting Bulletin Topic 5.Y., *Accounting and Disclosures Relating to Loss Contingencies*, FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss*, and AICPA Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties*.

Registrants, their auditors, and their advisors have a responsibility to critically assess the claims against the company in order to identify those for which losses should be accrued and those that are not accrued because the success of the claim is only reasonably possible. Disclosure should discuss the nature of the claim, the amount accrued, if any, and the possible range of loss for claims where any amount within the range of reasonably possible loss is material. Circumstances where a loss was accrued for a claim without disclosure in prior filings of the nature of the claim and the range of reasonably possible loss should be rare due to the nature of most contingencies. A registrant that accrues a significant loss for a contingency, but whose prior disclosure of the low end of the range of reasonably possible loss was zero with no loss accrued, should ensure that there is robust disclosure that explains what triggered the significant loss in the period in which it was recorded.

Income tax contingencies also fall within the scope of SFAS 5. FASB Statement No. 109, *Accounting for Income Taxes*, also provides disclosure requirements for income tax items that arise as a result of temporary differences. As with other contingencies, such as litigation contingencies, registrants need to balance concerns regarding confidentiality with the need for the registrant's investors, analysts, and regulators to gain a clear understanding of the registrant's liquidity, as well as results of operations and financial position, through footnote disclosure and discussions in MD&A.

### H. Pension, Post Retirement, and Post Employment Plans

#### 1. Selection of Discount Rates under FASB Statement Nos. 87 and 106 (New)

FASB Statement No. 87, *Employers' Accounting for Pensions*, and FASB Statement No. 106, *Employers' Accounting for Postretirement Benefits Other Than Pensions*, require that the calculation of a projected benefit obligation include a discount rate that reflects the rates at which the pension benefits could effectively be settled. Conceptually, the selection of an assumed discount rate should be based on the single sum that, if invested at the measurement date, would generate the necessary cash flows to pay the benefits when due (see paragraph 186 of Statement No. 106). As discussed in EITF Topic D-36, one method for determining the assumed discount rate is to create a hypothetical portfolio of high quality bonds (rated Aa or higher by a recognized rating agency) for which the timing and amount of cash outflows approximates the estimated payouts of the defined benefit plan.

The staff expects registrants with material defined benefit plans to include clear disclosure of how it determines its assumed discount rate, either in the financial statement footnotes or in the critical accounting policies section of MD&A. That disclosure should include the specific source data used to support the discount rate. If the registrant benchmarks its assumption off of published long- term bond indices, it should explain how it determined that the timing and amount of cash outflows related to the bonds included in the indices matches its estimated defined benefit payments. If there are differences between the terms of the bonds and the terms of the defined benefit obligations (for example if the bonds are callable), the registrant should explain how it adjusts for the difference. Increases to the benchmark rates should not be made unless the registrant has detailed analysis that supports the specific amount of the increase.

#### 2. Disclosure

Item 303(a) of Regulation S-K requires the disclosure of any known trends, demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way, or which would cause reported financial information not to be necessarily indicative of future operating performance or future financial condition. The discussion of employee benefit plans in MD&A should provide readers with information regarding the following to the extent material:

- the nature of the plans,

- the character of deferred gains and losses,

- the degree to which important assumptions have coincided with actual experience, and

- the timing and amounts of future funding requirements.

Case 1:24-cv-04987-ALC-SDA   Document 75-3   Filed 03/16/26   Page 30 of 45

The discussion and analysis of employee benefits should also provide readers with information regarding the following to the extent material:

- the effects of accounting for the registrant's benefit plans and

- the funding of the accumulated and projected benefit obligations on the registrant's financial condition and operating performance.

*Assumptions and Estimates*

The accounting for employee benefit plans typically involves numerous assumptions and estimates, and frequently the use of experts such as actuaries in determining asset allocations and quantifying benefit obligations, funding requirements, and compensation expense. The accounting standards for pension and post-retirement plans also involve mechanisms that serve to limit the volatility in earnings, which would otherwise result from recording changes in the value of plan assets and benefit obligations in the financial statements in the periods in which such changes occur.

MD&A should identify the following:

- material assumptions underlying the accounting for benefit plans, and

- changes to those assumptions having a material effect on financial condition and operating performance.

Registrants should ensure that the disclosure of their accounting policies and other footnote disclosure in the financial statements are comprehensive and minimize unnecessary repetition of information in MD&A.

*Changes to Assumptions and Estimates*

A registrant should consider the impact of its various assumptions, to determine the extent to which the assumptions or changes in the assumptions have a material effect, including those concerning:

- the long-term rates of return on plan assets,

- discount rates used for projecting benefit obligations,

- methods of deriving market-related value,

- average remaining service period,

- average remaining life expectancy, and

- any alternate methods of amortizing gains and losses selected.

While some of these assumptions are subject to frequent revision, others may be relatively static. In describing material changes to the assumptions, it may be necessary to indicate how often revisions are made.

*Comparison of Actual and Expected results*

Accounting for employee benefit plans is largely dependent on the assumptions concerning the periods of attribution (the process of assigning the cost of benefits to period of employee service) and the calculation and amortization of gains and losses. Therefore, MD&A should address the material trends or patterns of amounts reflected in the financial statements, significant assumptions and any material variations between the results

based on those assumptions, and the registrant's actual experience. For example, when results of operations are materially impacted by benefit plans, the registrant should disclose the material underlying assumptions and their effect to sufficiently address the quality of the registrant's earnings. In addition, when material deviations between the actual and expected long-term rates of return on plan assets arise, those amounts should be disclosed, as should any material deferred gains or losses that result. Under these circumstances, a registrant should quantify the amounts, and indicate the periods in which these will be reflected in the results of operations.

