# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

ANTONIO MARTINO,                                         24 Civ. 04987 (ALC) (SDA)

Defendant.

## DECLARATION OF SCOTT A. TAUB

I, Scott A. Taub, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been retained as an expert witness on behalf of the Securities and Exchange Commission ("SEC") in this action. I submit this Declaration in support of the SEC's response to Defendant Martino's letter to the Court dated March 10, 2026 related to his Request for Production No. 3 (a)-(c) ("Defendant's Request").

2. I understand that Defendant has requested documents related to public statements made by SEC staff in three publications:

- The "Report and Recommendation Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-To-Market Accounting", published December 30, 2008 ("2008 Section 133 Study").
- The version of "Current Accounting and Disclosure Issues in the Division of Corporation Finance", published March 4, 2005 ("2005 CADI").
- A press release entitled "SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting", issued September 30, 2008 ("Release 2008-234")

3. I have read the Defendant's Request for Production No. 3(a)-(c) and Defendant's letter to the Court dated March 10, 2026. This Declaration provides background information regarding the accounting standards that are the subject of the public statements referred to in Defendant's Request for Production No. 3(a)-(c), and provides my analysis and views regarding whether those public statements addressed the accounting issues in dispute in this action. My analysis and views were developed based my knowledge, experience, and expertise applying the accounting standards and related guidance and the information in the SEC's Complaint in this

matter.  I reserve the right to supplement or amend this Declaration in the event new or additional information becomes available.

## A        Qualifications.

4.        I have 36 years of accounting and auditing experience, including seven years as a financial statement auditor and 29 years in various roles as an accounting, auditing, and financial reporting expert.  For the past 19 years, I have provided consulting services related to accounting and financial reporting and litigation support services, primarily with regard to the application of United States Generally Accepted Accounting Principles ("GAAP"), International Financial Reporting Standards ("IFRS"), and the rules and regulations of the SEC.

5.        From September 2002 through January 2007, I was a Deputy Chief Accountant (and, for 14 months, Acting Chief Accountant) at the SEC.  I played a key part in the SEC's implementation of the reforms under the Sarbanes-Oxley Act.  I was also responsible for the day-to-day operations of the Office of the Chief Accountant ("OCA"), including resolution of accounting and auditing practice issues, rulemaking, and oversight of private sector standard-setting efforts and regulation of auditors.  I was also a member of the SEC staff between 1999 and 2001 as a Professional Accounting Fellow in OCA.

6.        From 1997 to 1999, I was a manager in Arthur Andersen's Professional Standards Group ("PSG"), and from 2001 to 2002, I was a partner in that group.  The role of the PSG was to consult on complex financial reporting matters; establish and disseminate Andersen's policies regarding financial reporting matters; and represent the firm before standards setters and regulators.  From 1990 to 1997, I was an auditor at Arthur Andersen.

7.        I have authored many articles and reports covering a variety of accounting and financial reporting issues and was the primary author of several SEC reports and publications.  I am also the author of CCH's Revenue Recognition Guide, a 600-page guide to revenue recognition, and CCH's Financial Instruments: A Comprehensive Guide to Accounting and Reporting, which provides over 500 pages of guidance on accounting for financial instruments.

8        A copy of my full curriculum vitae is attached as Appendix A.

## B.        Accounting Principles at Issue in the Matter

9.        The SEC's Complaint in this matter, filed July 1, 2024, summarizes certain accounting principles and requirements regarding debt securities held as investments.

10.     I understand from the SEC's Complaint in this matter that all of the debt securities relevant to the matter were classified as "available-for-sale" ("AFS").[1]

11.     AFS securities are measured at market (or "fair", as used in GAAP) value at each balance sheet date.  I understand from the SEC's Complaint that there is no dispute between the parties as to Silvergate's determinations of fair value of its AFS securities. Thus, GAAP and related guidance and discussion regarding the determination of fair value is not relevant to the action.

12.     When a security's fair value is less than its cost, the security is considered to be "impaired." [2] I understand from the SEC's Complaint that there is no dispute that Silvergate determined the market (or fair) value of many of its AFS securities to be less than their cost, and therefore, those investments were impaired.

13.     When an investment in a debt security is impaired, the holder is required to determine whether the impairment is "temporary" or "other-than-temporary."[3]  If the decrease in the value of an AFS security below its amortized cost is considered to be "other than temporary" ("OTTI"), that loss is recognized in net income, while temporary losses are not recognized as part of net income. There are three fact patterns that indicate an impairment of a debt security is "other than temporary."