When addressing the expected and actual long-term rates of return on plan assets, registrants should disclose, where material:

- the various categories of investments held as plan assets,

- the relative asset allocations or holdings in each category, and

- any reasonably likely changes in the allocation of plan assets.

A sensitivity analysis, demonstrating how a change in the assumed long-term rates of return would impact the results of operations, may also be necessary to sufficiently convey the quality of the registrant's earnings and the degree of uncertainty. If deferred gains and losses are material, a registrant should discuss the amortization periods, while differentiating between gains and losses that are subject to amortization and those that are not.

Other disclosures in MD&A related to benefit plans, including those related to exposure, recognition and funding obligations, should follow a similar approach. MD&A should build on and not unnecessarily repeat information disclosed in the notes to the financial statements. Registrants should disclose material assumptions and changes in assumptions, the resulting material effect on financial condition and operating performance, material deviations between results based on the assumptions used by registrants and actual plan performance, and the known material trends and uncertainties relating to plans, including those caused by these deviations. For example, registrants should consider whether disclosure of the historical pattern of expense recognition and the periods over which any amounts deferred in other comprehensive income will be recognized in results of operations is necessary.

*Funding Obligations*

If there are material funding obligations, a registrant should:

- quantify the amounts of the funding obligations,

- address the material known trends or uncertainties relating to paying such amounts (for example, if the registrant expects to pay them over a specified period of time, or if there are known material uncertainties concerning payment),

- address the material impact of future payments on future cash flows, and

- address any material uncertainty in the funding obligation itself (for example, uncertainty introduced by significant differences between the duration of debt instruments included in plan assets, or changing demographics in the workforce, and the expected timing of future benefit payments).

### I. FIN 46 and Deconsolidation

The FASB issued FIN 46 in January 2003 and revised it with FIN 46R in December 2003. The purpose of FIN 46 is to provide guidance on consolidation of certain kinds of entities. Although FIN 46 resulted in consolidation of many previously off-balance sheet structures, it also resulted in deconsolidation of certain subsidiary trusts that issue trust preferred securities. This deconsolidation has in turn raised the question of whether issuers of trust preferred securities may continue to provide the modified financial information permitted by Rule 3-10 of Regulation S-X, which presumes that consolidation is the basis for the 100% owned requirement in that rule. The staff believes that FIN 46 will not affect the ability of finance subsidiaries issuing trust preferred securities to avail themselves of Rule 3-10(b) of Regulation S-X and Exchange Act Rule 12h-5 if the finance subsidiaries meet the conditions of that paragraph and provide the following footnote disclosure:

• an explanation of the transaction between the parent and the subsidiary that resulted in debt appearing on the books of the subsidiary,
• a statement of whether the finance subsidiary is consolidated. If the finance subsidiary is not consolidated, an explanation why, and
• if a deconsolidated finance subsidiary was previously consolidated, and explanation of the effect that deconsolidation had on the financial statements

However, registrants should remember that consolidation is a requirement for entities that seek to avail themselves of the modified reporting provided by paragraphs (c) through (f) of Rule 3-10.

### J. Segment Disclosure

FASB Statement No. 131, *Disclosures about Segments of an Enterprise and Related Information*, became effective for fiscal years beginning after December 15, 1997. One significant focus of staff reviews continues to be the evaluation of whether registrants have complied completely with all the disclosure requirements of SFAS 131.

### 1. Identification of Operating Segments

SFAS 131 defines an operating segment, in part, as a component of an enterprise whose operating results are regularly reviewed by the chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance. Operating segments may be aggregated in the disclosure only to the limited extent permitted by the standard. If operating segments are aggregated, that fact must be disclosed. Under SFAS 131, the chief operating decision maker is not necessarily a single person, but is a function that may be performed by several persons.

If the chief operating decision maker receives reports of a component's operating results on a quarterly or more frequent basis, the staff may challenge a registrant's determination that the component is not an operating segment for purposes of SFAS 131 unless reports of other overlapping sets of components are more clearly representative of the way the business is managed. On a few occasions, the staff has requested copies of all reports furnished to the chief operating decision maker if the reported segments did not appear realistic for management's assessment of a registrant's performance or conflicted with that officer's public statements describing the registrant. The staff also has reviewed analyst's reports, interviews by management with the press, and other public information to evaluate consistency with segment disclosures in the financial statements. Where that information revealed different or additional segments, amendment of the registrant's filings to comply with SFAS 131 was required.

Case 1:24-cv-04987-ALC-SDA   Document 75-3   Filed 03/16/26   Page 33 of 45

## 2. Aggregation of Operating Segments

SFAS 131 allows for aggregation of operating segments that sell similar products or services created with similar production processes to similar customers using similar distribution systems in similar regulatory environments, and that have similar economic characteristics. These criteria are listed in paragraph 17 of SFAS 131, along with the requirement that aggregation must be consistent with the objectives and principles of the standard. The staff believes aggregation is a high hurdle and is appropriate only in situations where, as stated by the FASB in the basis for conclusions to SFAS 131, "separate reporting of segment information will not add significantly to an investor's understanding of an enterprise [because] its operating segments have characteristics so similar that they can be expected to have essentially the same future prospects." The FASB rejected recommendations that the aggregation criteria be indicators rather than tests. Therefore, after a company identifies their operating segments, aggregation is only allowed if the identified operating segments meet all of the aggregation criteria, with the resulting segments being reported if they meet the significance test in paragraph 19 of the standard.