- If the holder intends to (that is, it has decided to) sell the security, the impairment is considered other than temporary.[4]
- If the holder concludes that although it has not decided to sell the security, the evidence suggests that it is more likely than not that it will be required to sell the security before it recovers its cost, the impairment is considered other-than-temporary.[5]
- If the holder does not expect to recover its amortized cost (i.e., the holder does not expect the debt issuer to make enough of the contractually-required payments to recover its investment), an other-than-temporary impairment is considered to exist.[6]

14.     I understand from the SEC's Complaint that only the second bullet in the previous paragraph is at issue, and the key accounting issue relates to Silvergate's application of the

---

[1] AFS is one of three classifications used for investments in debt securities.  The other two are "held-to-maturity" ("HTM") and "trading."  The differences in accounting for the three classifications relate to how investments debt securities are measured on the balance sheet and whether and how decreases in market value are reflected in the financial statements.

[2] ASC 320-10-35-21.

[3] ASC 320-10-35-30.  As stated in that paragraph "*Other than temporary* does not mean permanent."

[4] ASC 320-10-35-33A.

[5] ASC 320-10-35-33B.

[6] ASC 320-10-35-33C.

standard requiring it to recognize an OTTI for impaired debt securities that, based on circumstances that existed at December 31, 2022, Silvergate was more likely than not to be required to sell.

## C.    History of OTTI Guidance

15.    While securities laws provide the SEC with authority to set accounting standards for public companies, the SEC has, for most of its existence, looked to the private sector for assistance in developing accounting standards.  For over 50 years, the Financial Accounting Standards Board ("FASB") has been the primary private sector standard setter in the US, and standards set by the FASB are recognized as "'generally accepted'" by the SEC. [7]  The FASB maintains the Accounting Standards Codification ("ASC"), which was created in 2009, as the repository of all authoritative GAAP. [8]  The content of the ASC was originally issued (in various types of documents with various name and numbering systems) by the FASB and other organizations that were authorized to promulgate accounting standards in the past.

16.    Through its interaction with registrants and other accountants, and through reviews of SEC filings, the SEC staff sometimes becomes aware of recurring accounting issues. In response, the SEC staff sometimes communicates its views on the application of GAAP through public statements, including, in some instances, through the issuance of a Staff Accounting Bulletin ("SABs").

17.    The FASB first published guidance requiring companies to evaluate declines in value of debt securities to determine whether those declines were temporary or "other than temporary" in 1993, in Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("SFAS 115"). [9]  Regarding impairment of debt securities, SFAS 115 set the principle that impairments should be recognized if they are considered to be "other than temporary."   The only guidance provided to help apply that principles was an "example" that an OTTI existed if it was considered probable that the holder of a debt security would not collect all amounts due under the contract. [10]

---

[7] U.S. Securities and Exchange Commission, "Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter," SEC Release Nos. 33-8221; 34-47743; FR-70, August 25, 2003.  *See also*, CFRP Section 101 (FR 70).

[8] Financial Accounting Standards Board, "ASC 105-10-05," available at https://asc.fasb.org/1943274/2147479442/105-10-05.

[9] Prior to 1993, accounting standards required losses on investments in equity securities to be recognized when declines in value were considered other than temporary.  While this guidance was not mandatory for investments in debt securities, practitioners often analogized to it, as no other authoritative guidance existed.

[10] SFAS 115, par. 16, which read "For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred. If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss)."

18.     SFAS 115 did not include any additional guidance on assessing whether an impairment was an OTTI, although additional guidance was requested.[11]

19.     In 2003, the SEC published Staff Accounting Bulletin No. 103, "Update of the Codification of Staff Accounting Bulletins" ("SAB 103").  SAB 103 updated existing SEC staff guidance on evaluating declines in value of investments in equity securities to also include debt securities.  The revised guidance was included in SAB Topic 5.M, and stated, in part:

> **Facts:** …Statement 115 does not define the phrase "other than temporary."
>
> …
>
> **Question:** Does the staff believe that the phrase "other than temporary" should be interpreted to mean "permanent"?
>
> **Interpretive Response:** No. The staff believes that the FASB consciously chose the phrase "other than temporary" because it did not intend that the test be "permanent impairment," as has been used elsewhere in accounting practice. The value of investments in marketable securities classified as either available-for-sale or held-to-maturity may decline for various reasons. The market price may be affected by general market conditions which reflect prospects for the economy as a whole or by specific information pertaining to an industry or an individual company. Such declines require further investigation by management. Acting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment.
>
> There are numerous factors to be considered in such an evaluation and their relative significance will vary from case to case. The staff believes that the following are only a few examples of the factors which, individually or in combination, indicate that a decline is other than temporary and that a write-down of the carrying value is required:
>
> a.  The length of the time and the extent to which the market value has been less than cost;
>
> b.  The financial condition and near-term prospects of the issuer, including any specific events which may influence the operations of the issuer such

---

[11] In SFAS 115, par. 114 (Basis for Conclusions), the FASB wrote "During the course of this project, some have urged the Board to develop guidance that would resolve recent practice problems about the application of other-than-temporary impairment. Although the Board believes that other-than-temporary impairment exists if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of the security, the Board believes that providing comprehensive guidance on other-than-temporary impairment involves issues beyond the scope of this Statement."

Page 5

as changes in technology that may impair the earnings potential of the investment or the discontinuance of a segment of the business that may affect the future earnings potential; or

c. The intent and ability of the holder to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in market value.

Unless evidence exits to support a realizable value equal to or greater than the carrying value of the investment, a write-down to fair value accounted for as a realized loss should be recorded.

20. As noted in footnote 11 above, the FASB understood in 1993 that accounting practitioners believed additional guidance on assessing OTTI was needed. SAB Topic 5M provided some of that guidance. However, the application the OTTI requirements was still inconsistent and difficult. While accountants have always been required to use professional judgment in applying accounting standards, the principle of OTTI was not well-defined in SFAS 115, and the SEC staff's guidance, while providing factors to consider, did little to help with the vagueness of the principle.

21. In 2005, the FASB issued FASB Staff Position No. FAS 115-1 and FAS 124-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments" ("FSP FAS 115-1"), which added to the FASB's literature a clear requirement to consider the discussion in SAB Topic 5M.[12] In addition, this FSP noted that an OTTI may exist even if the holder of the investment has not made a decision to sell the investment.[13] This addition did little to help with the application of the OTTI principle. Thus, even after the additions of SAB Topic 5M and FSP FAS 115-1, the application of the OTTI guidance continued to be inconsistent and difficult.

**D.    OTTI Discussion in Documents that are the Subject of Defendant's Request**

22. In the 2005 CADI (cited in Defendant's Request for Production No. 3(b)), the staff in the SEC's Division of Corporation Finance provided additional non-authoritative guidance based on their experiences working with registrants in applying the OTTI requirements under the guidance available at that time. The 2005 CADI stated:[14]

---

[12] FSP FAS 115-1, par. 13.

[13] FSP FAS 115-1, par. 14.

[14] 2005 CADI, Topic II.F.1, "Other Than Temporary Declines in Value". This subtopic also included discussion of the difficulties in determining market or fair value of debt and equity securities. As discussed previously, the determination of market or fair value is not relevant to this matter as the SEC has not challenged Silvergate's determinations of the fair value of its AFS securities.

> Bright line or rule of thumb tests are not appropriate for evaluating other-than-temporary impairments. The determination of whether a decline is other than temporary must be made using all evidence that is available to the investor, and not just that related to the registrant such as its financial condition and near-term prospects, but also the severity and duration of the decline in fair value and the investor's intent and ability to hold an investment for a reasonable period of time sufficient for a forecasted recovery. Guidance in evaluating whether a security's recent decline in value is other than temporary has in the past only been found in SAB Topic 5:M, Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities.

23.     While the discussion of OTTI in the 2005 CADI reiterated the SEC staff's views, it did not substantively change the subjectivity of the OTTI analysis, and concerns about the ability of practitioners to consistently apply the principle remained.

24.     The difficulty of applying the OTTI guidance became a larger problem in 2008 due to market conditions at the time.  The FASB and the SEC worked together in an attempt to address the issue.  Some of the activities were described in Release 2008-234 (cited in Defendant's Request for Production No. 3(c)).  Release 2008-234 was primarily focused on difficulties in determining the fair value of securities in the market conditions that existed at the time, as it noted that "The current environment has made questions surrounding the determination of fair value particularly challenging for preparers, auditors, and users of financial information. The SEC's Office of the Chief Accountant and the staff of the FASB have been engaged in extensive consultations with participants in the capital markets, including investors, preparers, and auditors, on the application of fair value measurements in the current market environment."