## 3. Other Compliance Issues

Registrants should remember to identify the products and services from which each reportable segment derives its revenues, and to report the total revenues from external customers for each product or service or each group of similar products and services. Disclosures for products and services that are not substantially similar must be disaggregated. The staff has objected to overly broad views of what constitutes similar products. In its assessment of whether dissimilar products have been aggregated, the staff may review public disclosures and marketing materials that describe the registrant's products.

Information about geographic areas is also required to be disclosed based on countries, both the country of domicile and for foreign countries. If a registrant manages its business by geographic regions and determines its reportable segments accordingly, it still must provide the separate geographic disclosures for each country in which revenues are material. Some registrants provide this disclosure by presenting material countries separately within the subtotals by region.

The reconciliation of segment elements to the consolidated financial statements should quantify and clearly explain each material reconciling item. Effects of measurement differences should be identified, and asymmetrical allocations among segments should be highlighted.

## 4. Changes in segments

The requirement to recast prior information to correspond with current reportable segments, or to otherwise provide comparable information, is discussed in paragraphs 34 and 35 of SFAS 131. Effects of changes in significance of reportable segments are discussed in paragraphs 22 and 23. If management changes the structure of its internal organization after fiscal year end, or intends to make a change, the new segment structure should not be presented in financial statements until operating results managed on the basis of that structure are reported. Disclosures based on the historical reportable segments should be presented until financial statements for periods managed on the basis of the new organizational structure are presented. However, supplemental disclosure of the future effects of the changes may be useful.

If annual financial statements are required in a registration or proxy statement that includes subsequent periods managed on the basis of the new

Case 1:24-cv-04987-ALC-SDA Document 75-3 Filed 03/16/26 Page 34 of 45

organizational structure, the annual audited financial statements should include a revised segment footnote that reflects the new reportable segments. The registrant's Description of Business and MD&A should be similarly revised. Prior filings that reported the old organizational structure should not be amended. The revised annual financial statements and related disclosures may be included in the registration or proxy statement or in a Form 8-K incorporated by reference. If a registrant files a Form S-3 that incorporates its most recent Forms 10-K and 10-Q before the new organizational structure is required to be presented in the financial statements, management and their advisors should consider whether the change in reportable segments is a material change per Item 11 of Form S-3. If the change in reportable segments is deemed to be a material change, the registrant should report recasted segment information prior to the effective date of the Form S-3.

### K. Issues Associated With SFAS 133, Accounting for Derivative Instruments and Hedging Activities

#### 1. Formal Documentation Under Statement 133 (Revised)

SFAS 133 contains explicit guidance regarding the application of hedge accounting models, including documentation and effectiveness assessment requirements. One of the fundamental requirements of SFAS 133 is that *formal* documentation be prepared at inception of a hedging relationship. The standard stresses the need for the documentation to be prepared contemporaneously with the designation of the hedging relationship. The formal documentation must identify the following:

- the entity's risk management objectives and strategies for undertaking the hedge,

- the nature of the hedged risk,

- the derivative hedging instrument,

- the hedged item or forecasted transaction,

- the method the entity will use to retrospectively and prospectively assess the hedging instrument's effectiveness, and

- the method the entity will use to measure hedge ineffectiveness (including those situations in which the change in fair value method as described in SFAS 133 Implementation Issue No. G7 will be used); see EITF D-102.

Contemporaneous designation and documentation of a hedging relationship are fundamental to the application of hedge accounting. If contemporaneous documentation can not be demonstrated, an auditor will be unable to determine whether the company has, after the fact, selected the hedged item or transaction, or the method of measuring effectiveness, to achieve a desired accounting result. Upon the adoption of SFAS 133, the staff believes that most registrants undertook efforts to adhere to the spirit and form of the standard and to satisfy all of its requirements. In the course of the filing review process, however, the staff has encountered instances where registrants have not been diligent in meeting those requirements. The staff has noted instances of shortcutting or minimizing the process, as well as instances of aggressive interpretation and attempts to achieve results inconsistent with the spirit of SFAS 133. The staff will continue to challenge the application of hedge accounting in instances where an entity has not contemporaneously complied with SFAS 133's formal documentation requirements upon designation of a hedging relationship, or has otherwise

3/11/26, 1:17 PM
Case 1:24-cv-04987-ALC-SDA     Document 75-3     Filed 03/16/26     Page 35 of 45
Current Accounting and Disclosure Issues in the Division of Corporation Finance, March 4, 2005

shortcutted or circumvented the process. Two documentation requirements are emphasized below.

*The hedged forecasted transaction*

SFAS 133 stresses that the documentation of the hedged forecasted transaction must be sufficiently specific such that when a transaction occurs, it is clear whether or not that particular transaction is the hedged transaction. Thus, the documentation of the forecasted transaction should include reference to the timing (i.e., the estimated date), the nature, and amount (i.e. the hedged quantity or amount) of the forecasted transaction.
*Description of how the entity will assess and measure hedge effectiveness*

While SFAS 133 provides an entity with flexibility in determining the method for assessing hedge effectiveness, the methodology used must be reasonable, and must be documented at inception of the hedging relationship. Additionally, SFAS 133 requires that an entity use the chosen method consistently throughout the hedge period (a) to assess, at inception of the hedge and on an on-going basis, whether it expects the hedging relationship to be highly effective in achieving offset and (b) to determine the ineffective aspect of the hedge. The method used for assessing hedge effectiveness and measuring ineffectiveness must be documented with sufficient specificity so that a third party could perform the measurement based on the documentation and arrive at the same result as the registrant. When hedge accounting has a material impact on a registrant, we encourage registrants to include disclosures that clearly describe the specific methodology used to test hedge effectiveness for each type of SFAS 133 hedge, as well as how often those tests are performed. Disclosures of this type may be appropriately included within the critical accounting estimates section of MD&A.