25.     Release 2008-234 also addressed the evaluation of OTTI under the guidance available in 2008.  The discussion of OTTI, however, largely repeated previous discussion from SAB Topic 5M and the 2005 CADI, and did not substantively enhance the accounting profession's ability to apply the OTTI guidance.

26.     OTTI was again discussed by the SEC staff in the 2008 Section 133 Study (cited in Defendant's Request for Production No. 3(a)) under the guidance available in 2008.  Although largely focused on the determination of fair value and its use in accounting, the Section 133 Study noted that "The current global economic crisis has highlighted difficulties in performing OTTI evaluations."[15]  The Section 133 Study included several recommendations, including one related to "The Accounting for Financial Asset Impairments".[16]  That recommendation stated, in part:

---

[15] Section 133 Study, page 30.
[16] Section 133 Study, pages 204-205.

The FASB should evaluate the need for modifications (or the elimination) of current OTTI guidance to provide for a more uniform system of impairment testing standards for financial instruments.   While there are a number of alternative models that the FASB should consider, several commenters have suggested the development of a model that would require recognizing impairments through income related only to credit losses (calculated on an incurred loss basis consistent with impairments on loans), while the remaining decline in fair value of an investment (the portion that is not related to incurred losses) would be recognized in OCI.  The Staff believes that this model has the potential to provide investors with both fair value information as well as transparent information regarding the cash flows management expects to receive by holding investments, rather than through accessing the market currently.

…

Further, in reassessing impairment the FASB should consider whether the "ability and intent to hold to recovery" test under SFAS No. 115 is sufficiently operational, including whether the operation of the model in practice is consistent with the notion of an AFS security.

### E.    OTTI Guidance that Was Applicable in 2022

27.    The guidance on OTTI that was applicable for Silvergate for its fiscal year ended December 31, 2022 was first issued on April 9, 2009, in FASB Staff Position No. FAS 115-2 and FAS 124-2, "Recognition and Presentation of Other-Than-Temporary Impairments" ("FSP FAS 115-2").  FSP 115-2 amended "…the other-than-temporary impairment guidance in U.S. GAAP for debt securities to make the guidance more operational…"[17]

28.    The most significant change to the evaluation of whether an impairment in a debt security should be considered other than temporary related to the previous requirement that "…to avoid recognizing an other-than-temporary impairment an investor must assert that it has both the intent and the ability to hold a security for a period of time sufficient to allow for an anticipated recovery in its fair value to its amortized cost basis."[18]  That requirement was replaced with the guidance summarized in paragraph 13 above.  The FASB explained that:

the Board believes it is more operational for an entity to assess whether the entity (a) has the intent to sell the debt security or (b) more likely than not will be required to sell the debt security before its anticipated recovery (for example, if its cash or working capital requirements or contractual or regulatory obligations indicate that the debt security will be required to be sold before the forecasted

---

[17] FSP 115-2, par. 2.
[18] FSP 115-2, par. 7.

recovery occurs). If either of these conditions is met, the investor must recognize an other-than-temporary impairment.[19]

29.     Shortly after FSP FAS 115-2 was issued, the SEC issued Staff Accounting Bulletin 111, which effectively repealed SAB Topic 5M with regard to debt securities.  This was done in recognition of the fact that the FASB's new standard had superseded the requirements that SAB Topic 5M's guidance was intended to assist in applying

**F.      Relevance of Discussion in Documents That are the Subject of Defendant's Request**

30.     The discussions of the difficulties and deficiencies in the OTTI guidance in the 2005 CADI, Release 2008-234, and the 2008 Section 133 Study (i.e., the subject of Defendant's Request for Production No. 3) were largely focused, as described previously, on the difficulty experienced by practitioners in (1) making judgments about whether an entity had the ability and intent to hold a security until its value recovered from an impairment, and (2) consistently applying the guidance to difficult fact patterns.  Those difficulties arose because the principle in SFAS 115 was vague and imprecise.

31.     As discussed above, the FASB stated that it issued FSP 115-2 because it believed the "new" requirement to be "more operational" than the "intent and ability to hold" requirement that it replaced.  In issuing the FSP, the FASB was intending to directly respond to the concerns and recommendation expressed in the SEC's Section 133 Study.