## 2. Financial Statement Presentation and Disclosure (Revised)

Registrants generally have continued the historical practice of including the results of hedging relationships on a net basis in the income statement line item associated with the hedged item. There is no required classification for the gain or loss recognized for hedge ineffectiveness or for any component of a derivative instrument's gain or loss that is excluded from the assessment of hedge effectiveness, but the amount of this net gain or loss and its income statement classification must be disclosed. Consistent classification should be observed in each period. Derivative assets and liabilities may be offset only to the extent permitted by FASB Interpretation No. 39, *Offsetting of Amounts Related to Certain Contracts*. Although bifurcated for measurement purposes, embedded derivatives should be presented on a combined basis with the host contract.

There is similarly no guidance in SFAS 133 related to classification of derivatives that do not qualify for hedge accounting. As a result, we encourage disclosure of the location in the income statement where the changes in the fair value of non-hedge accounting derivatives are reflected as well as the amount. However, we generally believe that a presentation that splits the components of a derivative into different line items on the income statement or that reclassifies realized gains and losses of a derivative out of the line item that included unrealized gains and losses of the same derivative is inappropriate. For example, if a registrant classifies changes in fair value of economic hedges (unrealized gains and losses) in a single line item such as "risk management activities", a registrant should not reclassify realized gains and losses (the periodic or final cash settlements from these economic hedges) in the period realized out of risk management activities and into revenue or expense lines associated with the related exposure. While SFAS 133 was essentially "silent on geography," it was the clear intention of the FASB to eliminate the practice of synthetic instrument accounting. The

Case 1:24-cv-04987-ALC-SDA Document 75-3 Filed 03/16/26 Page 36 of 45

presentation described in the above example is essentially a form of synthetic instrument accounting from an income statement perspective.

Registrants should focus on the clarity of their disclosures when they use hedges, both those that qualify for hedge accounting under SFAS 133 and those that don't. Registrants should provide transparent, "plain English" disclosures related to derivatives, including reasons for their use, associated hedging strategies, and methods and assumptions used to estimate fair value, as required by FASB Statements No. 107 and No. 133, and Item 305 of Regulation S-K. Furthermore, when hedge accounting has a material impact on the registrant, registrants should ensure they have disclosures, for each type of fair value and cash flow hedge, that clearly describe the specific type of asset or liability (or identified portion thereof) being hedged and the derivative used for that type of hedge. Registrants should also consider providing disclosures regarding their use of SFAS 133 elections. We note that the FASB staff recently proposed adding a project to the FASB's agenda to increase the disclosure requirements of SFAS 133. The proposed project would consider existing disclosures and assess new requirements that would improve transparency and relevance to the financial statement readers. We encourage registrants to monitor the FASB's discussions in this area.

### 3. Auditing Fair Values and SFAS 133

Management's assertions regarding fair values, timely hedge designation and documentation, and hedging effectiveness should be subject to on-going audit testing. Auditors should refer to SAS 92, SAS 73, SAS 70, and 37, as adopted by the PCAOB in Rule 3200T, as well as Independence Standards Board Interpretation 99-1, as adopted by the PCAOB in Rule 3600T, for guidance in this area. In addition, the AICPA has issued an Audit Guide, *Auditing Derivative Instruments, Hedging Activities and Investment Securities*.

### L. Market Risk Disclosures

Item 305 of Regulation S-K prescribes disclosures about derivatives and market risks inherent in derivatives and other financial instruments. Registrants should clearly explain how they manage their primary market risk exposures, including describing the objectives, general strategies and instruments used to manage each exposure. In the discussion of how the registrant manages risk exposure, registrants should separately discuss business decisions that result in natural (or economic) hedges and decisions to use derivative instrument positions to hedge exposures. Changes in the strategies or tools used to manage exposures during the year in comparison to the prior year should be clearly disclosed, as well as any known or expected changes in the future. Registrants should be specific in explanations of the intended result of the application of these policies (e.g., percentage of production intended to be hedged) and furnish any other information that would assist investors in understanding your particular position. To assure balance and usefulness, disclosures about commodity derivatives should be related to the registrant's exposures in the underlying commodity.

### M. Allowance for Loan Losses

#### 1. Disclosure

The determination of the allowance for loan losses requires significant judgment. The balance in the allowance for loan losses should reflect management's best estimate of probable loan losses related to specifically identified loans as well as probable incurred loan losses in the remaining loan portfolio. SFAS 5 and FASB Statement 114, *Accounting by Creditors for Impairment of a Loan*, limit loss allowances to losses that have been incurred as of the balance sheet date. Accordingly, allowances for loan losses should

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 37 of 45

be based on past events and current economic conditions. Disclosures that explain the allowance in terms of potential, possible, or future losses, rather than probable losses, suggest a lack of compliance with GAAP and are not appropriate.

APB Opinion 22 sets forth the general requirements for accounting policy disclosures in the financial statements. Industry Guide 3 specifies additional detail that should be provided in explanation of loss allowances within the Description of Business. Viewed together, these disclosures should describe in a comprehensive and clear manner the registrant's accounting policies for determining the amount of the allowance in a level of detail sufficient to explain and describe the systematic analysis and procedural discipline applied. Registrants commonly develop different elements in their allowances to estimate (1) losses based upon specific evaluations of known loss on individual loans, (2) estimated unidentified losses on various pools of loans and/or groups of graded loans, and (3) other elements of estimated probable losses based on other facts and circumstances. The disclosures should describe and quantify each element of the allowance, and explain briefly how the registrant's procedural discipline was applied in determining the amount, and not simply the "adequacy," of each specific element. If loans are grouped by pool or by grading within type to estimate unidentified probable losses, the basis for those groupings and the methods for determining loss factors to be applied to those groupings should be described. The basis for estimating the impact of environmental factors, such as local and national economic conditions and trends in delinquencies and losses, whether through modifying loss factors or through a separate allowance element, should be disclosed. Changes in methodology and their impact should be disclosed in accordance with APB Opinion #20.