> One of the recommendations in the study was that the FASB reassess current impairment accounting models for financial instruments. The SEC recommended that the FASB "evaluate the need for modifications (or the elimination) of current OTTI [other-than-temporary impairment] guidance to provide for a more uniform system of impairment testing standards for financial instruments." The SEC also noted that a model that would require that only credit losses be recognized in income with the remaining decline in fair value of an investment being recognized in other comprehensive income "has the potential to provide investors with both fair value information as well as transparent information regarding the cash flows management expects to receive by holding investments, rather than through accessing the market currently."[20]

32.     That description of the SEC's recommendation is consistent with the requirements the FASB included in FSP FAS 115-2.  The FSP required, as the SEC recommended in the Study, that all "credit losses" (that is, losses that relate to expectations that the issuer of the security may not make all of the contractual payments) be recognized in net income in all

---

[19] FSP 115-2, par. 7.
[20] FSP FAS 115-2, par. 4.

cases.[21]  The FSP also required that all losses be recognized in P&L when the holder intends to sell or more likely than not will be required to sell – that is, all losses are recognized in P&L if the entity expects to receive cash flows "through accessing the market currently".  So, it is clear that the FSP directly adopts the principles recommended by the SEC in the Section 133 Study.

33.     The fact that the FSP FAS 115-2 adopted the principles laid out in the 2008 Section 133 Study wasn't surprising, as the FASB and SEC had been working together to address the issues for some time, as evident from Release 2008-234, which was a joint press release of the SEC and FASB staffs.  Release 2008-234 was cited in the Section 133 Study as one of the prior efforts to address concerns that arose out of the "Global Economic Crisis".[22]

34.     Thus, it is clear that FSP FAS 115-2 was intended to replace the previous requirements related to OTTI for debt securities with guidance that would be easier to apply and more likely to applied consistently.

35.     This is precisely what has occurred in practice.  The SEC staff has not made any public statements indicating widespread difficulty in applying the OTTI requirements for AFS debt securities since FSP FAS 115-2 was adopted.

36.     Further, in 2016, the FASB considered, as part of a larger project on impairment of investments, changing the OTTI requirements for AFS debt securities again.  However, after requesting public comments, the FASB did not to make significant changes, in part, because some respondents to the request for comment "…stated that the OTTI model is well understood by investors and is applied consistently by preparers."[23]

## G.    Conclusion

37.     Experience in the application of the OTTI requirements for debt securities since the issuance of FSP FAS 115-2 in 2009 has shown that the new standards do not suffer from the deficiencies of the pre-2009 standards.  The concerns regarding the application of OTTI requirements in the documents that are the subject of Defendant's Document Request No. 3 were all expressed in regard to the old requirements, and the SEC has not made statements citing similar concerns with the application of the requirements adopted with the issuance of FSP FAS 115-2, which are the requirements that applied to Silvergate in 2022.  As such, the concerns expressed in the 2005 CADI, Release 2008-234, and the 2008 Section 133 Study are plainly not related or relevant to Silvergate's consideration of OTTI for its AFS debt securities in 2022.

---

[21] See the third bullet in paragraph 13 of this Declaration.
[22] Section 133 Study, page 192.
[23] Accounting Standards Update No. 2016-13, par. BC77.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:    March 16, 2026
                Chicago, Illinois


_____
Scott A. Taub

**Appendix A**

**Scott A. Taub, CPA**
**Managing Director, Financial Reporting Advisors LLC**
**100 N. LaSalle St, Suite 2215**
**Chicago, IL  60602**
**312-345-9105**
**taub@finra.com**

Scott A. Taub is a Managing Director of Financial Reporting Advisors, LLC (FRA).  Based in Chicago, Illinois, FRA provides consulting services related to accounting and SEC reporting.  FRA specializes in applying generally accepted accounting principles and SEC disclosure regulations to complex business transactions, offering clients an unbiased assessment of the accounting and disclosure requirements as applied to their situation.  FRA also provides litigation support and expert services, and FRA's partners participate in activities to improve financial reporting and the capital markets.

Mr. Taub is the author of the Wolters Kluwer *Revenue Recognition Guide*, a 600-page comprehensive guide to accounting for revenue recognition under US GAAP and IFRS, and was a member of the FASB/IASB Joint Transition Resource Group for Revenue Recognition.  He is also a co-author of Wolters Kluwer's *Financial Instruments: A Comprehensive Guide to Accounting and Reporting.* Mr. Taub was a member of the IFRS Interpretations Committee (IFRIC) from 2008-2014, and was an original member of the Financial Accounting Standards Board (FASB) Valuation Resource Group.  Mr. Taub wrote a periodic column for Compliance Week on financial reporting developments from 2007 through 2016.