MD&A should explain the period-to-period changes in specific elements of the allowance. It also should discuss the extent to which actual experience has differed from original estimates. The reasons for changes in management's estimates should indicate what evidence management relied upon to determine that the revised estimates were more appropriate and how those revised estimates were determined. A registrant following a procedural discipline should be recording provisions for loan losses that reflect the changes in asset quality as measured in the registrant's periodic loan reviews. MD&A should discuss the reasons for the changes in assets quality and explain how those changes have affected the allowance and provision. If historical loss experience appears low or high relative to the level of the allowance at the latest balance sheet date, a reconciling explanation should be provided. If a registrant changes its methodology, the basis for changing its methodology and the effects of the change should be explained.

### 2. Financial statement presentation

Allowances for credit losses are valuation accounts that should be presented as a reduction of the carrying value of the related balance sheet item. The allowance for loan losses should not include amounts provided for losses on financial instruments that are not classified on the balance sheet as loans. FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of* Others, issued in November 2002, requires that most guarantees be recognized and initially measured at fair value in the financial statements. The liability for guarantees should be classified separately from the allowance for loan losses.

As noted in Section H.1., SFAS 133 does not provide specific guidance on geography, but at the same time the staff believes that some classifications may not make sense. As an example, a financial institution classifying in the provision for loan losses all changes in credit derivatives used as economic

hedges would not seem appropriate given the importance of that line item to certain credit quality analyses.

Financial institutions must present the provision for loan losses as a deduction in the determination of net interest income, pursuant to Article 9 of Regulation S-X. Credit loss provisions on other types of balance sheet and off-balance sheet items that do not affect net interest income should not be included in the provision for loan losses. Loss provisions not related to interest income should be recorded in other appropriate categories of income or expense. Direct transfers of amounts between the allowance for loan losses and other credit loss allowances are not appropriate. Changes in the amount of the allowance for loan losses should be reflected in the provision for loan losses, while changes in other allowances should be reflected in other appropriate categories of income or expense.

### N. Loans and Other Receivables

#### 1. Accounting for Loans or Other Receivables Covered by Buyback Provisions

The terms of sale of loans or other receivables, including, but not limited to, those securitized through the Government National Mortgage Association or another GSE, may either require or allow for the transferor's repurchase of such loans or receivables upon an event of default.

Paragraph 55 of FASB Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement No. 125*, specifies the accounting in a circumstance where the seller regains control of assets previously accounted for appropriately as having been sold, such as in the case of a call option that becomes exercisable upon the event of borrower default. The assets should be accounted for in the same manner as a purchase of the assets from the former transferee in exchange for liabilities assumed. Specifically, the transferor recognizes in its financial statements those assets together with liabilities to the former transferees or beneficial interest holders in those assets at fair value on the date that the call becomes exercisable, regardless of whether it intends to exercise the call. EITF Issue 02-9 further clarifies the accounting for a transferor's re-recognition of assets pursuant to paragraph 55 of FASB Statement No. 140.

The original balance sheet classification of the asset when originally transferred should be maintained when control over that asset is re-recognized by the transferor. For instance, if the asset subject to the call or repurchased by the transferor is a loan, the balance sheet classification by the transferor upon re-recognition should be Loans, not Other Assets. No loan loss allowance should be recorded upon initial re-recognition of loans at fair value. Subsequent accounting for the re-recognized loan will depend on whether the loans are classified as held for investment or held for sale.

In the event that loans re-recognized by the transferor have the risk elements contemplated by Item III.C.1.of Industry Guide 3 (i.e., nonaccrual, past due, restructured), the amount of such loans should be included in the disclosures required by that Item. Supplemental disclosures may be made to facilitate understanding of the aggregate amounts reported pursuant to Item III.C.1. These disclosures may include, for example, information as to the nature of the loans, any guarantees, the extent of collateral, or amounts in process of collection. For example, if a loan re-recognized by a transferor is accruing, but it is contractually past due 90 days or more as to principal or interest, that loan should be included in the disclosure required by Item III.C.1(b) even if the loan is guaranteed through a government program, such as the Veterans Administration (VA) or Federal Housing Authority (FHA).

Case 1:24-cv-04987-ALC-SDA   Document 75-3   Filed 03/16/26   Page 39 of 45

## 2. Disclosures About Restructured Loans and Other Receivables

Paragraph 40 of FASB Statement No. 15, *Accounting by Creditors for Troubled Debt Restructurings*, as amended by FASB Statement No. 114, *Accounting by Creditors for Impairment of a Loan*, require disclosures about restructured loans, including information about restructured loans included in large groups of smaller-balance homogeneous loans such as credit cards, residential mortgages, and consumer installment loans. Paragraph 5 of FASB Statement No. 114 states, "[t]his Statement also addresses the accounting by creditors for all loans that are restructured in a troubled debt restructuring involving a modification of terms of a receivable, except loans that are excluded from the scope of this Statement in paragraphs 6(b)-(d), including those involving a receipt of assets in partial satisfaction of a receivable." Large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment are not among those exclusions. Accordingly, in the event that a loan is restructured, all of the provisions of FASB Statement No. 114 apply, including the disclosure provisions set forth in paragraph 20 of that Statement, as amended by FASB Statement No. 118, *Accounting by Creditors for Impairment of a Loan – Income Recognition and Disclosures, an amendment of FASB Statement No. 114*.