From September 2002 through January 2007, Mr. Taub was a Deputy Chief Accountant at the Securities and Exchange Commission (SEC), during which time he served as Acting Chief Accountant for 14 months. He played a key role in the SEC's implementation of the accounting reforms under the landmark Sarbanes-Oxley Act, and was responsible for the day-to-day operations of the Office of the Chief Accountant, including resolution of accounting and auditing practice issues, rulemaking, oversight of private sector standard-setting efforts, and regulation of auditors.

Mr. Taub represented the SEC in many venues, including advisory committees of the FASB and International Accounting Standards Board (IASB), and in front of the House Financial Services Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises.  He also served as the SEC Observer to the FASB's Emerging Issues Task Force (EITF) and as Chair of the Accounting and Disclosure committee of the International Organization of Securities Commissions (IOSCO).  Mr. Taub also was a member of the SEC staff between 1999 and 2001 as a Professional Accounting Fellow.

Prior to September 2002, Mr. Taub was a partner in Arthur Andersen's Professional Standards Group (PSG). The role of the PSG within Andersen was to consult on complex financial reporting matters; establish and disseminate Andersen's policies regarding financial reporting matters; and represent the firm before various standards setters including the FASB, SEC, AICPA, and IASB.  Mr. Taub consulted and authored interpretive guidance for Andersen on a wide variety of reporting issues, including revenue recognition, business combinations and goodwill, compensation arrangements, intangible assets, impairment and investment accounting.  Prior to joining the PSG, he was member of the audit practice in the firm's Detroit office serving publicly held and privately owned companies in a variety of industries.

Mr. Taub is a frequent speaker, having addressed numerous audiences sponsored by a variety of organizations such as the Financial Executives International, the AICPA, the Institute of Management Accountants, the Securities Regulation Institute, and the Practising Law Institute.  He was the primary author of several SEC reports and publications, including the *Report and Recommendations Pursuant to*

*Section 401(c) of the Sarbanes-Oxley Act of 2002 On Arrangements with Off-Balance Sheet Implications, Special Purpose Entities, and Transparency of Filings by Issuers* and the *Study Pursuant to Section 108(d) of the Sarbanes-Oxley Act of 2002 on the Adoption by the United States Financial Reporting System of a Principles-Based Accounting System.*

Mr. Taub received an undergraduate degree in economics in 1990 from the University of Michigan in Ann Arbor.  He won the William A. Paton Award for his performance on the CPA exam.  In 2005 Mr. Taub won the SEC's award for Supervisory Excellence. He is a licensed CPA in Illinois.

## EXPERIENCE

**Financial Reporting Advisors, LLC**
*Managing Director*                                                                                          *1/07-present*
- Advise clients on application of US GAAP, IFRS and SEC regulations to complex transactions.
- Draft and review language for clients to ensure they provide appropriate disclosures regarding their business, risks, and financial results.
- Provide assistance in responding to SEC comment letters and investigations.
- Explain new and novel accounting and reporting guidance to client financial reporting staff.
- Provide advice and counsel in litigation involving financial disclosures in SEC filings.
- Former member of the FASB/IASB Joint Transition Resource Group for Revenue Recognition, IFRS Interpretations Committee and FASB's Valuation Resource Group.
- Authored a bi-monthly column on financial reporting for Compliance Week for 9 years.
- Testified as an expert witness in criminal and regulatory matters in federal courts, a matter in the United States Tax Court and multiple arbitration proceedings.
- Provided deposition testimony as an expert in multiple civil cases and arbitration proceedings.
- Submitted expert reports in arbitrations, administrative proceedings, and contractual disputes.