Disclosures about certain restructured loans also are required for certain registrants by Item III.C.1(c) of Industry Guide 3.

### 3. Potential Problem Loans

We remind registrants subject to the provisions of Industry Guide 3 that Instruction 2 to Item III.C. requires disclosures about loans which are not now disclosed as past due but where known information about possible credit problems of borrowers causes management to have serious doubts as to the ability of such borrowers to comply with the present loan repayment terms and which may result in their being included later in past due loans.

### 4. Loans Held for Sale (New)

AICPA Statement of Position 01-6, *Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others ("SOP 01-6")* has a scope that includes **all** entities that lend to or finance the activities of others, including financing arrangements that only involve extending credit to trade customers resulting in trade receivables. Paragraph 8 of SOP 01-6 states that loans and trade receivables should only be classified as held for investment when management has the intent and ability to hold that loan/ receivable for the foreseeable future or until maturity or payoff. Loans/receivables not held for investment should be accounted for as held for sale and reported at the lower of cost or fair value. If a registrant decides to sell loans/receivables not previously classified as held for sale, such loans/receivables should be transferred to the held for sale classification and reported at lower of cost or fair value. Continuing to report these loans/receivables on an adjusted cost basis is inappropriate because it may delay recognition of losses due to declines in fair value.

Registrants should appropriately identify and account for loans and receivables that the registrant intends to sell, and consider the need for clarifying disclosure that:

    a. Identifies the amount of loans/receivables held for sale.

    b. Explains how it determines which loans/receivables are initially accounted for as held for sale or are later transferred to the held for sale classification.

3/11/26, 1:17 PM
Case 1:24-cv-04987-ALC-SDA     Document 75-3     Filed 03/16/26     Page 40 of 45
Current Accounting and Disclosure Issues in the Division of Corporation Finance, March 4, 2005

c. Describes the method it uses to determine the lower of cost or fair value for loans/receivables held for sale.

d. Reconciles the changes in loans/receivables held for sale balances to the amounts presented in the consolidated statement of cash flows

Registrants should ensure that they have appropriately classified the cash payments and receipts on loans that are held for sale in the statement of cash flows (loans that are unrelated to the sale of inventory; see Section II.A. above). Paragraph 9 of FASB Statement No. 102, "Statement of Cash Flows – Exemption of Certain Enterprises and Classification of Cash Flows from Certain Securities Acquired for Resale" ("SFAS 102"), states that cash flows related to loans that were originated or purchased specifically for resale and are held for short periods of time should be classified as operating. Cash flows related to loans that were not acquired specifically for resale and carried at the lower of cost or market value should be classified as investing.

### O. Materiality Assessments and the Use of Sampling (New)

Before a registrant decides to not apply specific requirements of GAAP because of materiality, the registrant and its auditors have an obligation to appropriately evaluate whether the impact of not applying that required guidance is material, as discussed in SAB Topic 1. M. That evaluation should be documented and completed for each reported financial period. The registrant's methodology for determining the quantitative impact of not applying the required guidance must allow the registrant and its auditor to reliably measure the difference for each reported financial period. If the pool of transactions to which the relevant accounting guidance has not been applied is not homogenous or varies from period to period, a sampling technique will most likely not allow the registrant and its auditor to reliably measure the impact of not applying GAAP.

### P. Change of Accountants

#### 1. Merger of Firms

A merger of accounting firms always results in a change in accountants due to the change in legal entity of the firm that performs the audit. The merger could take the form of a legal merger of 2 firms, an asset purchase, or the admission of a new partner(s) from another firm who brings SEC clients to the admitting firm. The acquired firm may or may not separately continue in business, except in a legal merger where the acquired firm would not practice separately.

An Item 4.01 Form 8-K must be filed no later than 4 business days after the merger. In addition to disclosing the name of the new accounting firm, the Form 8-K disclosure should describe the merger and state whether the merged firm resigned as auditors or the registrant dismissed the old firm. Auditors and registrants should be aware of any independence issues that could arise from the merger and address them appropriately.

If the old firm continues in business, even if as a shell, and is licensed to practice and in good standing as a public accounting firm, it would be able to continue to reissue prior opinions or provide consents to the use of prior opinions. Should the new firm be willing to assume liability for the old firm's audits, it could issue a new opinion that covers the prior audited periods and provide consents to the use of that opinion.

If neither firm is willing or able to reissue opinions on prior audited periods or provide a consent to the use of a prior opinion, the registrant would have to provide a formal request for waiver of consent under Securities Act Rule 437C

Case 1:24-cv-04987-ALC-SDA    Document 75-3    Filed 03/16/26    Page 41 of 45

or write to the staff of the Office of the Chief Accountant in the Division of Corporation Finance to request a waiver of the re-issuance of a prior opinion where no consent is needed. Generally, the staff limits granting waivers to hostile takeovers/tender offers.

### 2. PCAOB Registration

PCAOB Rule 2100 requires registration with the PCAOB of any firm that 1) prepares or issues an audit report with respect to a registrant or 2) plays a substantial role in the preparation or furnishing of an audit report with respect to a registrant. The deadline for registration was October 22, 2003 (or, for foreign public accounting firms, July 19, 2004). An unregistered firm cannot issue a new opinion (even if dated before October 22) or update/dual-date its opinion after October 22, 2003 on an issuer's financial statements.