**United States Securities and Exchange Commission (SEC)**
*Deputy Chief Accountant*                                                                                    *9/02-1/07*
*Acting Chief Accountant*                                                                 *5/03-9/03 and 11/05-8/06*
- Led staff in the Office of the Chief Accountant in all accounting interpretive and policy matters.
- Formulated and implemented SEC policies on significant national issues, including accounting for stock options and pensions, fair value accounting, and transparency in reporting.
- Responsible for resolution of issues regarding US and international accounting standards.
- Provided oversight of and input to standard-setting activities of the FASB and IASB.
- Represented the SEC in front of Congress, standard-setters, auditing firms, and regulators.
- Developed strategies to harmonize global financial reporting and regulatory systems as chair of a committee of the International Organization of Securities Commissions.
- Managed implementation of significant portions of the Sarbanes-Oxley Act of 2002, including the formation and start-up of the Public Company Accounting Oversight Board (PCAOB).
- As Acting Chief Accountant, added oversight of the PCAOB and auditor independence matters.
- Served as primary advisor to the Commission on all accounting, auditing and financial disclosure.
- Managed growth of office from 30 people to over 60.

*Professional Accounting Fellow*                                                                          *6/99-6/01*
- Selected for a highly competitive fellowship at the SEC.
- Developed SEC positions on accounting and auditing interpretive and standard-setting matters.

**Arthur Andersen LLP**

| | |
|---|---|
| *Professional Standards Group, Partner* | *8/01-8/02* |
| *Professional Standards Group, Manager* | *7/97-5/99* |
| *Audit Manager/Senior/Staff* | *7/90-7/97* |

- Advised audit engagement teams and clients on difficult accounting issues.
- Developed Arthur Andersen's positions on the application of accounting standards.
- Became recognized expert in accounting for revenue recognition, business combinations, compensation arrangements, intangible assets, investment accounting.
- Contributed to Arthur Andersen's researchable database of guidance, articles, and Q&A's for use by clients and engagement teams in understanding accounting literature.
- Planned, supervised and executed audits of clients ranging from small owner-operated companies to publicly-traded Fortune 500 entities.
- Led the coordination of global audits of two large multi-national companies.
- Participated in more than 10 public debt and equity offerings.
- Supervised staffs of up to 15 auditors while consistently completing audits on time and on budget.

## TESTIMONY AND EXPERT REPORTS (past four years)

*Lehigh County Employees' Retirement System, vs. Novo Nordisk A/S, et al (Case No. 3:17-cv-00209-BRM-LHG), United States District Court, District of New Jersey* – Expert report and deposition testimony on behalf of Novo Nordisk A/S

*MetroPCS California, LLC v. Alice Reynolds, President of the California Public Utilities Commission, in her official capacity, et. al. (Case No. 3:17-cv—5959-SI), United States District Court Northern District of California* – Expert report, deposition testimony, and trial testimony on behalf of MetroPCS California, LLC

*Hyatt Hotels Corporation & Subsidiaries v. Commissioner of Internal Revenue (Docket No. 13858-17), United States Tax Court* – Expert report and trial testimony on behalf of Hyatt Hotels Corporation & Subsidiaries

*Securities and Exchange Commission against Karen Rosenberger and Joanna Lanni, No. 22 Civ. 4736 (DLC) (SLC)* – Expert report and deposition testimony on behalf of the Securities and Exchange Commission.

*Votorantim S.A. v . ArcelorMittal Brasil S.A. and ArcelorMittal Spain Holding SL (ICC Case No. 27284/RLS)* – Expert report on behalf of Votorantim S.A.

**PUBLICATIONS (past ten years)**

*CCH Publications Revenue Recognition Guide* -- Originally written in 2002 and updated annually, a 600 page comprehensive guide to accounting for revenue recognition, the first of its kind for any accounting topic.

*CCH Publications Financial Instruments: A Comprehensive Guide to Accounting and Reporting* – An 800 page guide to accounting for financial instruments (co-author).

*Compliance Week* (bi-monthly columnist 2007-2016) – Columns on a variety of financial reporting topics.

**SELECTED SPEECHES**
(available at www.sec.gov)

- The Future of Financial Reporting (June 8, 2006)
- Looking Forward and Back at Financial Reporting (June 6, 2006)
- Fostering Accuracy and Transparency in Financial Reporting: Testimony before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises (March 29, 2006)
- International Convergence and Public Oversight of Accounting and Auditing (May 20, 2004)
- The SEC Internal Control Reporting Rules and Thoughts on the Sarbanes-Oxley Act (May 29, 2003)

**EDUCATION AND HONORS**

- Bachelors in Economics, with Honors -- University of Michigan, 1990
- Paton Accounting Award – State of Michigan, 1990 (highest score on CPA exam)
- Award for Supervisory Excellence at the Securities and Exchange Commission, 2005