A firm does not have to be registered to reissue a prior report (or issue a consent to the use of a prior report) issued before October 22, 2003, or to issue a report or consent on financial statements of a material acquiree that is a private company (non-issuer) that are filed pursuant to Rule 3-05 of Regulation S-X or Rule 310(c) of Regulation S-B.

An unregistered firm may be able to perform some audit services if the services represent less than 20% of the total engagement hours or fees provided by the principal accountant related to issuing all or part of its audit report. See PCAOB Rules 1001 and 2100 for more details.

### III. Other Information About the Division of Corporation Finance and Other Commission Offices and Divisions

#### A. Other Sources of Information

Much information about the Commission, proposed and recently adopted rules, and other activities and developments may be found at the Commission's website -- http://www.sec.gov. Information about current issues and interpretations in the Division of Corporation Finance can be found at www.sec.gov/divisions/corpfin.shtml. Information of particular interest to accountants practicing before the Commission is at http://www.sec.gov/about/offices/oca.htm. Other documents that may be of particular interest to readers of this outline include:

- Frequently Requested Accounting and Financial Reporting Interpretations and Guidance -- www.sec.gov/divisions/corpfin/guidance/cfactfaq.htm

- International Financial Reporting and Disclosure Issues in the Division of Corporation Finance -- http://www.sec.gov/divisions/corpfin/internatl/cfirdissues1104.htm

#### B. Corporation Finance Staffing and Phone Numbers

Division Director - Alan Beller (202) 942-2800
Deputy Director - Martin P. Dunn (202) 942-2890
Deputy Director - Shelley Parratt (202) 942-2830

#### Operations

Associate Director (Disclosure Operations) - Paul Belvin (202) 942-7893
Associate Director (Disclosure Operations) - James Daly (202) 942-7893
Associate Director (Disclosure Operations) - Barry Summer (202) 942-7893

Senior Special Counsel (Disclosure Operations) - James Budge (202) 942-2830

### Disclosure Support and Other Offices

Associate Director (Legal) - Paula Dubberly (202) 942- 2900
Associate Director (Regulatory Policy) - Mauri Osheroff (202) 942-2840
Senior Counsel to the Director - Amy Starr (202) 942- 2810
Senior Counsel to the Director - Consuelo Hitchcock (202) 942-2810
Senior Special Counsel (Regulatory Policy) - Mark Green (202) 942-2840
Office of Chief Counsel - David Lynn, Chief (202) 942-2925
Office of Mergers and Acquisitions - Brian Breheny, Chief (202) 942-2920
Office of International Corporate Finance - Paul Dudek, Chief (202) 942-2990
Office of Rulemaking - Elizabeth Murphy, Chief (202) 942-2910
Office of Small Business Policy - Gerald Laporte, Chief (202) 942-2950
Office of Enforcement Liaison - Mary Kosterlitz, Chief (202) 942- 2925
Office of EDGAR and Information Analysis - Herbert Scholl, Chief (202) 942-2930

### Office of the Chief Accountant [fax (202) 942-9582]

Associate Director (Chief Accountant) - Carol Stacey (202) 942-2850

| Craig Olinger, Deputy Chief Accountant (202) 942-2850 | | |
|---|---|---|
| | Liaison to: | Foreign Private Issuers |
| Louise Dorsey, Associate Chief Accountant (202) 942-2960 | | |
| | Liaison to: | Office # 5 (Structured Finance, Transportation and Leisure) |
| | | Office # 8 (Real Estate and Business Services) |
| Todd Hardiman, Associate Chief Accountant (202) 942-2960 | | |
| | Liaison to: | Office # 1 (Health Care and Insurance) |
| | | Office # 10 (Electronics and Machinery) |
| Joel Levine, Associate Chief Accountant (202) 942-2960 | | |
| | Liaison to: | Office # 2 (Consumer Products) |
| | | Office # 3 (Computers and On Line Services) |
| Rachel Mincin, Associate Chief Accountant (202) 942-2960 | | |
| | Liaison to: | Office # 7 (Financial Services) |
| Leslie Overton, Associate Chief Accountant (202) 942-2960 | | |
| | Liaison to: | Office # 4 (Natural Resources and Food) |
| | | Office # 6 (Manufacturing and Construction) |
| Sondra Stokes, Associate Chief Accountant (202) 942-2960 | | |
| | Liaison to: | Office # 9 (Emerging Growth Companies) |
| | | Office # 11 (Telecommunications) |

**Assistant Directors (AD) and Senior Assistant Chief Accountants (SACA)**

| #1 Health Care and Insurance – AD - Jeffrey Riedler (202) 942-1840 | | | |
|---|---|---|---|
| | SACA - | Jim Rosenberg | (202) 942-1803 |
| #2 Consumer Products – AD - H. Christopher Owings (202) 942-1900 | | | |
| | SACA - | Jim Allegretto | (202) 942-1885 |
| #3 Computers and OnLine Services – AD - Barbara Jacobs (202) 942-1800 | | | |
| | SACA - | Craig Wilson | (202) 942-2949 |
| #4 Natural Resources and Food – AD - Roger Schwall (202) 942-1870 | | | |
| | SACA - | Barry Stem | (202) 942-1919 |

| #5 Structured Finance, Transportation and Leisure – AD - Max Webb (202) 942-1850 | | | |
|---|---|---|---|
| | SACA - | Joseph Foti | (202) 942-1952 |
| #6 Manufacturing and Construction – AD - Pam Long (202) 942-1950 | | | |
| | SACA - | John Hartz | (202) 942-1798 |
| #7 Financial Services – AD - Todd Schiffman (202) 942-1760 | | | |
| | SACA - | Don Walker | (202) 942-1799 |
| #8 Real Estate and Business Services – AD - Karen Garnett (202) 942-1960 | | | |
| | SACA - | Linda Van Doorn | (202) 942-1964 |
| #9 Office of Emerging Growth Companies – AD - John Reynolds (202) 942-2999 | | | |
| | SACA - | Tia Jenkins | (202) 942-1902 |
| #10 Electronics and Machinery – AD - Peggy Fisher (202) 942-1880 | | | |
| | SACA - | Martin James | (202) 942-1984 |
| #11 Telecommunications – AD - Larry Spirgel (202) 942-1990 | | | |
| | SACA - | Carlos Pacho | (202) 942-1876 |

### C. Division Employment Opportunities for Accountants

For more information about any of the positions or programs described below, contact Charlee Marcus, Program Support Specialist, at (202) 824-5553, or fax your resume to (202) 942-9652. You can also visit our website at http://www.sec.gov/jobs/jobs_accountants.shtml for current information about employment opportunities in the Division, salary and benefits, and how to apply for a federal job.

### 1. Staff Accountant

The full disclosure system for public companies is the foundation of the federal securities laws. Currently, the Division of Corporation Finance achieves the goal of improving the quality and timeliness of material disclosure to investors by selectively reviewing the periodic financial and other disclosures made by public companies. The Division is responsible for assuring full compliance with a number of new rules the Commission recently adopted that affect the disclosure of all public companies. Included are rules related to accelerated periodic reporting, certification of financial statements, use of non-GAAP financial measures, and MD&A disclosure about off-balance sheet arrangements and aggregate contractual obligations.

Corporation Finance accountants:

- review financial statements and disclosures for a variety of complex transactions, as well as interesting and unusual accounting, auditing and factual issues.

- review filings to identify potential or actual material accounting, auditing, financial reporting or disclosure deficiencies resulting from deviations from GAAP, GAAS or the accounting rules and policies of the SEC.

- interact with top professionals in the accounting and securities industries.

- influence accounting standards and practices.

- propose new and amended disclosure rules.

- field questions from registrants, prospective registrants and the public.

- offer guidance and counseling, either informally or through noaction letters.

Accountants in the division work directly with corporate officers, underwriters, outside accountants and counsel, as well as with division lawyers and financial analysts. Much of the work involves novel and unique accounting issues, financing and business structures. Accountants in the division review a variety of disclosure documents including registration statements; initial public offerings; proxy materials; annual reports; documents concerning tender offers; and filings related to mergers and acquisitions.

### 2. Professional Accounting Fellowships

The Division also has openings for up to ten positions for Professional Accounting Fellows for a nonrenewable term of two years. This program provides Accounting Fellows with in-depth exposure to the Commission's full disclosure system administered by the Division. Accounting Fellows, working in a team with other staff accountants and lawyers, review filings by public registrants to identify material accounting, auditing or financial reporting deficiencies resulting from deviations from GAAP, GAAS, and SEC rules and regulations.

### 3. Professional Academic Fellowships

The Commission offers fellowship opportunities in the Office of the Chief Accountant, the Division of Corporation Finance, and the Office of Economic Analysis for financial accounting and auditing professors; a fellowship typically lasts for 12 months (August 1-July 31). An academic fellowship at the SEC provides an unparalleled opportunity for a professor to be directly involved in the work of the Commission and to gain insight into the SEC's oversight and regulatory processes. An SEC fellowship is a notable way to spend a sabbatical year or a leave of absence and offers a set of memorable experiences that will greatly enhance subsequent teaching and publication activities.

The fellowship, which originated about six years ago, typically involves researching financial reporting issues in connection with Division policy or program initiatives, reviewing filings by public companies to identify significant accounting and disclosure problems, and developing and presenting training on emerging or controversial accounting issues for accountants and attorneys at the Commission. Requirements include a Master's or Ph.D. and teaching experience in upper-level/advanced financial accounting courses. Expertise in quantitative analysis and finance, as well as the ability to discuss issues in plain English, are plus factors.

While on sabbatical or leave of absence from the home university, an academic fellow maintains an employee relationship with the home institution, typically earning 12/9 of the usual 9-month academic salary (currently up to about $158,844), plus benefits and relocation expenses. [Note: The salary cap does *not* mean that an academic fellow's maximum 12-month salary is $158,844. Rather, $158,844 is the maximum salary that the SEC will reimburse to the school (all normal university benefits will also be reimbursed). The employing university is permitted to pay the professor more than this amount.]

Indicate your initial interest and request more information by sending an e-mail to one or more current academic fellows in Office of the Chief Accountant (Jonathan Glover gloverj@sec.gov; Audrey Gramling

gramlinga@sec.gov ), the Division of Corporation Finance (David Sherman shermand@sec.gov ), or Office of Economic Analysis (Agnes Cheng (chenga@sec.gov). Feel free to contact the current academic fellows to discuss the nature of the position.

Application reviews for the 2005 -2006 academic fellowships began in late 2004, and will continue until the positions are filled. Interviews will be conducted at the SEC headquarters in Washington, DC. Candidates' travel expenses cannot be reimbursed. The SEC's goal is to announce final selections by the Spring of 2005.

*To find out more about the experiences of three previous academic fellows, see Thomas J. Linsmeier's article in Accounting Horizons (September 1996) and articles by Steve Kolenda and Patricia Fairfield in the Financial Reporting Journal (Summer 2000.)*

*http://www.sec.gov/divisions/corpfin/acctdis030405.htm*

---

Home | Previous Page                                    Modified: 03/30/2005